**Exhibit B-1**

**Excerpts from the Deposition of Keisha Jones, dated January 10, 2013, Pages 1-94**

```
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   ----------------------------------x
 5   KEISHA JONES,
 6                          Plaintiff,
                                   Civil Action No.
 7           -against-              11CV9136(CM)(KNF)
 8   EQUIFAX, INC., EXPERIAN INFORMATION
     SOLUTIONS, INC., TRANS UNION, LLC,
 9   BILATERAL CREDIT CORP., LLC,
     HAHNEMANN UNIVERSITY HOSPITAL,
10   CENTRAL FINANCIAL CONTROL,
     COMCAST CABLE,
11
                          Defendants.
12   ----------------------------------x
13                       January 10, 2013
                         9:55 a.m.
14
15
16
17
18       Videotaped Deposition of KEISHA JONES,
     taken by Defendants, pursuant to Notice, at the
19   offices of Jones Day, 222 East 41st Street, New
     York, New York, before William Visconti, a
20   Shorthand Reporter and Notary Public within and
     for the State of New York.
21
22
23
24
25
```

KEISHA JONES - 1/10/2013

```
 1
 2   A P P E A R A N C E S:
          FISHMAN & MALLON, LLP
 3        Attorneys for Plaintiff
                305 Broadway
 4              New York, NY 10007
 5        BY:    KEVIN MALLON, ESQ.
                kmallon@lawsuites.net
 6
 7        JONES DAY
          Attorneys for Experian
 8              222 East 41st Street
                New York, NY 10017-6702
 9
          BY:    JOSEPH A. STRAZZERI, ESQ.
10              jastrazzeri@jonesday.com
11
          MORAN KARAMOUZIS LLP
12        Attorneys for Comcast
                One Penn Plaza, 36th Floor
13              New York, NY 10119
14        BY:    ANDREW P. KARAMOUZIS.  ESQ.
                akaramouzis@mka-law.com
15
16
17
     ALSO PRESENT:
18
          JONATHAN POPHAM, Videographer
19
20
21
22
23
24
25
```

1

2            THE VIDEOGRAPHER:   This is the video

3      operator speaking, Jonathan Popham, of

4      Merrill Corporation, today is January 10th,

5      2013 and the time is 9:55 a.m.   We are at the

6      offices of Jones Day, 222 East 41st Street,

7      New York, New York to take the videotape

8      deposition of Keisha Jones in the matter of

9      Keisha Jones versus Equifax Incorporated, et

10     al. in the United States District Court for

11     the Southern District of New York.   Case

12     number 11 CV 9136 (CM) (KNF) will counsel

13     introduce themselves for the record.

14            MR. MALLON:   Kevin Mallon of

15     Fishman & Mallon for the Plaintiff.

16            MR. STRAZZERI:   Joseph Strazzeri with

17     the law firm of Jones Day representing

18     Experian Information Solutions Incorporated.

19            MR. KARAMOUZIS:   Andrew Karamouzis of

20     the firm Moran Karamouzis for Comcast Cable.

21            THE VIDEOGRAPHER:   Will the court

22     reporter, Bill Visconti, please swear in the

23     witness.

24

25

1

2              K E I S H A    J O N E S,

3        having been first duly sworn by the Notary Public,

4        was examined and testified as follows:

5                MR. STRAZZERI:  Before we begin I

6        would just like to put on the record two

7        stipulations that we have established through

8        the discovery process but I want them to

9        appear on the transcript.

10               One is a stipulation that plaintiff is

11        not claiming actual damages in this action

12        and that includes economic loss, injury to

13        reputation or emotional distress or any form

14        of actual damages.

15               MR. MALLON:   That's correct.

16               MR. KARAMOUZIS:   To be clear that is

17        against all Defendants.

18               MR. MALLON:   That's correct.

19               MR. STRAZZERI:  The other stipulation

20        that I wanted to confirm is that the only

21        inaccuracy alleged in this action pertains to

22        CFC Hahnemann University Hospital and Comcast

23        Cable.

24               MR. MALLON:   Plus those are the only

25        inaccurate accounts, but there are addresses

KEISHA JONES - 1/10/2013

```
 1

 2          and personal information on the report that

 3          was not accurate as well.

 4               MR. STRAZZERI:   Anything else?

 5               MR. MALLON:   No.

 6   EXAMINATION CONDUCTED BY MR. STRAZZERI:

 7          Q.    Good morning.  My name is Joseph

 8   Strazzeri and I'm an attorney with the law firm of

 9   Jones Day and we represent Experian Information

10   Solutions in this lawsuit.  Can you state your

11   name and full address for the record?

12          A.    Keisha Jones, Post Office 634,

13   Bronx, New York 10451.

14          Q.    What is your physical address?

15          A.    1020 Grand Concourse, Bronx, New

16   York 10451.

17          Q.    What apartment?

18          A.    It is not my apartment.

19          Q.    Which apartment do you live at 1020

20   Grand Concourse?

21          A.    I lived in 24D.

22          Q.    Which apartment do you currently

23   live?

24          A.    I don't live there, I stay there.

25   So I'm there sometimes and sometimes I'm not
```

```
 1                    KEISHA JONES
 2   there.
 3        Q.      What type of building is 1020 Grand
 4   Concourse?
 5        A.      High-rise building.
 6        Q.      Where in the building do you stay?
 7        A.      Fifth floor.
 8        Q.      Which apartment?
 9        A.      5X.
10        Q.      Describe what you mean when you say
11   you don't live there?
12        A.      Someone is allowing me to stay
13   there until I'm able to get back on my feet.
14        Q.      Is there somewhere else that you
15   live other than apartment 5X?
16        A.      There is an apartment that I stay
17   at in Queens.
18        Q.      What is the address?
19        A.      107-27 154th Street.
20        Q.      We will get to the addresses in
21   more detail.  Have you ever had your deposition
22   taken before?
23        A.      Yes.
24        Q.      When?
25        A.      A few years ago, I don't remember
```

```
1                    KEISHA JONES

2   the exact date, but it was Jones v. Commerce Bank.

3        Q.       What was the nature of that

4   lawsuit?

5        A.       Stolen money out of a bank account

6   and it was my contention that is where the

7   identity theft stemmed from.

8        Q.       So you were a Plaintiff in the

9   lawsuit?

10       A.       Correct.

11       Q.       And your deposition was taken in

12  that capacity as Plaintiff?

13       A.       Correct.

14       Q.       Has your deposition been taken at

15  any other time?

16       A.       No.

17       Q.       It sounds like you have had some

18  experience in this process.  During the deposition

19  I will ask you questions and my questions and your

20  answers will be recorded by the court reporter

21  that is sitting next to us.  You will need to

22  speak up when giving your response so that the

23  court reporter can hear you.  You also need to

24  give a verbal response as you have because the

25  court reporter cannot record nods of the head or
```

KEISHA JONES - 1/10/2013

```
 1                         KEISHA JONES
 2    contexts?
 3            A.      I have, but not for business
 4    purposes.
 5            Q.      People know and refer to you as Kay
 6    Jones?
 7            A.      Some do.
 8            Q.      What is your date of birth?
 9            A.      ███/70.
10            Q.      Where were you born?
11            A.      New York City.
12            Q.      Where in New York?
13            A.      Manhattan.
14            Q.      State your father's name?
15            A.      Walter Jones.
16            Q.      And your mother's name?
17            A.      Kathleen Jones.
18            Q.      What is your Social Security
19    Number?
20            A.      ███-5746.
21            Q.      Have you ever had any other social
22    security numbers?
23            A.      No.
24            Q.      Have you ever used a different
25    social security number?
```

```
1                        KEISHA JONES
2          A.     No.
3                 (Jones Exhibit 1 for identification,
4          Copy of Miss Jones' New York State driver's
5          license.)
6          Q.     I show you, Miss Jones, a document
7    marked Jones Exhibit 1.  It is document that I
8    received from your attorney yesterday.  Do you
9    recognize the document?
10         A.     Yes.
11         Q.     What is it?
12         A.     It is my New York State driver's
13   license.
14         Q.     Is it a true and accurate copy of
15   it?
16         A.     Yes, it is.
17         Q.     It was issued in June, 2010?
18         A.     Correct.
19         Q.     What is the P.O. Box number that
20   you list on the license?
21         A.     524081.
22         Q.     Is that your current post box
23   number?
24         A.     No, actually I have to update that.
25         Q.     When was this the P.O. Box number
```

```
 1                     KEISHA JONES
 2   that you used?
 3         A.    I'm sorry?
 4         Q.    When was this your post box, the
 5   number that appears -- let me clarify.
 6               The number that appears on your
 7   driver's license, when was that your post box,
 8   post office box?
 9         A.    When it was issued.
10         Q.    So June, 2010 you were using P.O.
11   Box number 524081?
12         A.    For my driver's license, correct.
13         Q.    What do you mean when you say for
14   your driver's license?
15         A.    This is the P.O. Box that appears
16   on my driver's -- that appears on my driver's
17   license.  In terms of documents and mail and
18   regular correspondence that goes to the P.O. Box
19   that I stated as my current address.
20         Q.    How many P.O. Boxes do you have?
21         A.    Two.
22         Q.    How many P.O. Boxes do you
23   currently have?
24         A.    Two.
25         Q.    Identify both of them?
```

```
 1                    KEISHA JONES
 2        A.     P.O. Box 634 Bronx, New York 10451.
 3        Q.     What is the second one?
 4        A.     I don't recall the box number
 5   offhand, I have to look it up.  I don't carry it
 6   with me.
 7        Q.     For how long have you used P.O.
 8   Box 634?
 9        A.     More than ten years.
10        Q.     For what purpose do you use P.O.
11   Box 634?
12        A.     All correspondence with the
13   exception of anything that comes from the
14   Department of Motor Vehicles.
15        Q.     Do you use it for other official or
16   business purposes other than the Department of
17   Motor Vehicles?
18        A.     I'm sorry?
19        Q.     Do you use P.O. Box 634 for other
20   business or official purposes?
21        A.     I use P.O. Box 634 for all
22   correspondence and mail except for anything from
23   motor vehicles.
24        Q.     So other government or official
25   business you would use P.O. Box 634?
```

```
 1                    KEISHA JONES

 2        A.      Correct.

 3        Q.      And you referenced another P.O. Box

 4   that you currently have.

 5        A.      Yes, but I don't have the full

 6   address.

 7        Q.      For how long have you had that

 8   other P.O. Box?

 9        A.      I think it has been -- I think I

10   opened that box in June, I believe June of 2012.

11        Q.      For what purpose did you open that

12   P.O. Box?

13        A.      To transition over to make sure

14   that my driver's license information gets from

15   this box to a different address, that other box.

16   It is for motor vehicles.

17        Q.      Why do you have a separate P.O. Box

18   for motor vehicles?

19        A.      Because as my driver's license was

20   compromised when my identity was stolen, a part of

21   the information that I received in the Commerce

22   case was that and from the New York City Police

23   Department is that identity thief used my personal

24   information to go to DMV in Pennsylvania and

25   obtain authentic identification.
```

```
 1                    KEISHA JONES
 2              I'm not sure it was a driver's
 3   license or a nondriver's license but NYPD
 4   confirmed that it was a valid Pennsylvania DMV ID
 5   or license using my personal information with
 6   fraudulent documents.
 7         Q.    For what reason do you have a
 8   separate P.O. Box for Department of Motor Vehicles
 9   correspondence?
10         A.    Because I wanted to isolate all
11   information that would be coming from DMV with
12   respect to this because my fear is that something
13   would get attached to my driver's license and my
14   biggest fear is being falsely arrested for something
15   that I didn't do knowing that identity thieves can
16   go as far as getting authentic documents from
17   Department of Motor Vehicles with fraudulent
18   information.
19         Q.    Do you have a driver's license in
20   any other state other than New York?
21         A.    I do not.
22         Q.    Is the document marked Jones
23   Exhibit 1 the only image of the only driver's
24   license that you have?
25         A.    That is my driver's license that I
```

```
 1                       KEISHA JONES

 2    have that belongs to me.  I can't say that there

 3    is no other driver's license in the other 49

 4    states that an identity thief might have.  That is

 5    what I learned as a part of the whole process with

 6    Commerce and that is information that I got from

 7    the New York Police Department and DMV.

 8              Q.     Is the document marked Jones

 9    Exhibit 1 the only driver's license shall, a copy

10    of the only driver's license that you have?

11              A.     That is correct.

12              Q.     So, since opening the other P.O.

13    Box in June, 2012, have you used it for any

14    purpose?

15              A.     No, it is just for purposes of DMV.

16    So I actually have to go and get this updated.

17              Q.     To date, have you used the other

18    P.O. Box for any purpose?

19              A.     No.

20              Q.     Since obtaining the other P.O. Box

21    in June, 2012 you haven't notified the DMV of it

22    yet?

23              A.     I have notified DMV, so they are

24    aware of it.  I have to go to DMV and actually get

25    another license -- I mean get --
```

```
 1                    KEISHA JONES

 2        Q.      Go ahead and finish.

 3        A.      To get it updated.

 4        Q.      How did you notify DMV?

 5        A.      I called DMV.

 6        Q.      When did you call them?

 7        A.      I called them periodically

 8  throughout the year, so I call them maybe once or

 9  twice so far, once or twice in 2012.

10        Q.      Do they except change of addresses

11  by telephone?

12        A.      Yes, they do.

13        Q.      But you haven't -- have you been

14  instructed to obtain a new license?

15        A.      They said when I have a chance I

16  can -- they said I can go in and get a new one.

17  They wouldn't just mail me one with the change

18  over the phone, I have to go in.

19        Q.      Have you received any

20  correspondence from the Department of Motor

21  Vehicles at the new post office number?

22        A.      No.

23        Q.      Let's talk about the P.O. Box

24  number that appears on your license.  When did you

25  open that P.O. Box?
```

KEISHA JONES - 1/10/2013

1                        KEISHA JONES

2          A.       I don't remember the date that I

3     opened it.

4          Q.       In which year?

5          A.       I believe it was 2010.

6          Q.       Have you used it for any purpose

7     other than your New York State driver's license?

8          A.       I would get mail and if I got -- if

9     I ordered something like, you know, something like

10    from Amazon let's say.

11         Q.       So you receive correspondence from

12    other than the DMV at that P.O. Box?

13         A.       Correct.

14         Q.       Sometimes you use P.O. Box 634 for

15    correspondence and sometimes you use P.O.

16    Box 524081?

17         A.       No.  524081 would be for if I'm

18    receiving a package or something of that nature.

19    P.O. Box 634 is for all of my business, the IRS,

20    all of my personal business.  Tax returns,

21    anything that would come from the IRS or anything

22    other than DMV.

23         Q.       Sometimes when you place orders

24    with Amazon, for example, you would use the 524081

25    P.O. Box number?

```
 1                        KEISHA JONES

 2        A.      Yes, I have occasionally.

 3        Q.      Is that box still active?

 4        A.      No.

 5        Q.      When did you close the box?

 6        A.      I believe I closed it in the fourth

 7   quarter of 2012.  I don't remember the date.

 8        Q.      Why did you close that P.O. Box?

 9        A.      Because I needed -- I wanted to

10   transition to a post office that had better hours.

11        Q.      Any other reason?

12        A.      No.

13        Q.      What address was reflected on your

14   driver's license prior to June, 2010?

15        A.      It was an old address.  915 East

16   178th Street.

17                MR. KARAMOUZIS:  Can you repeat that?

18                THE WITNESS:  915 East 178th Street.

19        Q.      Were you living there prior to

20   June, 2010?

21        A.      No.

22        Q.      Why did that address appear on your

23   license?

24        A.      I didn't change it.  It was -- I

25   grew up in a family house, so I didn't change the
```

```
 1                        KEISHA JONES
 2    address.
 3         Q.      When did you live at 915 East 178th
 4    Street?
 5         A.      I lived there through high school,
 6    college, all the way up until 2000 -- no, not
 7    2000.  Up until 1997.
 8         Q.      You moved out in 1997?
 9         A.      Correct.
10         Q.      Have you lived there at 915 East
11    178th Street at any point since 1997?
12         A.      No.
13         Q.      Up until June, 2010 your license
14    always reflected that your physical address was
15    915 East 178th Street?
16         A.      Right, correct.
17         Q.      Did you use that address for other
18    purposes?
19         A.      What address?
20         Q.      915 East 178th Street.
21         A.      I don't understand the question.
22         Q.      Did you use the address 915 East
23    178th Street for any purposes at all?
24         A.      After I moved?
25         Q.      After 1997.
```

1                          KEISHA JONES

2           A.     No.

3           Q.     Did you receive any mail at 915

4    East 178th Street?

5           A.     If it was from the Department of

6    Motor Vehicles, yes.

7           Q.     Why is that?  Because that is the

8    license that was on my address.  That is the address

9    that they had on file?

10          A.     Correct, if something came from DMV

11   it could have gone to that address.

12          Q.     Did you use that address for any

13   other purposes?

14          A.     When?

15          Q.     After 1997?

16          A.     No.

17          Q.     Do you have a copy of your birth

18   certificate?

19          A.     I don't know where it is, I believe

20   it is somewhere.  I'm still looking for it.

21          Q.     Where have you searched?

22          A.     I searched all of my files and bags

23   and books.

24          Q.     When is the last time that you seen

25   it?

```
 1                    KEISHA JONES

 2        A.     I don't recall.

 3        Q.     Have you seen it in the last five

 4   years?

 5        A.     Yes.

 6        Q.     Have you seen it in the last year?

 7        A.     No, I haven't seen it in the last

 8   year.

 9        Q.     Is there a place where you keep

10   your files stored?

11        A.     They are in various places because

12   I have been displaced.  So I have bags and boxes

13   and just strewn about.

14        Q.     What do you mean when you say

15   strewn about?

16        A.     Some are with me and some are at

17   someone's house, some are in someone's basement

18   because I have been displaced since -- for the

19   last couple of years, so things have not -- just

20   are not organized for that reason.  Not as

21   organized.

22        Q.     Have you searched all documents

23   that you had in your possession?

24        A.     I have.

25        Q.     Have you searched all the documents
```

1                    KEISHA JONES

2    that you had in other people's basements that were

3    yours?

4         A.    I have.

5         Q.    Is there anywhere else other than

6    in your house or someone else's basement where you

7    have records stored?

8         A.    I have looked -- I looked everywhere

9    where I have my personal belongings and I cannot

10   locate it, but I just have to keep looking because

11   that is not a document that I carry in my bag.

12   So, it could be stuck between pieces of paper and

13   I overlooked it .  It could be inside of a book

14   and I overlooked it.

15        Q.    Do you think it is lost?

16        A.    No, I do not.

17        Q.    Do you have a social security card?

18        A.    I do.

19        Q.    Where is that?

20        A.    I don't know where it is at the

21   moment.

22        Q.    Have you searched for it?

23        A.    Yes.

24        Q.    Where have you searched?

25        A.    All of my documents and bags and

```
 1                      KEISHA JONES
 2   clothes and I can't seem to locate it at the
 3   moment.
 4         Q.      When is the last time that you saw
 5   it?
 6         A.      I honestly don't know.  That is not
 7   a document that I carry.
 8         Q.      Have you seen it in the last five
 9   years?
10         A.      I have seen it in the last five
11   years.
12         Q.      Is that a document you keep track
13   of?
14         A.      When you say keep track of, what do
15   you mean?
16         Q.      Is that a document that you retain
17   in a safe place?
18         A.      It's a document that I do retain.
19   A safe place would be my own house.  Since I'm not
20   in my own house it is not in a safe place.  That
21   is why I can't find it.  If I were in my own house
22   I would have it handy.
23         Q.      Do you think it is important to
24   keep the social security card in a safe place?
25         A.      It is important.
```

1                       KEISHA JONES

2        Q.      Why haven't you -- as a victim of

3   alleged identity theft, did you need to locate the

4   social security card?

5               MR. MALLON:   Objection, form.

6        A.      I'm sorry?

7        Q.      Has anyone asked for a copy of your

8   social security card prior to this litigation?

9        A.      No.

10        Q.      Did you look for the card in the

11   context of your alleged identity theft?

12               MR. MALLON:   Objection, asked and

13          answered.

14        A.      Can you repeat that again?

15        Q.      Did you look for the social

16   security card in the context of your alleged

17   identity theft?

18               MR. MALLON:   Same objection.

19        A.      What do you mean in the context of

20   my alleged identity theft?

21        Q.      You claim that your identity was

22   stolen in the past.

23        A.      My identity was stolen, correct.

24        Q.      And you investigated that theft; is

25   that right?

```
 1                         KEISHA JONES

 2          A.     That's correct.

 3          Q.     During that investigation did you

 4   locate your social security card?

 5          A.     I didn't have a need for the

 6   physical card.  So it wasn't something that I had

 7   to look for or give to anyone.

 8          Q.     Did you verify where it was located

 9   during your investigation?

10          A.     When I was at home, yes, I knew

11   where it was.  Since I'm not at home, it is just -- I don't

12   know where it is.  I know it is not lost in the

13   street, that I know.

14          Q.     You lost track of it?

15          A.     It's amongst my possessions

16   somewhere.  I have to keep looking for it.

17          Q.     Do you have a passport?

18          A.     I do.

19          Q.     Where is that located?

20          A.     I cannot locate that at the moment

21   either.

22          Q.     When is the last time that you saw

23   that?

24          A.     Probably early 2000s, the last time

25   that I travelled overseas.
```

```
 1                        KEISHA JONES

 2          Q.      And you have since lost track of

 3    it?

 4          A.      I'm not sure where it is, correct.

 5          Q.      Have you looked for it?

 6          A.      Yes, I have.

 7          Q.      When?

 8          A.      I have been looking for it for the

 9    last couple of months.

10          Q.      Have you searched all of your

11    belongings?

12          A.      Correct.

13          Q.      Do you have any idea where it could

14    be?

15          A.      Amongst my belongings somewhere

16    and I anticipate that when I do finally get settled again I

17    will find all of my documents.   None of my documents are

18    lost in the street.

19          Q.      So it is somewhere in your possession?

20          A.      Somewhere.

21          Q.      Did you ever report a missing

22    social security card?

23          A.      No.

24          Q.      Did you ever report a missing

25    passport?
```

1                       KEISHA JONES

2        A.      No.

3        Q.      What about a missing birth

4   certificate?

5        A.      No.

6        Q.      Have you ever sought to replace any

7   of those documents?

8        A.      Not yet, because know I have them,

9   so I'm not overly concerned about it because I

10  know that I didn't have them in my bag and then my

11  bag was dropped in the street and they are somewhere in

12  the street.  I know they are amongst my possessions

13  somewhere.

14       Q.      Do you plan on reporting these

15  documents as missing?

16       A.      If I determine they are missing, I

17  will.

18       Q.      How do you make that determination?

19       A.      Once I'm settled and have all of

20  any possessions and I'm able to take the time and

21  look through every single item piece by piece I

22  will make that determination.

23       Q.      When do you expect that could be

24  made?

25       A.      I don't know.

```
1                        KEISHA JONES
2          Q.     Until then you feel comfortable
3    assuming that the documents are somewhere?
4          A.     I do know that they are somewhere.
5    I just don't know exactly where they are.
6          Q.     Does it ever concern you that as a
7    victim of identity theft these documents are not
8    safely in your possession?
9                 MR. MALLON:   Objection, form.
10         A.     I did not lose my documents and it
11   is important to me to find them because I don't lose
12   important things like that.   So I'm concerned about
13   the fact that, you know, I'm so unorganized at
14   this point that I can't find my important documents.
15   But I know that they have not been stolen and know
16   they are not lost in the street or in some strange
17   place.
18         Q.     Are you currently married?
19         A.     No.
20         Q.     Have you ever been?
21         A.     No.
22         Q.     Do you have any children?
23         A.     No.
24         Q.     Have you ever?
25         A.     No.
```

```
 1                       KEISHA JONES
 2          Q.     Let's get back to the topic of your
 3     address?
 4                 MR. MALLON:  Can we take a break?
 5                 MR. STRAZZERI:   That's fine.
 6                 THE VIDEOGRAPHER:   We are going off
 7          the record at 10:34 a.m.
 8                 (Recess taken.)
 9                 THE VIDEOGRAPHER:   We are back on the
10          record at 10:39 a.m.
11     BY MR. STRAZZERI:
12          Q.     You understand, Miss Jones, when we
13     take a break and return you're still under oath?
14          A.     Yes.
15          Q.     Is there anyone who you support
16     besides yourself?
17          A.     No.
18          Q.     I want to get back to the address
19     that you -- your residential history and the address
20     that you listed before.
21                 For how long have you been staying
22     at apartment 5X at 1020 Grand Concourse?
23          A.     Off and on since 2007.
24          Q.     Describe what you mean when you say
25     off and on?
```

```
1                        KEISHA JONES
2          A.     Periodically.
3          Q.     How frequent do you stay in
4    apartment 5X?
5          A.     I haven't been there recently.
6          Q.     When is the last time that you were
7    there?
8          A.     What is this 2013.  2011, I believe.
9          Q.     The last time that you stayed at
10   apartment 5X was in 2011?
11         A.     Right.
12         Q.     Which month?
13         A.     I don't recall.
14         Q.     Which season?
15         A.     I don't remember.
16         Q.     Where have you been staying since
17   2011?
18         A.     I have been in Queens.
19         Q.     At what address -- is that where
20   you're currently -- where you slept last night?
21         A.     Yes.
22         Q.     Is that where you usually stay?
23         A.     I have been there, yes.
24         Q.     What is the address at Queens?
25         A.     107-27 154th Street.
```

```
 1                    KEISHA JONES

 2        Q.     For how long have you been staying

 3   there?

 4        A.     I have been there for the most part

 5   since -- this is 2013, 2011.

 6        Q.     Since moving from apartment 5X?

 7        A.     Yes.

 8        Q.     Is it an apartment or house?

 9        A.     It's a two-family house.

10        Q.     Do you rent there?

11        A.     No.  I don't have any lease.

12        Q.     Do you pay rent?

13        A.     No.

14        Q.     Who owns the property?

15        A.     My mother.

16        Q.     For how long has she lived there?

17        A.     More than ten years.

18        Q.     Did you consider that your

19   permanent residence?

20               MR. MALLON:   Objection, form.

21        A.     For the moment, correct.

22        Q.     Why have you chosen not to use that

23   address in your official or business capacity?

24        A.     Because all of my business is

25   concentrated in a P.O. Box 634.  And since I am
```

1                    KEISHA JONES

2     still not settled, I thought it best to keep all

3     of my information in the same place as opposed to

4     constantly changing addresses as I have constantly

5     been moving around to make sure that I don't miss

6     anything.

7           Q.     Would you describe the address on

8     154th Street as your legal residence?

9                  MR. MALLON:   Objection, form.

10          A.     I don't know what the definition of

11    legal residence is.

12          Q.     What is your understanding of the

13    term?

14          A.     I don't know.

15                 MR. MALLON:   Objection, form.

16          Q.     If I say the word official

17    residence, would you understand?

18          A.     What is meant by official?

19          Q.     How would you describe your

20    residence at your mother's house at 154th Street?

21                 MR. MALLON:   Objection, form.

22          A.     I'm staying with my mother

23    temporarily.

24          Q.     Do you live there?

25                 MR. MALLON:   Same objection.

```
1                        KEISHA JONES
2           A.    I'm staying there.  I guess staying
3   and live are the same.
4           Q.    Do you have your own room?
5           A.    Yes.
6           Q.    Do you keep personal belongings
7   there?
8           A.    Yes.
9           Q.    Who else lives there other than
10  your mother?
11          A.    Myself and my mother.
12          Q.    Anyone else?
13          A.    No.
14          Q.    Since moving there in 2011, have
15  you lived or stayed anywhere else?
16          A.    No.
17          Q.    So you have stayed there
18  consistently since 2011?
19          A.    Yes.
20          Q.    Do you receive mail there?
21          A.    No.
22          Q.    Do you ever list the address on
23  154th Street as your residence or your address?
24          A.    No.  The only instance where I
25  needed to give that address was for the FBI which
```

1                    KEISHA JONES

2    was a couple of weeks ago, because they would not

3    take my mailing address, and they asked me for a

4    street address.  So I gave them that street address.

5            Q.     For what reason was the FBI asking

6    for your address?

7            A.     For a background check.

8            Q.     For what purpose?

9            A.     For a contract.

10           Q.     What type?

11           A.     Work.

12           Q.     What type of work contract?

13           A.     What do you mean what kind of work?

14           Q.     Describe what contract you referred

15   to with the FBI?

16           A.     I was offered a position, however I

17   needed to pass or clear a background check.  So

18   the offer is contingent upon that check.

19           Q.     What position?

20           A.     It is called a communications

21   specialist.

22           Q.     Which branch of the FBI are you

23   seeking employment?

24           A.     The FBI is doing the background

25   check, so that is who I gave permission to do the

```
 1                    KEISHA JONES
 2   background check.  I was told that I needed to
 3   clear a background check.  Department Of Homeland
 4   Security and FEMA are the agencies that need --
 5   that are doing the work.
 6        Q.     So you're applying for a
 7   communications specialist position?
 8        A.     Correct.
 9        Q.     And that position is with FEMA of
10   the Department of Homeland Security?
11        A.     Correct.
12        Q.     Because of that application the FBI
13   is doing a background check?
14        A.     Correct.
15        Q.     And you gave the FBI your address
16   at 154th Street?
17        A.     I gave them both my P.O. Box 634
18   and that I was told that they would not take that,
19   they needed a physical street address and I gave
20   them the 107 -- the address on 154th Street.
21        Q.     Did they explain their reasoning
22   for requesting a physical street address?
23        A.     They said the FBI needs a physical
24   street address and I said that is fine and I
25   explained to them what happened briefly and they
```

```
 1                    KEISHA JONES

 2   said that is fine, but we do need the street

 3   address.

 4        Q.      When did you apply for the

 5   position?

 6        A.      I was offered the position on

 7   December 17th, 2012.

 8        Q.      When did you apply for the

 9   position?

10        A.      December 17th, 2012.

11        Q.      You were offered it the same day

12   that you applied?

13        A.      Yes.

14        Q.      Did you accept the offer?

15        A.      I did accept the offer and it is

16   all contingent upon the background check.

17        Q.      Has that been completed?

18        A.      No, it has not.

19        Q.      Have you paid any rent while

20   staying at 154th Street?

21        A.      No.

22        Q.      Where did you stay or live prior to

23   living with your mother?

24        A.      1020 Grand Concourse.

25        Q.      And that is apartment 5X?
```

```
1                      KEISHA JONES

2        A.     And 24D.

3        Q.     What apartment were you staying

4   immediately before moving to Queens?

5        A.     5X.

6        Q.     Who lived there?

7        A.     Miss Horn.

8        Q.     Who is Miss Horn?

9        A.     The person whose apartment that is.

10       Q.     What is her first name?

11       A.     Elizabeth.

12       Q.     Do you have any relationship to

13  Elizabeth Horn?

14       A.     She is a friend.

15       Q.     For how long did you stay in Miss

16  Horn's apartment?

17       A.     I was there for a while.  Between '07

18  and '11.

19       Q.     Between 2007 and 2011 you lived in

20  Miss Horn's apartment at 5X?

21       A.     I was there -- I was there as well

22  as another friend's house that I stayed at

23  periodically.

24       Q.     What other friend?

25       A.     Another -- just another friend.  I
```

KEISHA JONES - 1/10/2013

```
 1                        KEISHA JONES
 2   didn't live there.  I just stayed there off and on.
 3          Q.     What is the name?
 4          A.     Miss Watson.
 5          Q.     What is Miss Watson's first name?
 6          A.     Susan.
 7          Q.     At what address did you say with
 8   Miss Susan Watson?
 9          A.     She is in Yonkers, I don't remember
10   the address off the top of my head.  I have to get
11   it.
12          Q.     What is the name of the street?
13          A.     I would have to get the address, I
14   don't remember now.
15          Q.     Do you remember the street name?
16          A.     Landscape Avenue.
17          Q.     Is there a particular section of
18   Yonkers?
19          A.     Just Yonkers.
20          Q.     I'm not familiar how that breaks
21   apart there.
22          A.     Me neither.
23          Q.     If there is any particular
24   neighborhoods.
25                 What portion of the period from
```

1                    KEISHA JONES

2   2007 to 2011 did you stay in apartment 5X with

3   Miss Horn?

4          A.     It was '07 to I want to stay '09, I

5   believe.  '07 to -- I don't remember the exact

6   dates.  I have been displaced since '07.  So I

7   have been a couple of places.

8          Q.     I need to just get a clear

9   understanding where you were residing between 2007

10  and 2011.  Why don't you describe where you lived

11  during that period?

12         A.     I was at 1020 Grand Concourse, I

13  was in Yonkers, and I was in Queens.

14         Q.     So you stayed concurrently at the

15  same time at these different addresses?

16              MR. MALLON:   Objection to form.

17         A.     When you say --

18         Q.     Over that period some nights you

19  would stay at one address and some nights you

20  would stay at other addresses?

21         A.     Yes, pretty much.

22         Q.     It wasn't that for a year you lived

23  here and a year you lived there?

24         A.     Correct.

25         Q.     Can you give me an idea of what

```
 1                      KEISHA JONES

 2    portion of your time you spent at apartment 5X?

 3         A.     2007 is the earlier part.

 4         Q.     You stayed there every night?

 5         A.     Most nights.

 6         Q.     Until when?

 7         A.     Until about -- I have been in all

 8    three places during that time, so it is -- from

 9    2007 until about '9 or '10 -- I will have to go

10    back and -- I have to go back and just check my --

11    just look through my documents to give you exact

12    dates.  But between 2007 and now those are the

13    three places that I have been.

14         Q.     Would you say over that time period

15    between 2007 and now you have had multiple

16    residences?

17         A.     That's correct.

18         Q.     At the same time?

19         A.     Well, I guess if you want to say at

20    the same time going from place to place and back

21    and forth, if that is what you want to say.

22         Q.     Is that what you say?  Is that your

23    testimony?

24         A.     No.

25         Q.     What is your testimony?
```

```
 1                     KEISHA JONES
 2          A.     I have lived -- I have been in
 3   three residences over the course for '07 to now.
 4          Q.     You mixed up which apartments
 5   you're staying in over that time period?
 6                 MR. MALLON:   Objection, asked and
 7          answered multiple times.
 8          A.     I have been between the three
 9   addresses.
10          Q.     Other than those three address,
11   have you lived or stayed anywhere else since 2007?
12          A.     No.
13          Q.     Where did you live in 2007?
14          A.     2010 Grand Concourse.
15          Q.     Which apartment?
16          A.     24D.
17          Q.     Who owned apartment 24D?
18          A.     I did.
19          Q.     When did you purchase it?
20          A.     1997.
21          Q.     What was the purchase price?
22          A.     I don't recall the purchase price.
23          Q.     Did you have a mortgage?
24          A.     Yes.
25          Q.     How many?
```

                        KEISHA JONES

1

2          A.      One and a HELOC, a line of credit.

3          Q.      Who was the mortgage with?

4          A.      Chase was the primary and Citibank

5    was the line of credit.

6          Q.      Were you the -- did you own it

7    solely or jointly with anyone else?

8          A.      Individually.

9          Q.      The mortgages were solely through

10   your name?

11         A.      Yes.

12         Q.      You said before you were displaced

13   in 2007, describe what you mean?

14         A.      My identity -- I discovered my

15   identity theft in '05, so from '05 up to this

16   point I have been -- well, between '05 and '07 I

17   have been dealing with the whole identity theft

18   situation and it has been a real serious problem.

19   So I wasn't able to work.  And I wasn't able to

20   maintain my normal professional status because of

21   all that was going on.  And so I had to -- I couldn't pay

22   my bills.

23         Q.      Did you default on both mortgages?

24         A.      I couldn't pay the mortgages,

25   that's correct.

1                    KEISHA JONES

2         Q.     Did you default on the mortgage?

3         A.     Yes.

4         Q.     Did you default on the HELOC?

5         A.     Yes.

6         Q.     What happened as a result?

7         A.     Someone bought the note and I had

8    to leave.  I had to vacate.

9         Q.     Foreclosure proceedings were

10   brought against you?

11        A.     They started, but I don't believe -- I

12   don't think it went that far.  Someone bought the

13   note and that was it.  That was my understanding.

14   I don't know if there was an actual sale.  I don't

15   know.

16        Q.     Where did the proceeds from that

17   purchase go?

18        A.     There were no proceeds.

19        Q.     The bank sold the note?

20        A.     I'm assuming so.

21        Q.     Were you in default of your co-op

22   maintenance payments as well?

23        A.     Yes.

24        Q.     Did they bring legal action against

25   you?

```
1                          KEISHA JONES

2          A.      Yes.

3          Q.      Did they petition to evict you?

4          A.      Yes.

5          Q.      Describe what occurred?

6          A.      They filed papers to evict me and

7    that is what happened.

8          Q.      Were they successful?

9          A.      I left.  I mean no one had to

10   escort me out.

11         Q.      Did they bring legal action to

12   collect payments?

13         A.      Yes.

14         Q.      Did they collect it?

15         A.      No.

16         Q.      There was an outstanding unpaid

17   balance?

18         A.      Yes.

19         Q.      Do you recall how much?

20         A.      No.

21         Q.      Was there an unpaid balance on your

22   mortgage?

23         A.      Yes.

24         Q.      Was that ever paid?

25         A.      Not by me.
```

```
 1                        KEISHA JONES
 2          Q.      What about the HELOC, was there an
 3   unpaid balance?
 4          A.      Yes.
 5          Q.      Past due amount?
 6          A.      Yes.
 7          Q.      Was that ever paid?
 8          A.      Not by me.
 9          Q.      Do you have documents concerning
10   the actions brought against you in the context of -- with
11   respect to apartment 24D?
12          A.      No.
13          Q.      What happened to those documents?
14          A.      They probably got cleared out with
15   some other things that I thought I no longer
16   needed.
17          Q.      When did you clear documents out?
18          A.      This is 2013, 2011, I think or '12.
19   I don't know exact date.
20          Q.      What do you mean when you say
21   cleared out?
22          A.      Meaning that I went through some
23   things -- I just had a lot of paperwork and I went
24   through things and called the IRS and found out
25   what I needed to keep and what I didn't need to
```

```
 1                         KEISHA JONES
 2    keep and if I felt I didn't need it, I shredded it.
 3         Q.      Was that -- you filed your lawsuit
 4    in December, 2012; is that right?
 5         A.      '11.
 6         Q.      You're right.  You filed the
 7    lawsuit in December, 2011; is that right?
 8         A.      Correct.
 9         Q.      Was this instance where you cleared
10    documents before or after December, 2011?
11         A.      I don't recall the exact date that
12    I cleared out the documents.  I would have to
13    double-check.
14         Q.      How could you determine the date?
15         A.      I would have to go back and look at
16    my calendar.  Or look at a calendar.
17         Q.      Where would that calendar be kept?
18         A.      I just use an online calendar.
19         Q.      Is it a particular file?
20         A.      No.
21         Q.      Where is the information stored for
22    the calendar?
23         A.      I just use an online calendar.  If
24    I look at a calendar I will be able to recall what
25    I did because, you know, it is either before or
```

1                        KEISHA JONES

2          A.      What do you mean where would it

3     appear?

4          Q.      How did you use that address as

5     your residence?

6                  MR. MALLON:   Objection, form.

7          A.      It was my primary residence.

8          Q.      Did you put it on your driver's

9     license?

10         A.      No.

11         Q.      Did you put it on any other

12    government forms?

13         A.      Yes.

14         Q.      Which forms?

15         A.      Tax returns.

16         Q.      So you filed your tax returns over

17    the period from 1997 to 2007 with that as your

18    legal address?

19         A.      Correct.

20         Q.      What address have you used for tax

21    purposes after 2007?

22         A.      P.O. Box 634.

23         Q.      For what other official or business

24    purpose did you use your address at 1020 Grand

25    Concourse?

```
 1                      KEISHA JONES
 2        A.      Whatever I was -- work.
 3        Q.      When you conducted any personal
 4   business since 2007 which address did you use?
 5                MR. MALLON:   Objection, form.
 6        A.      After I was displaced I used my
 7   P.O. Box exclusively, P.O. Box 634.
 8        Q.      Before being displaced in 2007,
 9   which address did you use for personal business?
10                MR. MALLON:   Objection, asked and
11           answered.
12        A.      1020 Grand Concourse, 24D.
13        Q.      Did you use a P.O. Box number for
14   business purposes before 2007?
15        A.      I had the P.O. Box at the same time
16   that I was at 1020, so, with respect to my credit
17   reports, the P.O. Box has been on there for a
18   couple of years.  With the P.O. Box being on there
19   and then 1020 Grand Concourse, apartment 24D.
20   Those are the two addresses that have been used.
21        Q.      You were using the P.O. Box number
22   even during the time period that you lived in 24D?
23        A.      Yes.
24        Q.      And you were using it on
25   applications for credit?
```

```
 1                    KEISHA JONES
 2        A.    No.
 3        Q.    Which address would you use on
 4   applications for credit?
 5              MR. MALLON:   Objection.  At what
 6        time?
 7        Q.    During the period where you lived
 8   at apartment 24D which address did you use to
 9   apply for credit?
10        A.    When I was living in my apartment
11   at 1020 Grand Concourse number 24D I used my
12   address if I was applying for credit up until
13   2006.
14        Q.    The period of time when you lived
15   at 24D what address did you use for utilities?
16        A.    My utilities were included in my
17   maintenance.
18        Q.    What address did you use while
19   living at 24D for your telephone or cellular
20   phone?
21        A.    That it either went to the
22   apartment, 24D or it could have gone to the P.O.
23   Box.  I don't remember.
24        Q.    Did you use both addresses for
25   those types of reasons?
```

```
 1                    KEISHA JONES

 2              MR. MALLON:   Objection.

 3         A.    I don't recall.  It could have been

 4    both.  It could have been either or.  Because

 5    there is some entities that say you can have a

 6    mailing address but please give us your street

 7    address.  So both addresses could have been on

 8    file at the same time.

 9         Q.    What address over that time period

10    when you lived in 24D would you use for medical

11    reasons?

12         A.    My home address or it could have

13    been the P.O. Box.

14         Q.    You used both?

15         A.    Yes.

16         Q.    Which P.O. Box?

17         A.    P.O. Box 634.

18         Q.    Do you own a time share?

19         A.    I did.

20         Q.    When?

21         A.    That was some years ago.  I don't

22    remember.  It was some years ago.  I can't

23    remember exactly when.

24         Q.    Where was it?

25         A.    In Florida.
```

```
1                    KEISHA JONES
2         Q.    Was it before or after 2007?
3         A.    Before.
4         Q.    Through which company?
5         A.    Marriott.
6         Q.    What is the status, what happened?
7         A.    I don't know, I tried to sell it
8    back to them, they said you could sell it back and
9    I went through the process and nothing happened.
10   So I just let it go.  I don't know what happened.
11   I gave up.
12        Q.    Did you have to make payments for
13   it?
14        A.    There were payments.
15        Q.    Did you default on the payments?
16        A.    Yes.
17        Q.    So did they repossess or foreclose
18   on it?
19        A.    I don't know what they did, to be
20   quite honest.
21        Q.    But you don't own it now?
22        A.    No, not to my knowledge, I don't.
23        Q.    How often did you use it?
24        A.    Before identity theft I would use
25   it quite often, probably once a year, once every
```

```
 1                     KEISHA JONES
 2   other year.
 3        Q.      What portion of the year would you
 4   use it as your residence?
 5        A.      It wasn't a residence, it is strictly
 6   vacation.
 7        Q.      One week a year?
 8        A.      Yes.
 9        Q.      Since 1997 have you lived anywhere
10   other than apartment 24D, apartment 5X at 1020
11   Grand Concourse, 107-27 154th Street and in
12   Yonkers?
13        A.      No.
14        Q.      Have you stayed anywhere other than
15   those locations?
16        A.      No.
17        Q.      Have you ever lived in Pennsylvania?
18        A.      Never.
19        Q.      Have you ever lived in New Jersey?
20        A.      Never.
21        Q.      Prior to 1997 where did you -- for
22   how long did you live at 915 East 17th Street?
23        A.      I grew up there.  I grew up in that
24   house and I left when I purchased my apartment in
25   1997.
```

KEISHA JONES

1
2  Q.     So from birth until 1997 that was
3  your sole residence?
4  A.     That is a family house, my mother
5  lived other places, but that is a family house.
6  That was my default.
7  Q.     Do you have any family members who
8  live in Pennsylvania?
9  A.     No.
10  Q.     Have you ever lived in North
11  Carolina?
12  A.     I went to North Carolina.   I was
13  going to split my time between New York and North
14  Carolina, but that did not occur because the
15  identity theft happened while I was in the midst
16  of doing that.
17  Q.     Why were you going to split your
18  time between New York and North Carolina?
19  A.     Because I wanted to be in a warmer
20  place and I chose North Carolina and was going to
21  split my time between North Carlina and New York
22  and that didn't work out.
23  Q.     Did you take any efforts to start
24  that process?
25  A.     Sorry?

```
1                        KEISHA JONES
2          Q.     Did you take any efforts to start
3     the process of moving?
4          A.     Yes, I did.
5          Q.     What did you do?
6          A.     I went to North Carolina and I
7     bought a house.
8          Q.     Where did you buy the house?
9          A.     In Charlotte.
10         Q.     What was the address?
11         A.     I don't remember the number.  But
12    it was Dauphine either road or place.
13         Q.     Is there a particular section of
14    Charlotte where it was located?
15         A.     I don't know Charlotte that well.
16    I just know it was Charlotte.  I know it is broken
17    into sections, but I don't recall the section.
18         Q.     Do you have documents concerning
19    the purchase?
20         A.     I do not.
21         Q.     Where are those?
22         A.     They got cleared out with my other
23    documents because I didn't think I needed them.
24         Q.     When did you purchase the property?
25         A.     Let's see, that was probably
```

```
 1                    KEISHA JONES

 2   identity theft I discovered in '05.  Prior to

 3   identity theft so prior to '05..

 4        Q.     How long before 2005 did you

 5   purchase the property in North Carolina?

 6                MR. MALLON:   Objection.

 7        A.     Not long before.  It wasn't like

 8   five or six years before.  It was not long before,

 9   but I don't remember the exact time.

10        Q.     How many homes have you purchased

11   over your lifetime?

12        A.     My apartment and that home.

13        Q.     And you don't know which year you

14   bought that home?

15        A.     I believe it was -- it was between -- I'm

16   going to give you a range.  It was between '03 and

17   '05.

18        Q.     What was the purchase price?

19        A.     I don't recall.  But it was less

20   than 200.

21        Q.     200,000?

22        A.     Correct.

23        Q.     Did you have a mortgage?

24        A.     Yes.

25        Q.     Which lender?
```

```
 1                        KEISHA JONES
 2          A.     I don't remember the name, but I
 3    did have a mortgage.
 4          Q.     Do you remember which bank?
 5          A.     It wasn't one of your large banks,
 6    it was another one.  I forget the name.
 7          Q.     Did you own it individually or
 8    jointly?
 9          A.     Individually.
10          Q.     Did you have a letter of credit or
11    mortgage on the property?
12          A.     It was an 80/20 so there were two
13    mortgages on the house.
14          Q.     Do you remember the lender on
15    either of the mortgages?
16          A.     Option One, that is what it is.
17    Option One.
18          Q.     What happened to your ownership of
19    the property?  Do you still own it?
20          A.     No, I do not.
21          Q.     What happened?
22          A.     It was sold.  I believe it was a
23    short sale because I had the issue here in New
24    York with the identity theft.
25          Q.     How did the identity theft affect
```

```
 1                    KEISHA JONES
 2   the North Carolina residence?
 3        A.     When I discovered -- I discovered
 4   the identity theft and then -- it was in the
 5   process of -- I was going to rent out my apartment
 6   and I had an issue with the -- I had an issue with
 7   the floor, so I had a dispute with the flooring
 8   company.  That was one thing.
 9              And when I was disputing or
10   fighting with flooring company to come fix the
11   floors, shortly thereafter I found out my identity
12   was stolen and money was stolen and then I had
13   to -- I just couldn't move forward with my plans
14   in North Carolina and I had to take care of what
15   was happening in New York.
16        Q.     How did the identity theft prevent
17   you from moving to North Carolina?
18        A.     Money was stolen from my bank
19   account and at that time when I realized what was
20   going on it was in the news and it could be
21   Googled today, it was a massive bank data theft
22   and as far as I was concerned it was much bigger
23   than just my little bit of money being stolen.
24              And when the money was stolen other
25   things started to happen.  I found out about the
```

```
 1                    KEISHA JONES
 2   driver's license in Pennsylvania.  Fraudulent
 3   accounts, everything associated with the identity
 4   theft started to unfold.
 5             MR. STRAZZERI:   We are going to take
 6         a quick break so the videographer can change
 7         the tape.
 8             THE VIDEOGRAPHER:   Going off the
 9         record at 11:15 a.m. and this marks the end
10         of tape one.
11             (Recess taken.)
12             THE VIDEOGRAPHER:   We are back on the
13         record at 11:26 a.m. and this marks the
14         beginning of tape number two.
15   BY MR. STRAZZERI:
16         Q.    Miss Jones, before we broke for the
17   videographer to replace the tape you testified
18   that you bought a house in Charlotte, North
19   Carolina; is that correct?
20         A.    Correct.
21         Q.    Did you still own the apartment at
22   24D?
23         A.    Yes.
24         Q.    Why didn't you move into the
25   apartment in Charlotte, the house in Charlotte?
```

```
 1                      KEISHA JONES

 2          A.       Because as I was making my

 3     transition and preparing to rent my apartment, I

 4     had a problem with the flooring company, then I

 5     discovered the identity theft, and it wasn't just

 6     my identity theft, it was in the news and well

 7     documented in 2005 that there was a massive bank

 8     data theft of employees stealing people's

 9     information.  So it was quite a bit to do here at

10     home.

11                      So I couldn't just get up and go

12     knowing that I had this fraud issue to deal with.

13     And it was prior to New York enacting the Security

14     Freeze Law.

15          Q.       Why couldn't you handle the issue

16     from North Carolina?

17          A.       It didn't make sense to do that.

18          Q.       Why?

19          A.       I needed to be here because I

20     didn't know what was happening.  I never had any

21     problems with my credit.  I never had any fraud or

22     dealing with the police.  I never had any issue.

23     I didn't know what was happening or what was going

24     on.  I never had money stolen out of a bank

25     account.  None of those things happened to me.
```

1                         KEISHA JONES

2          Q.      How much was stolen from you?

3          A.      I don't recall.

4          Q.      We will get to the details later.

5                  Did you default on the mortgages on

6    the Charlotte, North Carolina property?

7          A.      That was a short sale yes, because

8    I couldn't pay the bills.

9          Q.      When you say short sale, what do

10   you mean?

11         A.      It was sold for less than what was

12   owed.

13         Q.      So the bank foreclosed on the

14   property?

15         A.      No, not to my knowledge.  My

16   knowledge it was a short sale because someone sold

17   it.

18         Q.      You sold it?

19         A.      It was sold in a short sale.

20         Q.      Who sold it?

21         A.      I had a realtor at the time.

22         Q.      Who was that realtor?

23         A.      Coldwell Banker.

24         Q.      And you retained them to sell the

25   property?

1                    KEISHA JONES

2        A.    Correct.

3        Q.    Who covered the loss?

4        A.    I don't understand the question.

5        Q.    You say it was sold for an amount

6    less than you paid.

7        A.    Yes.

8        Q.    Who bore that loss?

9        A.    It's a short sale, so I'm not an

10   accountant.

11       Q.    Did the bank ever take any legal

12   action against you?

13       A.    I don't know -- I don't recall if

14   they started a foreclosure proceeding, I don't

15   recall.  I do recall that it was a short sale.

16   So, if they started it and then it stopped because

17   the property got sold, that could be, but I don't -- that is

18   as much as I remember.

19       Q.    The account was defaulted?

20       A.    Correct.

21       Q.    Did they ever seek to recover the

22   amount that you owed them?

23       A.    I don't recall a deficiency

24   judgment.  I don't recall that.

25       Q.    What do you recall with respect to

1                    KEISHA JONES

2    the amount that was lost?

3         A.    I recall that it was just a short

4    sale.  I don't recall them -- I don't recall them

5    suing me after the house was sold for anything.

6         Q.    So you just walked away from that

7    sale?

8         A.    Once it was sold, I would say as

9    far as I recall.

10         Q.    Did you put any money down?

11         A.    No, that was an 80/20.

12         Q.    What does that mean?

13         A.    I had two mortgages.  One was for

14    80 percent of the price and the other was for

15    20 percent of the price.

16         Q.    So you bought the property without

17    putting a penny down?

18         A.    Correct.

19         Q.    And it was sold for less than what

20    you paid for it?

21         A.    I believe so.

22         Q.    And then you just walked away from

23    that transaction without bearing any loss?

24         A.    I'm sure -- with the short sale I

25    mean -- I may have gotten a 1099 C on that.  But I

```
 1                    KEISHA JONES

 2   don't recall.  But probably.

 3           Q.      What is a 1099 C?

 4           A.      Where they look at it as like

 5   income to me because they received less money than

 6   what was owed.  It appears as though I received

 7   some income which I never got any money.

 8           Q.      Did you ever pay any money toward

 9   that house?

10           A.      Yes, I paid my -- I made my

11   payments when I was -- prior to all -- prior to

12   the fraud, yes.

13           Q.      For how long did you own the

14   property?

15           A.      Not long.  I don't recall.  But it

16   wasn't long.

17           Q.      Under a year?

18           A.      I would say less than two years, I

19   don't recall exactly but I'm going -- definitely

20   less than two years.

21           Q.      Did you have to pay any money as a

22   result of the short sale?

23           A.      I don't recall.  I don't recall the

24   details of it.

25           Q.      Do you recall paying any money?
```

```
 1                        KEISHA JONES
 2          A.     I don't recall.
 3          Q.     Do you know if there are any liens
 4    against you with respect to that property?
 5          A.     Not that I know of.
 6          Q.     Are there any liens against you
 7    with respect to the property at 1020 Grand
 8    Concourse?
 9          A.     Liens meaning?
10          Q.     Tax liens.
11          A.     Not that I recall.  I mean, you
12    know, not from -- looking at my credit reports
13    there is something on there, but, I'm not looking
14    at my credit reports right now.  But I do believe
15    there is something on there.
16          Q.     Have you ever been notified that
17    there is any sort of lien against the property
18    that you held at 1020 Grand Concourse?
19          A.     A lien when?
20          Q.     Ever.  Were you ever notified that
21    any entity or government agency was putting a lien
22    against your property at 1020 Grand Concourse?
23          A.     Not that I -- no, not that I
24    recall, no.
25          Q.     Do you remember receiving any
```

|    | KEISHA JONES |
|----|--------------|
| 1  | |

2   correspondence regarding liens generally?

3          A.      I don't recall that, no.

4          Q.      Did you ever use the address in

5   Charlotte, North Carolina as your residence?

6          A.      No.

7          Q.      Did you ever file any income taxes

8   with that address?

9          A.      I don't believe I filed an income --

10  a return at that address, no.  No.

11         Q.      Did you ever use that address on

12  any of your business accounts, personal accounts?

13         A.      No, other than maybe to set up

14  utilities there.

15         Q.      Did you use it to set up utilities

16  there?

17         A.      I believe I set up utilities there.

18         Q.      And they would required you to

19  apply for credit with them?

20                 MR. MALLON:   Objection to form.

21         A.      I don't recall applying for credit

22  to turn on lights.

23         Q.      Did you use that address to apply

24  for credit with anyone other than utilities?

25         A.      No.

```
1                    KEISHA JONES

2         Q.     Have you ever owned or lived

3  anywhere other than the addresses that we

4  discussed?

5         A.     No.

6         Q.     Have you ever owned any property

7  elsewhere?

8         A.     No.

9         Q.     Do you have a car?

10        A.     No.

11        Q.     Have you ever?

12        A.     Yes.

13        Q.     When?

14        A.     1997, '98, somewhere thereabouts.

15        Q.     Have you ever had a car since then?

16        A.     No.

17        Q.     Did you graduate from high school?

18        A.     Yes.

19        Q.     From where?

20        A.     Stevenson in the Bronx.

21        Q.     During which years did you attend?

22        A.     I graduated from high school in

23  1987.

24        Q.     After high school did you continue

25  your education at all?
```

```
 1                      KEISHA JONES

 2          A.     Yes.

 3          Q.     Where?

 4          A.     Long Island University.

 5          Q.     When?

 6          A.     1987 to 1991.

 7          Q.     What did you study?

 8          A.     Marketing.

 9          Q.     Did you receive any degree?

10          A.     I have a bachelor's in marketing.

11          Q.     Do you have any student loans?

12          A.     Yes.

13          Q.     Who is the lender?

14          A.     Sallie Mae.

15          Q.     Have you ever defaulted on those

16   payments?

17          A.     Yes.

18          Q.     When?

19          A.     After my identity theft, so

20   sometime after '05.  Sometime between '05 and '09.

21          Q.     What is the current status?

22          A.     I spoke to them and I'm working on

23   getting that paid up.

24          Q.     Is it still in default?

25          A.     Yes, as we speak, yes.
```

1                     KEISHA JONES

2          Q.     Has it been in default since 2005?

3          A.     No, it wasn't in default in 2005, I

4    don't think.

5          Q.     When did it go into default?

6          A.     I'm not sure what year it went into

7    default.  I have to check.

8          Q.     Has it been in default the last

9    five years?

10         A.     I have to check.  I have to call

11   them to know for sure.

12         Q.     Have you received any other degrees

13   or certificates other than the bachelor's degree?

14         A.     I have a Master's degree.

15         Q.     From where did you receive that?

16         A.     Long Island University.

17         Q.     When?

18         A.     1996.

19         Q.     Do you have any student loans?

20         A.     My undergraduate student loans,

21   yes.

22         Q.     Do you have any student loans from

23   the master's degree?

24         A.     No.

25         Q.     Master's program?

```
 1                       KEISHA JONES
 2    the '90s.
 3            Q.      What else?
 4            A.      Anything that was old that I didn't
 5    need or, you know, just I just didn't need.
 6            Q.      Did this include documents
 7    pertaining to your ownership of apartment 24D?
 8            A.      They probably were in there, yes.
 9            Q.      Did this include documents
10    pertaining to the ownership of the property in
11    Charlotte?
12            A.      Yes, they were probably in there
13    also.
14            Q.      Did it include any documents
15    regarding your credit file?
16            A.      No, anything that I could find I
17    set aside.
18            Q.      Did you discard any documents
19    comprising of correspondence or communications
20    with Experian?
21            A.      Anything that I could find that had
22    anything to do with my credit reports, I set
23    aside.
24            Q.      Did you destroy any documents
25    concerning Comcast or CFC or Hahnemann?
```

KEISHA JONES - 1/10/2013

```
 1                        KEISHA JONES

 2          A.      Not knowingly, no.

 3          Q.      During that destruction, do you

 4   recall including any documents concerning those

 5   entities?

 6          A.      Not knowingly, no.

 7          Q.      Are you currently employed?

 8          A.      No.

 9          Q.      When was the last time that you

10   were employed?

11          A.      The last time full-time employer

12   was -- I worked temp in July.

13          Q.      July, 2012?

14          A.      Correct.

15          Q.      For how long?

16          A.      The month of July.  So from the 9th

17   to the 27th.

18          Q.      Who was your employer?

19          A.      I believe that was Manpower.

20          Q.      What was the position?

21          A.      They called it supervisor.  That is

22   what he they called it.

23          Q.      What was the nature of the work?

24          A.      It was -- the client wanted -- the

25   client had a compliance project that needed to be
```

```
 1                    KEISHA JONES
 2   done so it was more a combination of customer
 3   service and data entry.
 4        Q.     And that was designed as a
 5   temporary project?
 6        A.     Correct.
 7        Q.     When were you employed before that?
 8        A.     Previous assignment which was also
 9   temp was -- that assignment ended in March of
10   2010.
11        Q.     Who was it with?
12        A.     Manpower.
13        Q.     For how long did you hold that
14   position?
15        A.     From '08 to -- from 2008 to 2010.
16        Q.     Consistently throughout that time
17   period?
18        A.     Yes, that ended up being long-term.
19        Q.     How many hours a week?
20        A.     It averaged 32, 33.
21        Q.     What was the wage?
22        A.     That one was 25 per hour.
23        Q.     And you worked every month during
24   those calendar years 2008 to 2010?
25        A.     Yes.
```

```
 1                        KEISHA JONES
    ..   .    .
 2           Q.      Was that reported on your tax

 3     returns?

 4           A.      I did receive a W-2, yes.

 5           Q.      Did you report that income on your

 6     tax returns for 2008 through 2010?

 7           A.      Yes, I did.

 8           Q.      Since 2010 has there been any sort

 9     of income other than from Manpower?

10           A.      Unemployment.

11           Q.      From where do you receive

12     unemployment benefits?

13           A.      The state administers unemployment.

14           Q.      For how long have you received

15     those payments?

16           A.      For the maximum allowed.  I think

17     with all the extensions I think it ended up like

18     being 90 something weeks.

19           Q.      Did you still receive them?

20           A.      No.

21           Q.      Over what period did you receive

22     unemployment benefits?

23           A.      From 2010 to -- from March of 2010

24     to January, 2012.

25           Q.      Since March of 2010 have you any
```