**Exhibit B-2**

**Excerpts from the Deposition of Keisha Jones, dated January 10, 2013, Pages 95-191**

1                    KEISHA JONES

2      other source of employment other than that one

3      month that you worked in July of 2012?

4           A.     Not full-time, no.

5           Q.     Any part-time?

6           A.     No.

7           Q.     Have you received any income since

8      March, 2010 other than unemployment benefits and

9      from Manpower?

10          A.     I haven't worked temp since.

11     March, 2010 and then the one month in July of

12     2012.

13          Q.     During that time period did you

14     have any other source of income other than

15     unemployment benefits?

16          A.     No.

17          Q.     Have you ever been employed by

18     Lehman Brothers?

19          A.     Yes.

20          Q.     When?

21          A.     1996 to 2000 -- either 2003 or '4.

22     I forget the exact termination date.  But I think

23     that is correct.

24          Q.     Where were you employed prior to

25     March, 2008?

```
 1                          KEISHA JONES
 2          A.      After Lehman Brothers I was at
 3   Chase.  I think it was 2003 or '4 to '5 and from
 4   there I was doing free-lance work.
 5          Q.      What type of free-lance work?
 6          A.      Business writing.  Business
 7   development.
 8          Q.      What do you mean?  Describe the
 9   nature of that work?
10          A.      If someone wanted me to type up a
11   business proposal or help them put together a
12   business proposal.  That is an example of business
13   writing.
14          Q.      Did you conduct this business under
15   the name ILV Enterprise?
16          A.      No.
17          Q.      This was work that you did individually?
18          A.      After 2005.
19          Q.      How much did you gross from that
20   consulting work?
21          A.      Not much.
22          Q.      Estimate.
23          A.      I don't know.  Not much.  I don't
24   know.
25          Q.      How often were you working?
```

```
 1                    KEISHA JONES
 2         A.      Commerce Bank.
 3         Q.      Did you have any type of utility,
 4  phone, any other business service account under
 5  the name ILV Enterprise?
 6         A.      I did, I had phone service.
 7         Q.      Through ILV Enterprise?
 8         A.      Correct.
 9         Q.      With what company?
10         A.      Sprint and -- well Nextel which
11  became Sprint.
12         Q.      Rather than being under your name
13  it was under the name ILV Enterprise?
14         A.      That's correct.
15         Q.      Is there anyone else who worked for
16  ILV Enterprise?
17         A.      No.
18         Q.      Did you have any other accounts
19  under ILV Enterprise?
20         A.      Not that I recall, I kept it invest
21  minimal and streamline because my goal was to make
22  sure that similar to my credit, that my business
23  credit was stellar.
24         Q.      Did you use your business credit in
25  any way?
```

```
 1                    KEISHA JONES
 2        A.     No.  I didn't have any kind of
 3   credit cards or loans or anything like that out,
 4   no.  No business loans, nothing like that.
 5        Q.     Any other type of account, a
 6   business account using ILV Enterprise?
 7        A.     I don't recall anything other than
 8   checking and phone and I don't recall anything
 9   else.
10        Q.     Did you maintain business records
11   for the entity?
12        A.     I did for my taxes.
13        Q.     Where are those documents now?
14        A.     I don't know.  I don't know if I
15   still have those physical tax returns because when
16   I called the IRS it was my understanding that if I
17   need to get documents I could get documents.
18        Q.     From 2001 to 2000 -- the beginning
19   of 2005, did you do any consulting separate from
20   ILV Enterprise?
21        A.     No.
22        Q.     What was the business address for
23   the entity?
24        A.     1202 Lexington Avenue.
25        Q.     What was that address?
```

```
 1                         KEISHA JONES
 2           A.     I'm sorry?
 3           Q.     What was that address?
 4                  MR. MALLON:    Objection, form.
 5           A.     1202 Lexington Avenue.
 6           Q.     What is at 1202 Lexington Avenue?
 7           A.     It's a mailing address.  A street
 8    address.
 9           Q.     Why did you use that address for
10    the entity?
11           A.     Because the -- because I wanted to
12    make sure that I kept all the records and
13    information separate from my personal.
14           Q.     So you -- how did you -- did you
15    use that address for the business's accounts?
16           A.     Yes.
17           Q.     For invoices and receipts?
18           A.     Yes.
19           Q.     Payments were made to you for your
20    consulting services through that address?
21           A.     Payments were made to the business
22    or if it wasn't a physical payment mailed then it
23    was electronic.  Then it was electronic.
24           Q.     When they were made to the business
25    they were made at that address?
```

KEISHA JONES

1

2    A.    If it was mailed, yes.

3    Q.    How did the identity theft affect

4  the business?

5    A.    It was my -- it was my contention

6  and still remains my contention that my personal

7  and business information was stolen or compromised

8  at Commerce Bank.  While I didn't maintain any

9  personal accounts at Commerce Bank, because I kept

10  my business separate from my personal, so I didn't

11  have personal accounts at Commerce Bank they did

12  have my personal information.

13         Through discovery and dealing with

14  NYPD certain things came up where I realized that

15  my information had been compromised.  My personal

16  information, my driver's license at the time as

17  well as the accounts.

18    Q.    When was that?

19    A.    That was -- I discovered that at

20  the top of -- 2004, 2005.

21    Q.    Is the business still operating?

22    A.    No.

23    Q.    What happened to it?

24    A.    It is closed.

25    Q.    When did you close it?

```
 1                    KEISHA JONES

 2         A.    It was -- I don't recall the date

 3   that it was closed, but I didn't close it.  But it

 4   is closed.

 5              MR. KARAMOUZIS:    Can you read back

 6         the last answer?

 7              (Requested portion of record read.)

 8         Q.    Have you used the address on

 9   Lexington Avenue for any purpose since?

10         A.    No.

11         Q.    Is that still an address that is

12   available to you to use?

13         A.    No.

14         Q.    Who is located at that address?

15         A.    That was a -- at the time it was

16   Mailboxes Etc.

17         Q.    So you were using an address at

18   Mailboxes Etc. to run your business?

19         A.    For my business, correct.

20         Q.    And that was at the same time that

21   you were using the P.O. Box for your personal

22   mail?

23         A.    My corporation business was

24   separate from my personal business.

25         Q.    Was there any correspondence
```

KEISHA JONES - 1/10/2013

1                          KEISHA JONES

2      walked out on a prospective job because they

3      listed your name and social security number on a

4      form?

5              A.      There was a temporary job that I

6      went through a temp agency for and when I got to

7      the site they wanted me to give all my personal

8      information again and then I called the agency to

9      ask them why am I doing all of this.  And they

10     didn't really have an explanation, so, yes, now I

11     do recall that.

12             Q.      So what happened?

13             A.      So I asked them why do I have to

14     give all of this information because I had never

15     done that with a temp agency before.  And they

16     just -- at that time they said that is how the

17     client is doing things.  They didn't tell me that

18     beforehand.

19             Q.      So what was the outcome?

20             A.      I left the assignment because they

21     didn't tell me -- they didn't give me -- they

22     didn't tell me that up front to let me know that I

23     won't be working with the -- I wouldn't be on the

24     temp agency's payroll.  They said I would be on

25     the client's payroll.

KEISHA JONES - 1/10/2013

1                    KEISHA JONES

2         Q.      What information did they want from

3    you that you refused to provide?

4         A.      They wanted all personal

5    information.  Date of birth, social security

6    number, whatever forms they had.  They were

7    duplicate in terms of things that I filled out

8    with that temp agency.

9         Q.      Because you disagreed you walked

10   out?

11        A.      Well, I didn't walk out.  Initially

12   I called the temp agency to ask the question, and

13   we had a conversation while I was there.

14        Q.      Has that occurred any other time?

15        A.      No.

16        Q.      Do you list your personal

17   information on your resume?

18        A.      No, I do not.

19        Q.      What information do you list in

20   your resume?

21        A.      Name and contact phone number.

22        Q.      Do you list an address on your

23   resume?

24        A.      I do not.

25        Q.      Do you list any other identifiers

```
 1                      KEISHA JONES
 2    other than your name and phone number?
 3          A.     I do not.
 4          Q.     You refer to this as confidential
 5    information?
 6          A.     I wouldn't say it is confidential
 7    but on my resume given all that I experienced over
 8    the last now eight years I give what is a
 9    necessary.  And if I'm giving my resume it is with
10    the intent for someone to decide if they want to
11    speak to me.  So if they want to speak to me based
12    on what is on my resume, they could call me.
13          Q.     If asked, will you provide them
14    with other information other than your name and
15    phone number?
16                 MR. MALLON:   Objection, calls for
17          hypothetical.
18          A.     Say again, I'm sorry.
19          Q.     Have you ever been asked for
20    information other than your name and phone number
21    by prospective employers?
22          A.     Yes, and we are moving toward -- we
23    will be moving toward application or some sort of
24    offer, so, yes.
25          Q.     In those circumstances did you
```

```
 1                       KEISHA JONES

 2    provide more information other than your name and

 3    phone number?

 4              MR. MALLON:   Objection, form.

 5         A.      Yes.  Once we got past the resume

 6    stage.

 7         Q.      What do you mean by that?

 8         A.      So I would -- if you're looking for

 9    a job you submit a resume.  So whenever I --

10    whenever I selectively submitted a resume it had

11    my name and phone number and a very succinct

12    detail of my experience.  And then if I'm called

13    in for an interview and they ask me to move

14    forward with the process because they have

15    something for me or we are going to work together,

16    I proceed with filling out whatever forms they

17    would want.  But I don't offer the information

18    upfront.

19         Q.      For how long has than been your

20    practice?

21         A.      That has been my practice for the

22    last few years.  I give what is necessary.

23         Q.      For how long have you -- was there

24    a time when you had more personal information on

25    your resume than just your phone and name?
```

1                       KEISHA JONES

2          A.      Probably more than ten years ago.

3    Probably back in the '90s when there wasn't this

4    proliferation of fraud.  Back when I was let's say -- when

5    I was in graduate school if I submitted a resume

6    it was probably traditional format.  Name, address

7    phone number.

8          Q.      Since the '90s you have listed only

9    your name and phone number?

10         A.      The last few years on a resume and

11   I'm selective where it goes.

12         Q.      At this point in time are you on

13   any government assisted program?

14         A.      Yes, I receive food stamps.

15         Q.      Since when?

16         A.      Since March of last year.

17         Q.      March, 2012?

18         A.      Yes.

19         Q.      Where do you receive those?

20         A.      What do you mean where do I receive

21   them?

22         Q.      How are they distributed?

23         A.      On an EBT card.

24         Q.      Is that a plastic card?

25         A.      Yes.

KEISHA JONES - 1/10/2013

```
 1                          KEISHA JONES
 2          Q.      Where did you receive that card?
 3          A.      I receive the card it was mailed to
 4   me in 2012.
 5          Q.      What address do you use for
 6   purposes of the food stamp program?
 7          A.      The P.O. Box 634.
 8          Q.      Do they have any physical address
 9   for you?
10          A.      No.
11          Q.      Are you on any other government
12   assisted programs?
13          A.      No.
14          Q.      Have you been in the last ten
15   years?
16          A.      Ten years?  2002 -- no.
17          Q.      What was the annual revenue of ILV
18   Enterprise?
19          A.      I don't recall, but it wasn't much
20   because I was starting the business and working
21   full-time at the same time.
22          Q.      Estimate.
23          A.      Less than 5,000.
24          Q.      Annually?
25          A.      I would say yes.
```

```
 1                      KEISHA JONES
 2         Q.      What was the highest annual revenue
 3    for the entity?
 4         A.      I don't recall but it wasn't high.
 5    So I will say and I'm -- I don't recall because
 6    I'm -- I just don't recall, definitely less than
 7    20,000.
 8         Q.      So it never exceeded 20,000
 9    annually?
10         A.      I don't believe so.
11         Q.      Do you currently have any bank
12    accounts?
13         A.      I do.
14         Q.      With which banks?
15         A.      I have a Citibank account.
16         Q.      Any other?
17         A.      No.
18         Q.      What type of account?
19         A.      Checking savings.
20         Q.      Do you hold those accounts alone or
21    are they joint accounts?
22         A.      Individual.
23         Q.      How long have you had those?
24         A.      A long time.
25         Q.      Since the '90s?
```

```
 1                    KEISHA JONES
 2   2000?
 3              MR. MALLON:   Objection, asked and
 4        answered.
 5        A.      I would have to look at my
 6   balances.
 7        Q.      Do you have any recollection of it
 8   ever exceeding 2000?
 9        A.      I have to look at my balances.   It
10   is simple enough to look at a particular point in
11   time.
12        Q.      When you filed the lawsuit, do you
13   recall filling out an application to forego
14   payment of the filing fee?
15        A.      Yes.
16        Q.      Do you remember being asked in the
17   form whether you had any money in your checking
18   and savings accounts?
19        A.      I don't remember what the questions
20   were specifically, but I do recall the form asking
21   me if I had -- basically in essence asking me if I
22   had any resources to pay and I said I receive
23   unemployment.   And that was the extent of my
24   resources.
25        Q.      Did you have any money in your
```

```
 1                    KEISHA JONES

 2   account at that time?

 3        A.     There had to be something in the

 4   account or else it would have closed automatically.

 5   So there was something, I don't know exactly what.

 6        Q.     Can you estimate what that

 7   something was in December, 2011?

 8               MR. MALLON:   Objection, asked and

 9        answered.

10        A.     No.

11        Q.     Can you characterize -- was it

12   under 5,000?

13        A.     I don't recall.

14        Q.     Might it have been over 5,000?

15        A.     I don't recall.

16        Q.     Do you have any other investments

17   or assets?

18        A.     I don't have any assets.

19        Q.     Do you have any investments?

20        A.     No.

21        Q.     Do you own anything other than your

22   personal effects?

23        A.     You mean such as what?

24        Q.     Such as clothes and --

25        A.     I own clothes, yes.
```

```
 1                   KEISHA JONES

 2        Q.      Other than clothes and your

 3   personal items, do you own anything else?

 4        A.      Such as?

 5        Q.      Any other type of property?

 6        A.      I don't have -- are you talking

 7   about real estate?

 8        Q.      Do you own any real estate?

 9        A.      I don't own any real estate.

10        Q.      Do you own any -- I will come up

11   with some examples.  Any types of annuities?

12        A.      No, I don't have an annuity.

13        Q.      Any accounts receivable, stocks?

14        A.      No.  All of that -- no.

15        Q.      IRA plans?

16        A.      I don't have any -- I don't have

17   any -- I don't have any investment assets.  My

18   accounts are still physically open with a penny or

19   dollar, whatever it may be.  The accounts are

20   physically there, there are no assets in those

21   accounts.

22        Q.      Other than clothing, books,

23   household goods, furnishings, do you have any

24   other property that you own, personal or real?

25        A.      I do not.
```

```
1                        KEISHA JONES

2         Q.       Where is she located?

3         A.       She was in Manhattan at the time.

4    I don't know where she is now.

5         Q.       What firm?

6         A.       She was independent at the time, so

7    it was just her.

8         Q.       Do you have any documents

9    concerning the action?

10        A.       No.  I haven't seen -- I haven't

11   come across them in cleaning or --

12        Q.       Was any other party involved other

13   than you and the flooring company?

14        A.       No.

15        Q.       You don't remember the name of the

16   flooring company?

17        A.       I don't recall.

18        Q.       Do you have any documents at home

19   that would indicate?

20        A.       No.  Actually I have not seen

21   those, but since it was removed from small claims

22   I'm sure it is on file.

23        Q.       How was the case resolved?

24        A.       It wasn't.  Annette and I can't

25   remember her last name, when that was going on
```

```
 1                        KEISHA JONES

 2    shortly thereafter that is when the fraud

 3    happened.  This as '04 probably going into '05 and

 4    I couldn't afford to pay her, so she referred me

 5    to another attorney and I don't remember that

 6    woman's name.  And she just dropped the ball and

 7    nothing happened.

 8          Q.     Was the case dismissed?

 9          A.     I would assume so because she

10    dropped the ball.  She stopped communicating and I

11    ended up in court because she wanted to be off the

12    case and when I got to court I saw she was like

13    nine months pregnant.  I didn't even know.  Just

14    nothing happened.

15          Q.     Did you recover anything in that

16    action?

17          A.     No.

18          Q.     Have you been a party to any other

19    lawsuit?

20          A.     No.

21          Q.     Have there been any claims against

22    you by the IRS?

23          A.     Oh, yes, I have spoken to the IRS

24    and I'm in the process of clearing that up.

25          Q.     What do you mean?
```

```
1                    KEISHA JONES

2        A.    Back taxes.

3        Q.    Do you owe back taxes?

4        A.    Yes.

5        Q.    For which years?

6        A.    I don't have that information in

7   front of me, but it's a couple of years.

8        Q.    When is the last time -- do you owe

9   back taxes for 2011?

10       A.    Yes.

11       Q.    Do you owe back taxes for 2010?

12       A.    I don't know if '10 was a year that

13  I owed money.

14       Q.    For how many years do you owe

15  taxes?

16       A.    I don't recall.  Offhand it is not

17  like it is consecutive years.  I would have to go

18  back and look at my file.

19       Q.    More than five?

20       A.    I don't think so, but I have to

21  look at my file.

22       Q.    Where are those files?

23       A.    I have them.

24       Q.    Where?

25       A.    I have them at home.
```

```
 1                        KEISHA JONES
 2         Q.        Where do you keep them?
 3         A.        I have them in an IRS folder.
 4         Q.        Have they filed any proceeding or
 5   liens against you?
 6         A.        No.
 7         Q.        Did you owe back taxes for 2004?
 8         A.        I'm not sure because there is a
 9   sticking point with the IRS because I was working
10   and running my business at the same time and when
11   I was at Lehman Brothers I had stocks, so there is
12   a period where we are not clear on what is owed.
13         Q.        They claim that you owe taxes for
14   2004?
15         A.        They are claiming that I owe money
16   for a sale of stock, but I'm not really sure about
17   that.
18         Q.        Do they claim you owe money for
19   2005?
20         A.        I would have to look at my records,
21   but I don't think so.
22         Q.        Have any states brought any tax
23   liens against you?
24         A.        Not that I'm aware of.
25         Q.        Have you ever filed for bankruptcy?
```

```
1                          KEISHA JONES
2              A.     I did.
3              Q.     How many times?
4              A.     Once.
5              Q.     When?
6              A.     That was in '06 after the identity
7      theft.  So a year or so after the identity theft.
8              Q.     Why did you file bankruptcy?
9              A.     Because it was at the time it was --
10     the fraud and everything that was going on, it was
11     overwhelming, I wasn't able to maintain my status,
12     my professional status, it was just overwhelming,
13     I couldn't do it.  It literally made me sick.  So
14     someone made the suggestion and I said, well, you
15     know, if it is going to get me some relief then
16     that is what I need right now.
17             Q.     Did you seek an attorney?
18             A.     I did try to find an attorney, I
19     could not find one, so I just followed
20     instructions.
21             Q.     Proceeding on your own?
22             A.     Right.
23             Q.     What was the outcome?
24             A.     It was dismissed.
25             Q.     Why?
```

1                        KEISHA JONES

2          A.     I didn't follow through all the way

3     and I couldn't find an attorney, so I just -- I

4     just had to let it go because it was too much.

5          Q.     When you say you failed to follow

6     through, did you fail to make payments?

7          A.     I don't think we even got to that

8     point.

9          Q.     Did you pay for the filing fees?

10         A.     I don't recall.

11         Q.     Did you provide all the documentation

12    that they required?

13         A.     I believe I submitted what I could.

14    But I was quite overwhelmed with the fraud because

15    that was in '06 and that was prior to the state

16    enacting the Security Freeze Law, so there was no

17    relief.  There was no help for identity theft

18    victims at the time.

19         Q.     Have you filed for bankruptcy at

20    any point since?

21         A.     No.

22         Q.     So your debts were not discharged?

23         A.     No.

24               (Jones Exhibit 3 for identification,

25          Copy of the petition and schedules filed by

```
1                      KEISHA JONES

2         Miss Jones in the bankruptcy action.)

3         Q.      I show you what is marked as Jones

4    Exhibit 3.  Is this a copy of the petition and

5    schedules that you filed in the bankruptcy action.

6                   (Witness reviewing document.)

7         A.      Is there a question?

8         Q.      Yes.  Is this a copy of the

9    petition and schedules that you filed in the

10   bankruptcy action?

11        A.      Yes.

12        Q.      Your answer is yes?

13        A.      Yes.

14        Q.      Is that your signature that appears

15   on the third page?

16        A.      Page three, yes.

17        Q.      Let's look at Schedule E which is

18   more midway through.

19        A.      Schedule E?

20        Q.      Yes, Schedule E.  That looks like

21   it there.

22        A.      Yes.

23        Q.      Do you see Schedule E?

24        A.      Yes.

25        Q.      You indicate on Schedule E that
```

1                    KEISHA JONES

2    there are two claims against you from the IRS, one

3    in 2004 and one in 2005; is that right?

4            A.      That's what it says here.

5            Q.      This is your handwriting?

6            A.      Yes, it is, yes.

7            Q.      Did you ever pay on those claims

8    listed in Schedule E?

9            A.      No.  One says to be determined and

10   the one from 2004, 1500, I think that stems from

11   the issue with the stock sale.  I'm not really

12   sure.

13           Q.      Let's turn to the next schedule, F,

14   the next one.  Can you identify creditors listed

15   here?

16           A.      The first one would be the student

17   loan.  The second is the credit card.

18           Q.      Which credit card?

19           A.      It says credit card number one, so,

20   I don't know.  I didn't put down the bank name on

21   here so I don't know which one.  Credit card one

22   and credit card two.  So I had two credit cards at

23   the time but I didn't put the bank name.

24           Q.      Which banks did you have credit

25   cards in 2005 -- 2006?

```
 1                    KEISHA JONES
 2        A.     Probably one may have been Chase
 3   and one may have been MBNA.
 4        Q.     You defaulted on both of those
 5   cards?
 6        A.     Yes.
 7        Q.     They were both in the amount of
 8   $15,000?
 9        A.     At the time I may have estimated
10   what the balance was because they were both the
11   same.  I don't know if they would have been the
12   same.  I may have just put the limit on there.
13        Q.     Do you know how much you defaulted?
14        A.     I don't know.
15        Q.     Did you ever pay the amount due?
16        A.     No.
17        Q.     What happened to those debts?
18        A.     I don't know.
19        Q.     Do you have any correspondence from
20   those entities?
21        A.     No.
22        Q.     Any reason to think that their
23   claim was not $15,000 each?
24        A.     I don't know.  It could have -- I
25   don't know because it is strange that I -- I don't
```

KEISHA JONES - 1/10/2013

```
 1                    KEISHA JONES

 2   know if I had -- I don't remember if I had two

 3   credit cards with the same exact limit.  So I'm

 4   not really sure.

 5          Q.     How much debt do you recall that

 6   you had with credit card -- with those two credit

 7   cards with MBNA?

 8          A.     I don't recall what the balance due

 9   was.  I did have -- when I was in good standing

10   prior to identity theft I had high limits because

11   I had good credit.  So credit limit versus balance

12   due, I'm not a hundred percent sure.  So I may

13   have just listed maybe what the credit limit was.

14   I don't recall.

15          Q.     Had you borrowed up to the maximum

16   limit with both of these credit cards?

17          A.     I don't think I did.  But I'm not a

18   hundred percent sure right now.

19          Q.     On the next page we look at

20   Schedule I where you listed your current income in

21   2006?

22          A.     Yes.

23          Q.     At 1500 a month.  Is that accurate?

24          A.     At the time.

25          Q.     In 2006 you were -- your income was
```

1                    KEISHA JONES

2    $1500 a month?

3         A.      Estimated.

4         Q.      Is that right?

5         A.      It says based on a $18,000

6    contract, estimated.

7         Q.      What do you mean by that?

8         A.      I probably had a contract back then

9    at that amount.  But it wasn't, you know, that was

10   the contract amount, but I don't think it was

11   fully executed.

12        Q.      Who was that contract with?

13        A.      Looking at this, I don't know.

14        Q.      You see in the middle of the page

15   it indicates that the contract was fulfilled.

16        A.      I don't know that it was fulfilled.

17   I may have wrote that saying $18,000 -- I would

18   earn $18,000 if the contract was fulfilled.

19        Q.      Did you ever receive the $18,000?

20        A.      I don't think so.  I don't think I

21   received the full 18,000.

22        Q.      You were representing in this

23   document that the $18,000 annual was income?

24        A.      At the bottom of that page 17 I

25   wrote $18,000 is a minimum that I will earn this

1              KEISHA JONES

2        Q.      We will take a look at that later.

3                (Jones Exhibit 5 for identification,

4        Document filed in Miss Jones' bankruptcy

5        action.)

6        Q.      I show you what is marked as Jones

7   Exhibit 5.  Was this filed in your bankruptcy

8   action as well?

9        A.      Is there a question?

10       Q.      Is this a document that you filed

11  in your bankruptcy proceeding?

12       A.      Yes, it appears to be one of the

13  attachments.

14       Q.      The information here is true and

15  complete?

16       A.      As of then, yes, that is what I

17  submitted.

18       Q.      Here you also indicated that you

19  were paying 200 a month in medical expenses in

20  2006.

21       A.      Approximately.

22       Q.      Is that truthful?

23       A.      It is what it was at the time.

24       Q.      What were those costs, the basis

25  for those expenses?

KEISHA JONES - 1/10/2013

```
1                     KEISHA JONES
2          A.      I don't recall.
3          Q.      Has any other type of judgment been
4    entered against you?  Any legal judgments?
5          A.      Whatever is on my credit report,
6    that is what I know.
7          Q.      What legal judgments are you aware
8    of that have been filed against you?
9          A.      That has to do with the apartment.
10         Q.      From the co-op --
11         A.      Correct.
12         Q.      And from the banks involved in that
13   mortgage?
14         A.      Correct, yes.
15         Q.      Any other judgments?
16         A.      Not that I'm aware of.
17         Q.      Have you ever been charged or
18   convicted of a crime?
19         A.      No.
20         Q.      I would like to discuss the
21   Commerce Bank action.  Could you describe the
22   facts relevant to that lawsuit?
23         A.      It was at the time it was my belief
24   that my identity theft stemmed from Commerce Bank.
25   I believe that what I read in the news even though
```

```
 1                    KEISHA JONES
 2   those particular circumstances that was in the
 3   news in '05 that bank employees were stealing
 4   customer information and giving them to debt
 5   collectors, that wasn't my issue because I didn't
 6   owe anybody any money.  I was in good standing
 7   with excellent credit scores.
 8             But I felt as though employees had
 9   breached my accounts and took my information.
10   When I discover the missing money and contacted
11   the bank and they weren't being forthcoming with
12   any information, I just couldn't get any relief.
13   No one, other than NYPD, they were very helpful.
14   There was no recourse, no relief, no nothing for
15   identity theft victims at the time.  So I felt
16   that was the only thing that I was able to do to
17   try to figure out what happened and get answers
18   and that is why I filed the case.
19        Q.    The incident that you spoke about
20   regarding employees stealing personal information,
21   that was in New Jersey; is that right?
22        A.    It was 2005, you do a Google search
23   using massive bank data theft and it will come up
24   with numerous stories and the banks involved were
25   Commerce and I believe Bank Of America and PNC and
```

```
 1                        KEISHA JONES

 2   a couple of others.  So the details are there.

 3          Q.     But the bank theft accessed reports

 4   for customers of Cherry Hill, New Jersey; is that

 5   right?

 6          A.     I don't know.

 7                 (Jones Exhibit 6 for identification,

 8          Miss Jones' complaint against Commerce Bank.)

 9          Q.     I show you, Miss Jones, what is

10   marked as Exhibit 6.  Do you recognize this

11   document?

12          A.     Yes.

13          Q.     What is it?

14          A.     It is my complaint against Commerce

15   Bank.

16          Q.     That is your signature that appears

17   on page 14?

18          A.     Yes.

19          Q.     The allegations in here are true?

20          A.     To my knowledge, yes.

21          Q.     You signed it under oath?

22          A.     Correct.

23          Q.     You see on the second page,

24   paragraph eight?

25          A.     Second page you said?
```

1          KEISHA JONES

2          Q.     Yes.  Look at paragraph eight, you

3     were describing the article that -- an article

4     regarding bank theft; is that right?

5          A.     Yes.

6          Q.     Is that the bank theft that you

7     spoke about today at your deposition?

8          A.     Yes, that's one of several articles

9     that are online.

10          Q.     And this instance involved

11     customers of a Cherry Hill, New Jersey based

12     Commerce Bank?

13          A.     That was a part of the article,

14     correct.

15          Q.     And that is what this incident of

16     theft involved, Cherry Hill based customers?

17               MR. MALLON:   Objection, that clearly

18          misstates what the document says.  Can we go

19          off the record for a second?

20               MR. STRAZZERI:   Sure.

21               THE VIDEOGRAPHER:   We are going off

22          the record at 2:10 p.m.

23               (Recess taken.)

24               THE VIDEOGRAPHER:   We are back on the

25          record at 2:11 p.m.

```
 1                      KEISHA JONES

 2   BY MR. STRAZZERI:

 3        Q.      The incident that you're describing

 4   here in paragraph eight did not pertain to you or

 5   your personal information; is that right?

 6             MR. MALLON:   Objection.

 7        A.      This is -- what I did was I cited

 8   what I found online relative to what happened

 9   regarding what I thought was a breach of customer

10   information, including mine.  That was my

11   contention.  That even though -- whatever the

12   article said, it said.  I felt as though whatever

13   happened to me happened to hundreds of thousands

14   of other people at the same time, that it was all

15   part of the same fraud that was going on.

16        Q.      Did you have any reason to believe

17   that your identity theft was a part of this larger

18   incident described in the paper?

19        A.      I did.  Once I read the articles in

20   the paper, I read those articles after I discovered my

21   money was stolen, I thought it was just all

22   related.

23        Q.      Was it?

24        A.      It is my contention that it was,

25   yes.
```

KEISHA JONES - 1/10/2013

```
 1                    KEISHA JONES
 2         Q.     So you think your identity was
 3    stolen in the context of the identity theft
 4    described in this article?
 5                    MR. MALLON:   Asked and answered.
 6         A.     I believe that the identity theft
 7    stemmed from Commerce Bank.
 8         Q.     You alleged here that you opened an
 9    account at Commerce Bank for your business, ILV
10    Enterprise, right?
11         A.     Correct.
12         Q.     And you opened it in February,
13    2004?
14         A.     If that is what it says, I don't
15    recall.
16         Q.     Take a look at paragraph 13.
17         A.     Yes.
18         Q.     Did you open any other account with
19    Commerce Bank other than in February of 2004?
20         A.     No.
21         Q.     And the account was in the name of
22    your business?
23         A.     Correct.
24         Q.     Looking down at paragraph 21 you
25    allege that you discovered that money was
```

```
 1                      KEISHA JONES
 2   fraudulently withdrawn from your ILV Enterprise
 3   account; is that right?
 4          A.     Correct.
 5          Q.     How much?
 6          A.     I don't recall.  I don't know if it
 7   is here or not.
 8          Q.     Does the number $1,860 refresh your
 9   recollection?
10          A.     It is possible, but I don't recall
11   the exact dollar amount.
12          Q.     Do you have any reason to think
13   that it was anything other than that amount?
14          A.     I don't recall the exact dollar
15   amount.
16          Q.     Do you have any reason to think
17   that it was more than that?
18          A.     I don't recall the exact dollar
19   amount.
20                 (Jones Exhibit 7 for identification,
21          Decision issued by the court in your Commerce
22          Bank action.)
23          Q.     Take a look, Miss Jones, at
24   Exhibit 7.  Do you see that this was a decision
25   issued by the court in your Commerce Bank action?
```

```
 1                        KEISHA JONES
 2          A.      Is the dollar amount here?
 3          Q.      Do you recognize the document as
 4  the decision issued by the court in your action
 5  against Commerce Bank?
 6          A.      Yes.
 7          Q.      Take a look at the second page,
 8  does it indicate in the decision how much money
 9  that you claim was withdrawn from the account at
10  Commerce Bank?
11          A.      I don't see it on page two.  Unless
12  I'm just not seeing it.
13               MR. KARAMOUZIS:   Can we stipulate to
14          the amount?  It's a matter of record in the
15          court.
16               MR. MALLON:   If it is a matter of
17          record we don't need to stipulate to
18          anything.
19               MR. KARAMOUZIS:   Here it is on the
20          first page of that document also.
21               MR. MALLON:   Is there a question?
22          Q.      Yes, I mean the question is how
23  much money do you claim was fraudulently withdrawn
24  from your account?
25               MR. MALLON:   Objection, asked and
```

```
 1                    KEISHA JONES
 2       answered.
 3            MR. KARAMOUZIS:   Does that document
 4       refresh your recollection, the second one?
 5            MR. MALLON:   I have been handed a
 6       document by Mr. Karamouzis, this hasn't been
 7       marked as an exhibit yet.  This is a separate
 8       document.
 9            MR. STRAZZERI:   I will mark it just
10       for identification.
11            (Jones Exhibit 8 for identification,
12       Document.)
13       Q.     Do those two documents, Miss Jones,
14  marked as Jones Exhibit 6 and 7 refresh your
15  recollection as to how much you claim was
16  withdrawn from your ILV enterprise Commerce
17  account?
18       A.     This is the amount that is in the
19  opinion of order, yes.
20            MR. MALLON:   Those documents are
21       marked as 7 and 8 not 6 and 7.
22            MR. STRAZZERI:   Thank you.
23       Q.     How much did you claim in that
24  action was withdrawn from your account?
25       A.     It says $1,860 .
```

```
 1                    KEISHA JONES
 2         Q.    Go back to the complaint that you
 3    filed against Commerce Bank which is identified as
 4    Exhibit 6.  We were looking at paragraph 21.  You
 5    state here that "On May 22, 2005 you discovered
 6    that your business checking account balance was
 7    incorrect when you were unable to execute a debit
 8    card purchase at an office supply store."  Is that
 9    correct?
10         A.    Correct.
11         Q.    Was that the first time that you
12    learned that money had been withdrawn from that
13    account?
14         A.    That is when I discovered it.
15         Q.    Is that when you discovered the
16    identity theft?
17         A.    No.
18         Q.    When did you discover the identity
19    theft?
20         A.    At the beginning of the year in the
21    first quarter of 2005.
22         Q.    How did you discover it?
23         A.    By way of the IRS.  I called the
24    IRS to ask a question and they stated that my -- I
25    gave the incorrect address and through
```

```
 1                     KEISHA JONES

 2    conversation I realized that a fraudulent tax

 3    return had been filed through H&R Block.

 4         Q.      When is the first time that you

 5    learned of any fraudulent withdrawal from your

 6    Commerce Bank account?

 7         A.      2005, May.

 8         Q.      What did you know with respect to

 9    your identity being stolen prior to May 22nd,

10    2005?

11         A.      I knew that a fraudulent tax return

12    had been filed and that is when I discovered all

13    of the -- I read articles about the bank data

14    theft.

15         Q.      Tell me more about the IRS filing.

16         A.      I called the IRS to ask a question

17    because it was the beginning of tax season, as

18    they were identifying me they stated that the

19    address that I gave was not the correct address.

20    And I said what address do you have and I found

21    out that it was a Pennsylvania address and so

22    well, I said I don't live in Pennsylvania.  And

23    through conversation I learned that a fraudulent

24    tax return was filed electronically through

25    H&R Block and the identity thieves got away with a
```

```
 1                   KEISHA JONES
 2    little over $5,000 in a refund.
 3           Q.     When did that occur?
 4           A.     First quarter, 2005.  So, January,
 5    February, March.
 6           Q.     That is when you learned of it?
 7           A.     In the first quarter of 2005, yes.
 8           Q.     Did you learn when the theft
 9    occurred?
10           A.     What theft?
11           Q.     Did you learn when the fraudulent
12    tax return was filed?
13           A.     Yes, during that conversation with
14    the IRS.
15           Q.     When did they tell you the return
16    was filed?
17           A.     It was filed electronically I
18    believe in late January, early February, 2005.
19           Q.     So you had learned about it very
20    soon after it occurred?
21           A.     Yes, fairly soon, yes.
22           Q.     Describe what happened when you
23    spoke with the IRS?
24           A.     I proceeded to question them as to
25    what was happening, how could that occur.  It was
```

1                        KEISHA JONES

2    quite shocking to me at the end of the

3    conversation that anyone's tax account can be

4    altered by way of submitting a tax return.  My

5    address was altered.  And there was nothing that

6    the IRS could do.  They had no identity theft

7    help.  There was just nothing.

8            Q.    So the address that the IRS -- what

9    address did the IRS have for you?

10           A.    They had an address in

11   Pennsylvania.  I don't remember what address that

12   they had.  But they had an address in Pennsylvania

13   because the identity thieves went to an H&R Block

14   in Pennsylvania and used fraudulent documents and

15   filed a fraudulent return and got that return.

16           Q.    So the U.S. Internal Revenue

17   Service had that you, Keisha A. Jones' address was

18   in Pennsylvania?

19           A.    It was a Pennsylvania address, yes

20   by way of the return.  When you submit a return,

21   whatever is on that return gets attached to your

22   tax account.  So for me to actually get it back to

23   normal or to correct the record, I had to submit a

24   paper return and then that paper return overrode

25   the fraudulent return.

1                   KEISHA JONES

2         Q.      Were you owed money from the IRS?

3         A.      I don't recall.  I may have been

4  due a refund.  I honestly don't recall.  That

5  would have been '04, so the tax year '04, '05, I

6  don't recall.

7         Q.      Have you ever seen the fraudulent

8  filing?

9         A.      No, because it was electronic.

10        Q.      How do you know that they were able

11 to receive a refund of over $5,000?

12        A.      Because that is what the IRS issued

13 a check for or they issued a direct deposit into

14 the identity thieve's account, wherever it was and

15 the rapid refund was done electronically.

16        Q.      Do you have any details regarding

17 the account to which they transferred the money?

18        A.      I don't have the details.  The IRS

19 has the details.

20        Q.      Do you know any details regarding

21 the investigation by the IRS?

22        A.      I do not.  I did ask about follow

23 up but once it goes to the OIG, you're out of the

24 loop.  You report it and that's it.  At least at

25 that point in time.  Things may have changed since

KEISHA JONES - 1/10/2013

```
 1                    KEISHA JONES
 2    then.
 3           Q.      Do you know who did it?
 4           A.      I don't know who did it.
 5           Q.      Do you suspect anyone?
 6           A.      Not anyone personally.  I mean I
 7    hold H&R Block responsible, yes, but you know.
 8           Q.      Why?
 9           A.      Because -- it just seemed like an
10    inside job to me, but that is just from where I
11    sit because I'm the victim and I just -- that is
12    just what I believe.
13           Q.      What do you mean inside job?
14           A.      I just believe that people were
15    just in cahoots and as things start to happen when
16    I found out that this all happened through
17    H&R Block, I did a quick search and sure enough as
18    you read articles you see that H&R Block has been
19    involved in these kinds of things before where
20    fraudulent tax returns were filed, but they are
21    all independently owned.
22                  I can't say H&R Block are
23    responsible, this is something that goes on.  It
24    was news to me.  I don't use H&R Block I have a
25    personal tax accountant.  It was all news to me
```

```
 1                    KEISHA JONES
 2   because I didn't know that these things just
 3   happen.  Just like that.
 4         Q.    When did you go to H&R Block?
 5         A.    I never went to H&R Block.
 6         Q.    Were you using your accountant in
 7   2004?
 8         A.    In 2004, yes.
 9         Q.    Why did you call the IRS?
10         A.    I wanted to ask a question.
11         Q.    What question?
12         A.    I don't recall what the question
13   was in 2005, January.  But I did call to ask a
14   question and it's a good thing that I did.
15         Q.    Did you ask your accountant the
16   question?
17         A.    No.  Maybe I did, maybe I didn't, I
18   don't know.  But that was the reason for the call
19   to the IRS.
20         Q.    Did you submit a corrected filing,
21   tax filing for 2004?
22         A.    I submitted a paper return, yes.
23         Q.    Did you receive a refund?
24         A.    I did not receive a refund, I don't
25   believe, because all that was going on.  So there
```

1                    KEISHA JONES

2   was already a refund issued.  The tax return was

3   basically to get the account back to where it

4   needed to be with my correct information.  I don't

5   recall if I was due a refund on that particular

6   return.

7          Q.      How did the individual get the

8   refund of $5,000 but you didn't get a refund?

9          A.      Because they filed electronically.

10  They got a direct deposit into whatever account

11  they opened so they got the money that way, and

12  then after I found out what was happening and then

13  at some point in the year, I don't remember when,

14  I had to file a paper return to correct the record.  But I

15  don't recall on that return if I was due a refund

16  or if I actually owed money.

17         Q.      The IRS, what social security number

18  did they have for you?

19         A.      My social security number was

20  correct.

21         Q.      Was your birthday the same?

22         A.      The IRS -- I don't recall if that

23  piece of information had been changed.  The focus

24  was on the address.  But I don't think the

25  birthday came into play.  It was obviously the

KEISHA JONES - 1/10/2013

```
 1                    KEISHA JONES
 2   social, they filed it under my social.
 3        Q.     So your name and social security?
 4        A.     At a minimum they also did a credit
 5   check.  In order to get a rapid refund H&R Block
 6   checks your credit and at that point I didn't know
 7   what was happening and there was no security
 8   freeze or anything like that and I put the pieces
 9   together and that is how it happened.
10        Q.     The IRS issued a refund based on
11   your name and social security number?
12        A.     That's correct.
13        Q.     But a different address that was
14   located in Philadelphia?
15        A.     Correct?
16        Q.     Did you receive any documents from
17   the IRS concerning the matter?
18        A.     No.
19        Q.     Do you have any written -- did you
20   have any written correspondence with the IRS
21   regarding it?
22        A.     No.
23        Q.     This was all over the telephone?
24        A.     Correct.
25        Q.     Did you report the incident to
```

KEISHA JONES - 1/10/2013

```
 1                    KEISHA JONES

 2    anyone?

 3         A.     I filed a police report in 2005.

 4         Q.     Did you file a police report

 5    concerning the fraudulent tax filing?

 6         A.     Once you file a police report, it

 7    is one police report, identity theft, all the

 8    subsequent incidents that happened after that you

 9    don't file a new report, it is just -- it is

10    already documented that fraud has occurred.

11              (Jones Exhibit 9 for identification,

12         Miss Jones' identity theft police report.)

13         Q.     I show you now what is mark as

14    Jones Exhibit 9.  Do you recognize this document?

15    It is one that your attorneys produced in this

16    litigation?

17         A.     Yes.

18         Q.     What is it?

19         A.     It is my identity theft police

20    report.

21         Q.     Where did you obtain the record?

22         A.     I'm sorry?

23         Q.     Where did you obtain this document?

24         A.     The 44th precinct in the Bronx.

25         Q.     This physical piece paper you got
```

1                    KEISHA JONES

2    from the 44th precinct in the Bronx?

3         A.      Correct.

4         Q.      When?

5         A.      When I filed my police report I got

6    a report then and I went back and asked them to

7    give me another copy.  It was printed on

8    November 10, 2011.

9         Q.      Where was it printed?

10        A.      At the 44th precinct.

11        Q.      So you went down there personally?

12        A.      And asked for another copy.

13        Q.      And they printed it out for you?

14        A.      Correct, maybe not, maybe they

15   didn't -- let's see, NYPD.org, okay, so, yes, they

16   did.

17        Q.      Do you have a recollection of them

18   printing and handing you a report on November 10,

19   2011?

20        A.      Yes, that is the date because that

21   is what is printed at the bottom.

22        Q.      Do you have a recollection of

23   having them print and hand you a report on that

24   date?

25        A.      Yes, I do.  That is what it says.

1                          KEISHA JONES

2          Q.     Did you have a copy of any police

3    report prior to November 10, 2011?

4          A.     Yes, I had the original report from

5    2005 when I filed it.

6          Q.     How did you file it?

7          A.     I'm sorry?

8          Q.     Describe how you filed the report?

9          A.     I went to the precinct and the

10   police officer took the report with my credit

11   report.

12         Q.     What do you mean with your credit

13   report?

14         A.     I had to give them -- I had to go

15   in with my credit report to show someone was

16   opening accounts in my name.

17         Q.     Which credit report did you bring?

18         A.     Experian.

19         Q.     Did you bring any other reports?

20         A.     At the time, maybe Equifax, I

21   believe.

22         Q.     How did you know -- describe the

23   first instance that you spoke to the police regarding

24   alleged identity theft?

25         A.     When I spoke to the police, let me

```
 1                    KEISHA JONES

 2   capture the date.  The date here is February 17th,

 3   2005, so I filed it based on the fraudulent tax

 4   return as well as the credit reports that I had in

 5   my possession at the time.

 6        Q.      What did the credit reports have to

 7   do with the tax return?

 8        A.      Those were the two pieces of

 9   information with respect to why I was complaining

10   about identity theft.

11        Q.      How did the credit reports relate?

12        A.      It had fraudulent information on it

13   at the time.

14        Q.      What information was fraudulent?

15        A.      I think there was an account or two

16   opened.

17        Q.      What information do you recall?

18        A.      I just recall some sort of credit

19   accounts I don't know if it was like a toy store

20   or something like that.  But it was a fraudulent

21   account that was definitely opened and it wasn't

22   my account.

23        Q.      Do you remember who it was with?

24        A.      No, I don't.

25        Q.      Do you know what information it
```

```
 1                    KEISHA JONES
 2    displayed regarding the account?
 3         A.     It displayed an open account.  Yes.
 4    It was an account that didn't belong to me,
 5    because I had very few accounts.  My finances were
 6    quite streamlined.
 7         Q.     So, you reported this incident in
 8    person?
 9         A.     Correct.
10         Q.     And that was on you said
11    February 17th, 2005?
12         A.     Correct.
13         Q.     How did you know -- this was a walk
14    in it indicates?
15         A.     Yes.
16         Q.     How did you know to bring in your
17    credit disclosure?
18         A.     Because I called to verify the
19    correct precinct, to make sure that I was going to
20    the correct precinct and when I called them to
21    tell them what was the happening and what I needed
22    to do, they said well -- they asked me, do you
23    have any proof of this and I told them that what I
24    have.  I have my credit reports and I told them
25    about the fraudulent tax return and they said
```

```
 1                      KEISHA JONES
 2   bring what you have.
 3        Q.      When you called did you report your
 4   name to them?
 5        A.      No, I called to make sure based on
 6   my address that that was the correct precinct.  I
 7   explained what I was complaining about and they
 8   told me what I needed to do.
 9        Q.      Did they record a complaint at that
10   time or did they told you to come in?
11        A.      I'm sorry?
12        Q.      Did they record any complaint at
13   that time over the phone?
14        A.      No.
15        Q.      Is February 17th, 2005 the first
16   time that you reported any identity theft to the
17   police?
18        A.      Correct.
19        Q.      At that point in time the only
20   theft that you were reporting to them pertained to
21   the tax return and items on your credit report?
22        A.      Correct.
23        Q.      Did you report any other identity
24   theft to the police at that time?
25        A.      At that time I believe that is all
```

```
 1                        KEISHA JONES
 2   that I knew.
 3        Q.      The report states that you reported
 4   someone was using your name and social security
 5   number without your permission; is that right?
 6        A.      That is what the officer wrote.
 7   That is not what I said.  Because I would never
 8   give anybody permission to use my name and social
 9   security number.  That was the detective's summary
10   of what I was saying.
11        Q.      Did you give any details other than
12   what he summarized here?
13        A.      I explained to him in plain
14   language like I'm explaining to you now exactly
15   what happened.
16        Q.      At this point you didn't tell him
17   anything about an incident at Commerce Bank?
18        A.      It had not occurred.
19        Q.      And you didn't tell him anything
20   about a State Farm insurance check at this time?
21        A.      What State Farm insurance check?
22        Q.      There is allegations in the -- do
23   you recall making allegations in your Commerce
24   Bank action about a State Farm, a fraudulent State
25   Farm insurance check?
```

```
1                        KEISHA JONES
2           A.      I don't recall offhand, but I mean --
3           Q.      We will look at that in more
4    detail.
5           A.      Okay.
6           Q.      Did you report any other incident
7    of identity theft other than the IRS 2004 filing
8    and certain items on your credit report that you
9    don't recall?
10          A.      In February, 2005 that is what I
11   knew.  I knew about the fraudulent tax return and
12   I had credit reports in at that time.
13          Q.      Did you tell the police anything
14   about accounts with Central Financial Control or
15   Hahnemann University Hospital?
16          A.      I was not aware of that at the
17   time.
18          Q.      Did you tell the police anything
19   about a Comcast Cable account?
20          A.      I was not aware of that at the
21   time.
22          Q.      You weren't reporting those issues
23   with those accounts to the police at this time?
24          A.      No.
25          Q.      Is that right?
```

```
 1              KEISHA JONES
 2       A.      I reported on February 17th, 2005
 3  to NYPD about the fraudulent tax return and the
 4  credit reports that I had at the time because that
 5  is the information that I had on February 17th,
 6  2005.
 7       Q.      Did those credit reports or
 8  disclosures contain any entries regarding Central
 9  Financial Control, Hahnemann University Hospital
10  or Comcast Cable?
11       A.      I don't recall.  I don't recall.  I
12  don't know.  But I don't recall if it did or did
13  not.
14       Q.      Do you recall stating anything to
15  the police regarding any entries regarding those
16  entities?
17       A.      I don't recall those entities at
18  that time.
19       Q.      Does this report state anything
20  about the Central Financial Control or Hahnemann
21  University Hospital accounts?
22           MR. MALLON:   Objection to form.  The
23       document speaks for itself.
24       A.      The narrative that Detective
25  Grazzioso has here is what he captured in terms of
```

```
 1                    KEISHA JONES
 2   what I was complaining.
 3        Q.     The report says nothing about
 4   Central Financial Control or Hahnemann University
 5   Hospital?
 6        A.     Detective Grazzioso did not put
 7   that in his narrative.
 8        Q.     The report says nothing about
 9   Comcast Cable?
10        A.     No.
11        Q.     Have you filed any police reports
12   since the incident or the report identified as
13   Jones Exhibit 9?
14        A.     It is my understanding that when
15   you file a police report regarding identity theft,
16   that it is one police report.  So, any instances
17   subsequent to the initial, it is what it is.  You
18   don't file individual police reports for
19   individual instances was my understanding when
20   this happened to me in '05.  Things may have
21   changed since then, but that was my understanding
22   when I first filed the report.
23        Q.     Did you ever file a police report
24   or attempt to file a police report after February 17th,
25   2005?
```

1                    KEISHA JONES

2              MR. MALLON:   Objection, asked and

3         answered.  You can answer.

4         A.    No.

5         Q.    Did you ever file a police report

6    with respect to Commerce Bank?

7         A.    No.

8         Q.    Did you ever file a police report

9    with respect to Central Financial Control or

10   Hahnemann University Hospital?

11        A.    No.

12        Q.    Did you ever file a police report

13   with respect to Comcast Cable?

14        A.    No.

15        Q.    Did you ever verbally or in written

16   communication inform the police of any subsequent

17   theft of your identity?

18        A.    No.

19        Q.    So this is the last time that you --

20   February 17th, 2005 was the last time you spoke to

21   the police regarding the theft of your identity?

22        A.    It is not the last time.  But this

23   is the formal complaint that was filed when I

24   initially discovered it.

25        Q.    Did you ever inform the police of

1                    KEISHA JONES

2   any other identity theft other than what you

3   reported on February 17th, 2005?

4          A.      Yes, I called NYPD when I

5   discovered the money from the Commerce Bank was

6   missing.

7          Q.      When was that?

8          A.      May 22nd, 2005.

9          Q.      That is when you called the police?

10         A.      Yes, from the bank branch.

11         Q.      Who did you speak with?

12         A.      I don't know who I spoke with, but

13  I did speak to someone and I told him that I filed

14  a complaint about identity theft and I was calling

15  because money was stolen from my bank account.

16  And it was through that conversation that we

17  learned that the Pennsylvania ID was indeed

18  legitimate.  It was in fact ID from the

19  Pennsylvania DMV.

20                 I asked NYPD to please double-check

21  that and make sure and we found out that

22  fraudulent documents were used to obtain

23  legitimate Pennsylvania DMV credentials.  And I

24  asked NYPD to contact Pennsylvania DMV to let them

25  know what was going on and to make sure that they

```
1                       KEISHA JONES

2     blocked my social security number from

3     Pennsylvania DMV's system.

4               Through this process I learned that

5     someone can be out there in 49 other states with a

6     driver's license or a DMV issued ID and I would

7     have no way of knowing about it because the DMVs

8     aren't linked.

9          Q.     Someone had a legitimate

10    Pennsylvania ID in your name?

11         A.     Name and social.  I'm not sure

12    about the DOB.

13         Q.     So someone had a legitimate

14    Pennsylvania driver's license in your name and

15    social security number?

16         A.     I'm not sure if it was a driver's

17    license or just ID.  It was legitimate in the

18    sense that NYPD verified what DMV -- that DMV

19    issued it.  Although fraudulent documents were

20    used, it was a legitimate ID because Pennsylvania

21    DMV did issue it using false documents.

22         Q.     If someone were to check with the

23    Pennsylvania DMV they would have Keisha A. Jones

24    and your social security matched with the

25    Pennsylvania address?
```

```
 1                    KEISHA JONES

 2              MR. MALLON:   Objection, form.

 3        A.    I'm not sure exactly what

 4   combination of information they would have because

 5   NYPD didn't give me the actual ID itself.  They

 6   gave me the photo of the identity thief that was

 7   on the ID.  But certainly we did confirm that it

 8   was my social security and at least my first and

 9   last name.  Middle initial, I'm not sure.  DOB I'm

10   not sure.  Pennsylvania address obviously because

11   it was issued by Pennsylvania DMV.

12        Q.    Do you have -- where is that photo?

13   Have you retained it?

14        A.    I don't know if I did or if I

15   didn't.  But I got it from NYPD.

16        Q.    Have you searched for it?

17        A.    I wasn't looking for it and I

18   didn't see it in -- when I was cleaning or trying

19   to get organized.  So I don't know where it might

20   be.

21        Q.    It is a document that would be

22   covered by our request and we will follow up

23   requesting that you produce that document.

24        A.    It was from NYPD, so I can

25   certainly go back to the precinct and find out if
```

```
 1                        KEISHA JONES
 2   they could issue it again.
 3        Q.     When you called the New York Police
 4   Department on May 22, 2005, did you report your
 5   name to them?
 6        A.     I called them and stated my name
 7   and told them that I already filed a police report
 8   regarding identity theft and at that time I
 9   explained to them what was happening at that
10   moment while I was standing in the bank branch.
11        Q.     Did they send you any documents in
12   response to that call?
13        A.     No.
14        Q.     Was there any report generated as a
15   result of your call, to your knowledge?
16        A.     No.   The only thing that was
17   generated was that photograph from Pennsylvania
18   DMV that NYPD obtained.
19        Q.     How did you get that?
20        A.     NYPD.
21        Q.     Did they mail it to you?
22        A.     No, they handed it to me.  I was in
23   the precinct.
24        Q.     When did you receive that?
25        A.     I probably -- I don't remember the
```

```
1                          KEISHA JONES

2    exact date, but it may have been -- I may have

3    after I spoke to them on the phone and left the

4    bank, I may have gone straight to the precinct.

5         Q.     Other than -- during that call on

6    May 22nd, did you report the theft of your

7    identity other than with respect to Commerce Bank?

8         A.     On May 22nd my call to the police

9    was specifically about the theft at Commerce Bank.

10        Q.     It didn't reference your Experian

11   credit file or Central Financial Control or

12   Comcast Cable?

13        A.     My communication while I was in the

14   bank with NYPD was specific to the theft that day

15   that I discovered at the bank.

16        Q.     At Commerce Bank?

17        A.     Correct.

18        Q.     Have you formed or contacted the

19   police at any point other than on February 17th, 2005

20   and on May 22, 2005?

21        A.     No.

22        Q.     Have you ever gotten a report from

23   the police other than what is marked as Exhibit 9?

24            MR. MALLON:   Objection, asked and

25        answered.
```

1              KEISHA JONES

2        A.      I have one police report.

3        Q.      And this is it marked as Exhibit 9?

4        A.      Correct.

5        Q.      Was the report that you claim to

6   have received from the police on February 17th,

7   2005 identical to the one that appears as Exhibit 9?

8        A.      Exhibit 9 is what NYPD gave me when

9   I requested it.

10       Q.      Have you ever received a copy of

11  that report prior to November 10, 2011?

12       A.      I received a copy of the report

13  shortly after I reported it on February 17th,

14  2005.  I had to wait a few days before I could get

15  a copy of the police report after I filed it.

16       Q.      How did you get the copy?

17       A.      I had to go back into the precinct

18  to pick it up.

19       Q.      And they handed you a document?

20       A.      Correct.

21       Q.      Where is that document?

22       A.      I don't have that original

23  document.  I'm assuming that I may have

24  inadvertently submitted it and did not realize and

25  didn't keep a copy of the original police report.

1                    KEISHA JONES

2          Q.      Did you make copies of that

3    original report?

4          A.      Yes.

5          Q.      How many copies?

6          A.      I don't recall how many copies, but

7    at least three.

8          Q.      Did you send the report anywhere?

9          A.      I did.  I believe I did.

10         Q.      Where did you send the report?

11         A.      In 2006 when I got my credit

12   reports I believe I sent that along with a letter

13   and whatever else I need to send after New York

14   State enacted the Security Freeze Law in November

15   of 2006.

16         Q.      Where did you send the report?

17         A.      To Equifax, Experian and Trans

18   Union.

19         Q.      Do you have any report of ever

20   having sent a police report to Experian?

21         A.      I didn't keep a copy.  I can't find

22   the copies of the actual letter and attachments

23   that went with it.

24         Q.      Do you have any evidence indicating

25   that you sent the police report to Experian?

```
 1                    KEISHA JONES
 2              MR. MALLON:   Objection, asked and
 3          answered.
 4          A.     I produced my receipts that I sent
 5    to have my -- for my security freeze as well as
 6    the responses that I got back stating that my
 7    security freeze was placed in 2006.
 8          Q.     And none of those documents
 9    contained a copy of your police report?
10          A.     I'm sorry?
11          Q.     None of those documents contained a
12    copy of your police report; correct?
13          A.     I didn't keep a copy of my
14    attachments and what I put in the envelope.  I did
15    submit to you -- submit the receipts that I got in
16    terms of my mailing receipts.  But for some reason
17    I can't find documents that went with that.
18          Q.     Do you have any evidence that you
19    sent the police report to Experian?
20              MR. MALLON:   Same objection.
21          A.     I didn't keep a copy of the
22    attachments or I can't find them at the moment.
23    So I don't have the actual letter and attachments
24    that went with it.
25          Q.     So am I correct that you have no
```

```
 1                      KEISHA JONES

 2   evidence that you sent the police report to

 3   Experian in 2006?

 4              MR. MALLON:   Objection, misstates her

 5         testimony, asked and answered.

 6         A.    I can't find my copies at the

 7   moment.

 8         Q.    Other than the copies that you

 9   don't have, is there any other evidence indicating

10   that you sent a police report to Experian in 2006?

11              MR. MALLON:   Objection to form.

12         A.    Repeat the question.

13         Q.    Other than the copies that you

14   can't find, is there any other evidence indicating

15   that you sent a police report to Experian in 2006?

16              MR. MALLON:   Objection to form.

17         A.    My security freeze was placed and,

18   you know, my identity theft fraud alerts and all

19   of that is on the report.  So I'm assuming that

20   you all got it, because it is notated on my credit

21   reports.

22         Q.    So the basis for -- is your basis

23   for believing that you sent the report solely that

24   there is a security freeze on your account?

25              MR. MALLON:   Objection to form.
```

```
 1                     KEISHA JONES
 2         A.      And the identity theft notations.
 3         Q.      Is there any basis for believing
 4   that you sent the report, the police report to
 5   Experian other than the notation on the account
 6   and the security freeze?
 7              MR. MALLON:   Same objection.
 8         A.      I'm sorry?
 9         Q.      Is there any basis for believing
10   that you sent the police report to Experian other
11   than the notation on your Experian account and the
12   security freeze?
13              MR. MALLON:   Same objection.
14         A.      I'm not really clear on your
15   question.
16         Q.      We will take a step back.
17              You testified, and correct me if
18   I'm wrong, you're assuming that you sent the
19   police report because there was a security freeze
20   put on your account and because there is a
21   notation regarding identity theft on your file.
22   Am I right?
23              MR. MALLON:   Objection, misstates
24         testimony.  Go ahead.
25         A.      I believe that I sent it in along
```

```
 1                    KEISHA JONES
 2   with a cover -- a letter with attachments because
 3   the purpose of doing so was to get the security
 4   freeze because I'm a victim of identity theft.
 5        Q.     Do you have any actual recollection
 6   of sending the police report to Experian?
 7        A.     I believe I did.  I believe I sent
 8   the attachment.
 9        Q.     Do you have any recollection of
10   doing so?
11        A.     Yes, I believe so.
12        Q.     What is believe so, do you have a
13   recollection or not?  That is my question.
14        A.     I believe I submitted that along
15   with my letter.
16        Q.     Can you recall doing so, the action
17   of sending it?
18        A.     I believe so.
19        Q.     What act, what facts do you recall
20   regarding sending the report to Experian?
21        A.     I believe -- after -- once I knew
22   that the state was going to enact the Security
23   Freeze Law, I was basically waiting for
24   November 1st.  So, I got my letter, I knew I was
25   going to the post office to mail it off and I had
```

```
 1                        KEISHA JONES

 2   my receipts and I went to the post office and

 3   mailed it shortly after, if not the same day that

 4   the Security Freeze Law was enacted.

 5                    At the time I remember -- I said

 6   you need to submit whatever you need to submit.

 7   I'm not sure if it was a letter or a form.

 8   Whatever I needed to do based on that Security

 9   Freeze Law in '06 as a victim of identity theft I

10   followed that process and I mailed it.

11           Q.      And you recall mailing it?

12           A.      Absolutely.

13           Q.      Do you have any documents or copies

14   of it?

15           A.      I submitted my priority mail

16   receipts, so, it is Plaintiff's file for Experian,

17   so those copies are in there.

18                    (Jones Exhibit 10 for identification,

19           Miss Jones' production of documents.)

20           Q.      I show you what is now marked as

21   Jones Exhibit 10.  Are these the documents that

22   you produced in this action?

23           A.      Yes.

24           Q.      Direct me to which documents you

25   contend is evidence of sending Experian a copy of
```