**Exhibit B-3**

**Excerpts from the Deposition of Keisha Jones, dated January 10, 2013, Pages 192-283**

```
 1                      KEISHA JONES
 2   your police report in 2006?
 3         A.     It is not in this package.
 4         Q.     Are there other documents other
 5   than those that appear in this package that you
 6   provided to your attorney?
 7              MR. MALLON:   Objection to form.
 8         A.     It is not here.  The receipts, the
 9   three receipts showing the security freeze
10   mailings, it is not in this package, maybe it is
11   in the other.
12         Q.     Do you have other documents
13   concerning this litigation other than those that
14   are appearing in the package identified as
15   Exhibit 10?
16         A.     Everything that -- I have submitted
17   everything to date, so.
18         Q.     Have you submitted anything other
19   than what is contained in this packet?
20              MR. MALLON:   Objection, form.  The
21         documents were submitted by her attorney.
22         You can answer.
23         A.     There are other documents.  This is
24   concerning Equifax and Experian, there were
25   documents for Trans Union.  I don't know which
```

```
 1                    KEISHA JONES

 2   package it is in, but the receipts regarding the

 3   security freeze I did submit copies of that.

 4              MR. STRAZZERI:   Let the record

 5         reflect these are the only documents that we

 6         received from Plaintiff produce in this

 7         action.  To the extent --

 8              MR. MALLON:   That is totally untrue.

 9         We have given you way more documents.  Are

10         you kidding.

11              MR. STRAZZERI:   Let's go off the

12         record and figure out which other ones.  This

13         is all that I received.

14              THE VIDEOGRAPHER:   We are going off

15         the record at 2:53 p.m.

16              (Recess taken.)

17              THE VIDEOGRAPHER:   We are back on the

18         record at 2:55 p.m.

19              MR. STRAZZERI:  We are going to

20         proceed with the questioning regarding these

21         documents, though it appears that Plaintiff's

22         counsel never disclosed these documents to

23         Experian as opposed to some other Defendants.

24              MR. MALLON:   We disagree with that,

25         but go ahead.
```

```
 1                      KEISHA JONES
 2    BY MR. STRAZZERI:
 3          Q.     Miss Jones, identify whatever
 4    documents you provided to your attorney in this
 5    lawsuit other than those that appear in this
 6    packet?
 7          A.     There is a similar document that is
 8    documents from my file concerning Trans Union.
 9          Q.     What is in that packet?
10          A.     Information regarding Trans Union.
11          Q.     Is there any information in there
12    concerning Experian?
13          A.     It may be.  Some information is
14    cross-referenced, yes.
15                 MR. STRAZZERI:   To the extent that we
16          didn't get these documents I reserve our
17          right to question Miss Jones on those if they
18          are relevant to my client.
19          Q.     What documents in that production
20    concern your Experian credit file or identity
21    theft?
22                 MR. MALLON:   Objection, form.
23          Q.     Let's take one step at a time.
24    Which documents in that packet concern your
25    Experian credit file?
```

```
 1                   KEISHA JONES

 2         MR. MALLON:   When you say that

 3     packet, you're talking about Jones Exhibit 10?

 4         MR. STRAZZERI:   No.  Let me clarify

 5     if it is not clear.

 6     Q.      The question is, what documents in

 7 your production to Trans Union concern Experian?

 8         MR. MALLON:   Objection to form.

 9     A.      It may be in that particular

10 package where I submitted the copies of the

11 mailings regarding the security freeze.

12     Q.      Describe those documents?

13     A.      It is the signature -- the priority

14 mail confirmation receipts that you get at the

15 post office when you mail something and they are

16 pink.

17     Q.      When are they dated?

18     A.      They are pink and they are dated

19 November, 2006.

20     Q.      And they are just the receipts

21 alone, they don't indicate what was sent along

22 within that package?

23     A.      No.  Just the receipts showing they

24 went to the three credit bureaus security freeze

25 department on the day of or shortly after the
```

```
 1                     KEISHA JONES

 2   Security Freeze Law went into effect in 2006.

 3        Q.    Do you have a copy of the letter

 4   that you sent?

 5        A.    No.  I have those receipts and I

 6   have acknowledgment back regarding the security

 7   freeze that it was placed, which was submitted.

 8              (Jones Exhibit 11 for identification,

 9        Documents that Experian produced in this

10        action.)

11        Q.    I show you what is marked as

12   Exhibit 11?

13              MR. MALLON:   Can we go off the record

14        for a second?

15              MR. STRAZZERI:   Yes.

16              THE VIDEOGRAPHER:   We are going off

17        the record at 2:58 p.m.

18              (Recess Taken.)

19              THE VIDEOGRAPHER:   We are back on the

20        record at 2:59 p.m.

21   BY MR. STRAZZERI:

22        Q.    I hand you what is marked as

23   Exhibit 11.  These are documents that Experian

24   produced in this action.

25              MR. MALLON:   A partial amount of the
```

```
 1                    KEISHA JONES
 2        documents.
 3              MR. STRAZZERI:    These are documents,
 4        not the extent of them.   Experian produced
 5        over a thousand pages.
 6        Q.     What is the last Bates number in
 7   that packet?
 8        A.     15.
 9        Q.     Does that package of correspondence
10   include the document you sent Experian, the letter
11   that you sent Experian that you described a moment
12   ago?
13        A.     This information from Experian
14   looks like it goes from 2007 to 2011.
15        Q.     Let's take a look at the page that
16   is Bates labeled Experian 8.
17        A.     Yes.
18        Q.     Is this the letter -- is this a
19   letter that you sent to Experian in November -- on
20   November 18, 2011?
21        A.     Yes.
22        Q.     It is here that you're requesting --
23   describe this letter?
24        A.     I wrote this letter requesting how
25   Experian goes about investigating fraud.
```

```
 1                         KEISHA JONES
 2          Q.     Did you send any documents along
 3    with this letter?
 4          A.     It looks like this is just the
 5    one-page letter.
 6          Q.     Did you send any other documents to
 7    Experian in November, 2011 other than the letter
 8    identified at Experian 0008?
 9          A.     Yes, Experian 0011.
10          Q.     Describe that letter?
11          A.     That letter is December 12th, 2011
12    and I proceeded to ask questions about the report
13    indicated there.  Because I didn't understand it.
14          Q.     Did you enclose any documents with
15    the letter?
16          A.     I did not.  I referenced the
17    Experian report which Experian has.
18          Q.     Did you send any other letters or
19    correspondence or materials to Experian in 2011
20    other than what is marked Experian 005, Experian
21    008 and Experian 0011?
22          A.     Experian 0013 dated December 20th,
23    2011 where I'm asking, again, for my consumer
24    statement to be added verbatim, which was not.
25          Q.     Did you send any enclosures or
```

KEISHA JONES - 1/10/2013

1                       KEISHA JONES

2     materials along with this letter?

3           A.     I do not believe I sent an

4     enclosure.  It looks like it may just be the one

5     page requesting for the second or maybe third time

6     that my consumer statement be added.  My 100-word

7     consumer statement.

8           Q.     Have you ever sent any documents to

9     Experian or letters to Experian other than what is

10    contained in this Exhibit 11?

11          A.     I believe I have.

12          Q.     What is your basis?

13          A.     My basis that this has been going

14    on now year eight, so I'm pretty sure that I have

15    sent other letters, but I may not have them all.

16    I can't find every single thing.  I believe I have

17    sent other letters.

18          Q.     Do you have any recollection of

19    sending any letters other than those that appear

20    in Exhibit 11?

21          A.     I believe I may have.  I may not

22    have kept a copy.

23          Q.     I'm not asking what you believe or

24    assume or think.  I'm asking you what you recall.

25                 Do you recall sending any letters

```
 1                    KEISHA JONES

 2    or materials to Experian other than those that are

 3    contained in Exhibit 11?

 4            A.      I believe ever over the years, I

 5    have, yes.

 6            Q.      What recollection, if any,

 7    regarding other letters or materials that you sent

 8    to Experian?

 9            A.      I'm sorry?

10            Q.      What is the basis for your

11    statement that you believe you sent other

12    materials or letters?

13            A.      Because I have been disputing fraud

14    for quite a few years now.

15            Q.      Do you have any recollection, any

16    specific recollection of sending any other letter

17    or materials to Experian other than what is marked

18    as Exhibit 11?

19                    MR. MALLON:   Objection, she already

20            testified about other things that she sent.

21            A.      I believe I may have, yes.

22            Q.      I'm not asking what you believe you

23    may have done.

24            A.      So what's your definition?

25            Q.      My question is whether you have a
```

```
 1                    KEISHA JONES
 2   recollection, if you recall sitting here today at
 3   this table ever sending a specific document or
 4   letter or materials to Experian other than what is
 5   contained in Exhibit 11?
 6              MR. MALLON:    Same objection.
 7        A.    I believe so, yes.
 8        Q.    What actual recollection do you
 9   have?  Not assumptions or anything else, but what
10   actual recollection do you have of sending other
11   materials to Experian?
12        A.    I sent materials to put my security
13   freeze on and as I said, I have been disputing
14   fraud for several years, so I may have sent other
15   letters regarding fraud.
16        Q.    You may have sent or you recall
17   sending?
18        A.    I may have sent other letters
19   regarding fraud.  I certainly sent documentation
20   regarding the security freeze.
21        Q.    Testify as to all facts regarding
22   other letters or correspondence that you have sent
23   to Experian other than those in Exhibit 11?
24              MR. MALLON:   Objection, asked and
25         answered.
```

KEISHA JONES - 1/10/2013

1                    KEISHA JONES

2        A.       I believe over the years since 2005

3    to present which is now eight years I believe I

4    sent other letters and documentation to Experian,

5    one of which is regarding my security freeze that

6    I sent in 2006.

7        Q.       What are the facts that you recall

8    regarding each of those letters?  How many other

9    letters?

10       A.       Minimum of three.  Sorry, not to

11   Experian.  The security freeze is to all three

12   credit bureaus, those are three letters but not

13   all to Experian.

14       Q.       Let's focus on letters that you

15   sent to Experian.  Give me all the facts regarding

16   each specific letter or correspondence that you

17   sent Experian other than those contained in

18   Exhibit 11?

19       A.       In 2006 I sent Experian

20   documentation for my security freeze and with

21   regard to identity theft.

22       Q.       What did you send?

23       A.       I sent whatever documentation at

24   the time was necessary to get my security freeze

25   on my account and to make sure it is notated that

```
 1              KEISHA JONES
 2   I'm a victim of identity theft.
 3        Q.    What do you recall sending?
 4        A.    I recall sending either -- I don't
 5   know if it was a form or cover letter, but I don't
 6   recall if it was a form that the state required
 7   you to send along with the police report.  And I
 8   have my receipts that I sent it to the security
 9   freeze department and it was obviously done.
10   Which I don't see here.
11        Q.    You don't remember if it was a form
12   or cover letter that you sent?
13        A.    I'm not sure.
14        Q.    Do you remember actually seeing the
15   materials?  Can you recall what you sent?
16        A.    As I said, it was either a form or
17   a letter.  I'm not sure at the time what was
18   called for.  But I sent whatever I needed to send
19   at the time.
20        Q.    When did you send it?
21        A.    November, 2006.
22        Q.    It was just one time?
23        A.    For the security freeze, yes.
24        Q.    Other than that instant that you
25   just described in November of 2006, have you sent
```

```
 1                      KEISHA JONES
 2   Experian any other letters or correspondence other
 3   than those that are contained in Exhibit 11?
 4        A.      I believe so.
 5        Q.      Are you basing your belief on
 6   specific recollection or just an assumption?
 7        A.      I believe so because I have been
 8   disputing fraud for several years now.
 9        Q.      So you're drawing that assumption
10   based on the fact that you have been disputing it?
11             MR. MALLON:   Objection, asked and
12        answered.  Misstates testimony.  Go ahead.
13        A.      I believe I sent other documents.
14        Q.      Do you have any recollection of
15   sending other documents?
16        A.      I believe so, yes.
17        Q.      What is your recollection?
18             MR. MALLON:   Objection, you have ask
19        the same question about five times.
20             MR. STRAZZERI:   She is not answering.
21             MR. MALLON:   Yes, she has.
22             MR. STRAZZERI:   She is making
23        assumptions.
24             MR. MALLON:   She is answering it.  If
25        you don't like the answer that is one thing.
```

```
 1                    KEISHA JONES
 2          MR. STRAZZERI:  I'm asking for her
 3      recollection.
 4          MR. MALLON:  I am going to instruct her
 5      not to answer.
 6          MR. STRAZZERI:   Instruct your client
 7      to testify based on her recollection of
 8      events not on her assumptions of what she
 9      thinks she would have done based on the law
10      that was in place then.  I'm asking for
11      specific recollection.
12          MR. MALLON:  He is asking if you
13      remember specifically sending certain things
14      in.
15      A.    Do you want to ask the question
16  again?
17      Q.    What do you have a specific
18  recollection of sending Experian other than the
19  documents contained in Exhibit 11?
20      A.    I remember sending the documents
21  that were necessary for my security freeze in
22  November of 2006.
23      Q.    What documents did you send
24  Experian?
25      A.    I remember sending them, either it
```

1                    KEISHA JONES

2   is either a cover letter or a form, I don't know

3   which one, along with the police report and I

4   don't know if there was anything else that needed

5   to go with that.  I don't think there was anything

6   else that needed to go with that at the time.

7          Q.     Do you have a copy of that?

8          A.     I do not have a copy of the

9   contents.  I just have a copy of the mailing and

10  the confirmation back stating that the security

11  freeze was placed.

12         Q.     What do you mean when you say a

13  copy of the mailing?

14         A.     The receipt that I mailed it at the

15  post office.

16         Q.     Do you have a copy of anything else

17  with respect to that mailing, the package?

18         A.     I don't -- I have not come across

19  it in my file.  I have only came across the actual

20  receipt as well as the confirmation.

21         Q.     Do you recall sending Experian any

22  other documents or materials other than what you

23  have just described you sent in November, 2006 and

24  the documents in Exhibit 11?

25         A.     I recall sending Experian other

```
 1                    KEISHA JONES
 2  letters over the years that is not included in
 3  here, but I haven't come across the copies of
 4  those.
 5        Q.    Do you have copies of any other
 6  letters that you sent to Experian other than those
 7  in Exhibit 11?
 8        A.    I have not run across any
 9  additional other than what I gave today or that
10  has been printed and everything that I produced so
11  far.
12        Q.    Do you have any proof or evidence
13  indicating that you sent any other letters or
14  materials to Experian other than those in
15  Exhibit 11 and the receipts that you referenced in
16  November of 2006?
17             MR. MALLON:    Objection to form.
18        A.    What I -- everything that I
19  produced so far is what I have on hand so far.
20        Q.    Are there any receipts or anything
21  else with respect to these other mailings?
22        A.    I haven't seen any, but it is
23  possible that there could be.
24        Q.    Describe the other letters that you
25  contend that you sent to Experian that aren't
```

```
1                         KEISHA JONES
2    contained in Exhibit 11?
3                 MR. MALLON:   Objection, asked and
4          answered.   She answer this four times.
5          Q.      Not what we already described.   You
6    described one in November of 2006.   You see that
7    there is several here in Exhibit 11.   Describe any
8    other documents that you recall sending Experian?
9                 MR. MALLON:   Same objection.
10         A.      I believe over the years I have
11   sent Experian documents with regard to consumer
12   statements as well as fraud.
13         Q.      What documents do you, specifically
14   sitting here today, recall sending Experian other
15   than what you just described in November, 2006 and
16   what is contained in Exhibit 11?
17                MR. MALLON:   Same objection.
18         A.      I have sent letters regarding
19   consumer statements.
20         Q.      The letter regarding consumer
21   statements there are some here in Exhibit 11.
22   What other documents other than those here and
23   November of '06 do you have a specific
24   recollection of sending Experian?
25                MR. MALLON:   Same objection.
```

```
 1                    KEISHA JONES
 2        A.     Other than what is here, I believe
 3   I sent letters with respect to the same issue.
 4   Consumer statements and fraud.
 5        Q.     Do you have a specific recollection
 6   of any of those letters?
 7        A.     Consumer statements, yes.
 8        Q.     When did you send it?
 9        A.     At some point between '05 and now.
10   Because this is not -- these documents with
11   respect to the consumer statement, this is not the
12   first time that I asked for a consumer statement.
13        Q.     So you believe you sent another
14   letter concerning consumer statements sometime
15   between 2005 and the present?
16        A.     Yes.
17        Q.     Do you have any more details
18   regarding this alleged mailing other than what you
19   just stated?
20        A.     It was another request for my
21   consumer statement to be added.
22        Q.     Did it contain any other dispute or
23   issue?
24        A.     If I understand your question
25   correctly, what is not here and what I recall
```

KEISHA JONES - 1/10/2013

```
 1                    KEISHA JONES

 2   sending Experian, which I don't have a copy of, if

 3   I had it I would have produced it already, are

 4   specific to adding my consumer statement and

 5   disputes.  Those are the two issues that have been

 6   long-standing since '05.

 7          Q.     Before we can move off this area I

 8   need to understand exactly your recollection of

 9   other materials that you contend that you sent to

10   Experian.

11                 You have identified a letter that

12   you contend that you sent in November of 2006 and

13   we have documents in Exhibit 11.

14                 What I'm asking is for you to

15   identify what other letters you sent to Experian

16   other than those?

17                 MR. MALLON:   Objection.  Asked and

18           answered many times.

19          A.     I just -- you want me -- we could

20   read back what I just said.  It is the same

21   answer.

22          Q.     How many other letters were there?

23          A.     I don't recall.  I don't know how

24   many there were.  But those were the -- those are

25   the two long-standing issues.
```

KEISHA JONES - 1/10/2013

```
 1                        KEISHA JONES

 2          Q.      You don't know how many letters.

 3   Do you know when you sent them?

 4          A.      I don't know the exact dates.

 5          Q.      Do you know where you sent them?

 6          A.      To whatever address Experian had at

 7   the time.

 8          Q.      Do you have copies of any of them?

 9          A.      Not that I can put my hands on now,

10   but if I find them I will produce them.

11          Q.      You said they pertained to two

12   issues; is that right?

13          A.      Those are my two long-standing

14   issues, yes.

15          Q.      Those are disputes and your

16   statement?

17          A.      Consumer statement.

18          Q.      That consumer statement with

19   respect to the identity theft?

20          A.      That is my 100-word consumer

21   statement.

22          Q.      What disputes do those letters

23   pertain to?

24          A.      I don't have the letter in front of

25   me, so I couldn't tell you that.  These have been
```

KEISHA JONES - 1/10/2013

1                     KEISHA JONES

2    my issues over the last eight years.

3          Q.      Without those letters are you able

4    to testify what disputes you address in those

5    letters?

6          A.      Not until I find them or if I find

7    them.

8          Q.      Did you write Experian on any other

9    occasion regarding any issues other than your

10   consumer statement and what you recall just

11   generally as disputes?

12         A.      My issues have been around identity

13   theft, consumer statements, disputes, fraud.

14   Those have been my issues.

15         Q.      Did you ever send Experian a letter

16   specifically addressing Central Financial Control

17   or Hahnemann University Hospital?

18         A.      I don't recall -- I don't know if I

19   sent -- I may have sent a letter, I don't know

20   what is in that -- I don't know if one of those

21   letters is in there of what we -- what I produced

22   last night.  So, I could take a quick look and I

23   will tell you that.

24               (Jones Exhibit 12 for identification,

25         Documents produced day of deposition.)

```
 1                    KEISHA JONES

 2         Q.      I hand you now what is marked as

 3    Exhibit 12.   These are the documents that we

 4    received from your attorney this afternoon?

 5         A.      These are the same.  We already

 6    have them.  Okay.

 7         Q.      Did you ever send Experian any

 8    letter or correspondence regarding the account

 9    with Central Financial Control or Hahnemann

10    University Hospital?

11         A.      I don't recall mailing letters.  My

12    disputes with regard to those Defendants have been

13    verbal by phone.

14         Q.      Have any of your letter

15    correspondence with Experian referenced a Comcast

16    Cable account?

17         A.      My verbal conversations with

18    Experian have involved Comcast, yes.  My verbal

19    conversations.  I don't recall writing a letter to

20    Experian about it, but I certainly wrote to

21    Comcast.

22         Q.      So you never wrote a letter or any

23    written correspondence to Experian concerning CFC,

24    Hahnemann or Comcast Cable?

25         A.      My communication with Experian
```

```
 1                    KEISHA JONES

 2   regarding those Defendants have been primarily by

 3   phone and I have written letters to those

 4   Defendants.

 5           Q.      Have you written to Experian

 6   regarding those accounts?

 7           A.      My communication around that has

 8   been with Experian by phone.  I don't recall

 9   mailing a letter specifically around those

10   Defendants, but I have disputed them repeatedly

11   before and during this litigation.

12           Q.      Have you ever prepared or signed a

13   fraud affidavit?

14           A.      What is that?  If I had to write a

15   letter, if someone wanted me to write a letter

16   stating what happened, I have written a letter.

17   Is that what you're asking?

18           Q.      What letter are you referring to?

19           A.      With respect to getting the money

20   returned to my IRS account I had to write a letter

21   to get that money returned.

22           Q.      Where was that letter sent?

23           A.      I believe the bank that was

24   involved -- I believe it was HSBC, I believe.

25   Because the bank -- it was an electronic return
```

```
 1                    KEISHA JONES
 2   filed through H&R Block and HSBC I believe was the
 3   bank that actually either issued the refund --
 4   somehow or another HSBC was involved, so they had
 5   to -- they were responsible for making sure that
 6   that exact amount -- that check that was cashed
 7   went back to the IRS.
 8            Q.    Was this a statement that you made
 9   under oath or you just had to write a letter to
10   HSBC?
11            A.    I had to write a letter to HSBC and
12   I don't know where this letter is.  I probably
13   still have it, but I can't find it.  And they
14   wanted my signature as well because obviously they
15   had a copy of the canceled -- I believe they sent
16   a check, I don't know what they had, from the
17   identity thieves but I did have to send samples of
18   my signature.
19            Q.    Have you ever prepared or signed
20   any statement under oath regarding your identity
21   theft?
22            A.    Other than my complaints?
23            Q.    Yes.
24            A.    No, I don't recall doing that.
25            Q.    Did you ever submit any sworn
```

```
 1                    KEISHA JONES
 2   the issues that I mentioned.  Identity theft --
 3              MR. MALLON:   I think the confusion
 4         here is you can believe you did something
 5         without having a specific recollection that
 6         you actually did it.  So that is sort of the
 7         confusion that we are having here.
 8              So testify truthfully, but what he is
 9         asking is not whether you did it at all, but
10         whether or not you specifically remember
11         actually sending this certain type of letter
12         or not.
13              MR. STRAZZERI:   Thank you, yes.
14         A.    I think I did.  I think I did.  I
15   don't know what other answer you want from me on
16   that issue.  Because I believe I did.
17              MR. KARAMOUZIS:   Do you remember
18         whether you did it, that's the question.
19              MR. MALLON:   You can believe that you
20         did, but you don't have any specific recollection
21         of sending a letter on a specific date.
22         A.    I recall that I probably did have
23   to notarize -- I did, probably did send a
24   notarized letter to Experian because as I look at
25   that package here I see I sent a notarized letter
```

```
 1                         KEISHA JONES
 2    to Equifax on a particular issue.
 3                  MR. STRAZZERI:   Let's change the
 4           videotape.
 5                  THE VIDEOGRAPHER:   Going off the
 6           record at 3:23 p.m. and this marks the end of
 7           tape number three.
 8                  (Recess taken.)
 9                  THE VIDEOGRAPHER:   We are back
10           on the record at 3:30 p.m. and this marks the
11           beginning of tape number four.
12    BY MR. STRAZZERI:
13           Q.    Miss Jones, back to the point that
14    we were discussing earlier.  Do you have any
15    specific recollection of ever sending Experian any
16    notarized documents?
17           A.    I don't recall.
18           Q.    Do you have any specific
19    recollection of sending Experian anything other
20    than the exhibits in exhibit -- the letter in
21    Exhibit 11 and the documents that you described
22    before in November of 2006?
23                  MR. MALLON:   Objection, asked and
24           answered.
25           A.    Any documents other than what is
```

1                        KEISHA JONES

2    here in Experian's package and my security freeze

3    information from 2006, aside from that you're

4    saying?

5           Q.     Yes.

6           A.     I don't recall.

7           Q.     You referenced contacting Experian

8    by telephone?

9           A.     Correct.

10          Q.     Do you have any record of your

11   calls?

12          A.     I do.

13          Q.     What do you have?

14          A.     My reports.  The documents that I

15   submitted and the reports that were submitted are

16   direct results of my conversations with Experian.

17          Q.     The writing that appears on the

18   reports that you produced?

19          A.     As well as the reports themselves.

20          Q.     Have you made no other type of

21   record of your calls?

22          A.     What is in my complaint and what is

23   in the documents that I produced and the reports

24   themselves.

25          Q.     Did you make any notes?

```
 1                        KEISHA JONES

 2         A.      On the reports, yes.

 3         Q.      Any notes other than what you

 4  produced in this pile marked Exhibit 10?

 5         A.      I'm sorry?

 6         Q.      Have you made any notes regarding

 7  calls with Experian other than those contained

 8  this Exhibit 10?

 9         A.      Along with the complaint and any

10  documents that I produced, those are the results

11  of conversations as well as credit reports received.

12         Q.      I'm just referring to notes.  Have

13  you made any notes regarding your calls with

14  Experian?

15         A.      Yes.

16         Q.      Where are the notes?

17         A.      On my credit reports and the

18  documents that I submitted.

19         Q.      Have you any notes regarding calls

20  other than those that appear on the documents that

21  you submitted?

22         A.      No, because I haven't spoke to

23  Experian since, I forget what date it was, but I

24  did call Experian to dispute something and they

25  told me to call Experian's counsel, that was prior
```

```
 1                      KEISHA JONES
 2              (Witness reviewing document.)
 3        Q.     Does this appear to be your credit
 4   disclosure?
 5        A.     Yes, I do recognize this
 6   information, yes.
 7        Q.     Turn to page three, do you see ID
 8   fraud victim alert on your credit file?
 9        A.     On page three this is Experian's
10   statement.
11        Q.     It indicates that you have an ID
12   fraud victim alert on your file?
13        A.     That is what it says here.
14        Q.     What is your understanding of such
15   an alert?
16        A.     I have no understanding because as
17   far as I'm concerned it is incoherent and not the
18   statement that I requested.  I don't know why
19   Experian continues to maintain this statement.
20        Q.     You understand there is a fraud
21   victim alert on your file?
22        A.     If that is what you're telling me.
23        Q.     Do you understand what it means to
24   have an ID fraud victim alert on your credit file?
25        A.     No.
```

```
 1                          KEISHA JONES
 2          Q.       You see your credit file is frozen?
 3          A.       That is what it says.
 4          Q.       What is your understanding of a
 5   freeze?
 6          A.       My understanding of a freeze, the
 7   only entities that would have access to my credit
 8   reports would be existing creditors and -- existing
 9   creditors.  Otherwise my permission is needed for
10   someone to pull my report.
11          Q.       Take a moment to review the
12   document.  Do you contend that anything in this
13   current disclosure is inaccurate?
14          A.       Yes.
15          Q.       Direct me to each item?
16          A.       Page 13, address.
17          Q.       Which address?
18          A.       4358 Edison Avenue.
19          Q.       Do you recognize that address?
20          A.       I do not.
21          Q.       Have you ever had an account with
22   that address?
23          A.       No.
24          Q.       Anything else.
25                   (Witness reviewing document.)
```

```
 1                    KEISHA JONES

 2              MR. MALLON:   I'm going to object to

 3         the extent that you're asking her to look at

 4         this entire report.  I don't know if we have

 5         time, but she can try to answer the question

 6         to the best of her ability right now.

 7         Q.      Take the time that you need, Miss

 8    Jones.

 9                 (Witness reviewing document.)

10         A.      Telephone number, page 14.

11         Q.      Do you recognize the number?

12         A.      That is not my phone number.

13         Q.      Do you recognize the number?

14         A.      That is not my phone number.

15         Q.      My question, Miss Jones, is if you

16    recognize the number.

17         A.      It is not my phone number, no, I

18    don't recognize it.

19         Q.      My question is just whether you

20    recognize it.

21         A.      I do not recognize the phone

22    number.  That does not belong to me.

23         Q.      Does it belong to your mother?

24         A.      No.

25         Q.      What is your mother's number?
```

```
1                      KEISHA JONES
2          A.     Why do you need my mother's phone
3     number. ·
4          Q.     Is that the number of the house in
5     which you currently live?
6          A.     I use a mobile phone number.
7          Q.     What is your mother's phone number
8     to the house located at --
9          A.     My mother uses a mobile phone
10    number.
11         Q.     Is there any phone line to that
12    house?
13         A.     There is for the Internet, I
14    believe.  It is for the Internet.
15         Q.     What is the telephone number to the
16    residence at 915 East 178th Street?
17         A.     That is not my address.
18         Q.     Sorry.  You currently live at 154th
19    Street?
20         A.     Correct.
21         Q.     What is the phone number of that
22    home?
23         A.     I don't even call it.  I have to
24    look in my phone book.  I don't call my mother on
25    her home phone.  So I have to look it up and get
```

```
 1                    KEISHA JONES
 2  back to you.
 3          Q.     Do you know what it starts with?
 4          A.     718, because it is Queens.
 5                 MR. MALLON:   But it is not the number
 6          on page 14?
 7                 THE WITNESS:   Absolutely not.  I
 8          don't know whose phone number that is.  It
 9          isn't anybody that I know.
10          Q.     You wouldn't know one way or the
11  other if that is your mother's number if you don't
12  know your mother's number, right?
13          A.     That is not my mother's number.  I
14  could tell you that.
15          Q.     Do you have your mother's number in
16  your mobile phone?
17          A.     I do not.  It is at home.
18          Q.     There is no way with what you have
19  here you can identify your mother's number?
20          A.     I'm sorry?
21          Q.     From what you have with you here
22  today, can you identify your mother's phone
23  number?
24          A.     I don't call my mother at home.  I
25  don't have my mother's phone number.
```

1                    KEISHA JONES

2         Q.      Is there anything else in this

3    disclosure statement identified as Exhibit 13 that

4    you contend is inaccurate?

5              MR. MALLON:    Same objection.

6         A.      On page three it says up top,

7    "Personal statement you have asked us to include.

8    You have given us the following statement to

9    include every time a company asks us for your

10   credit report."  That is absolutely false.

11        Q.      Why do you contend that it is

12   false?

13        A.      I have never given that statement

14   and it is an incoherent statement, and I have been

15   disputing that statement consistent, which we have

16   documented here.  This is an Experian statement.

17   This is not anything that I have given to Experian

18   in writing.

19        Q.      What is the statement that you have

20   given to Experian to include here?

21        A.      If we go back to Exhibit 11, Jones

22   11, Experian 005 is one dated January, 2011.

23        Q.      The question, Miss Jones, what is

24   the statement you wanted to have included here on

25   page three of your disclosure statement?

1           KEISHA JONES

2      A.      I'm directing you to two of several

3  requests.  So if you look at Experian 005 dated

4  January, 2011 that is one of at least two.  And

5  the second one is Experian 0013 dated

6  December 20th, 2011.  And I believe that repeats

7  in what was printed off for today.

8      Q.      What I would like you to testify to

9  today Miss Jones is what you have asked Experian

10 to include as your personal statement.

11           MR. MALLON:   She just answered the

12      question.

13           MR. STRAZZERI:   She directed me to

14      some document and I would like her to

15      testify --

16           MR. MALLON:   She answered the

17      question by showing you the document where

18      she asked for that.

19      A.      In writing --.

20      Q.      Just state for the record here what

21 you have asked Experian to indicate as your

22 personal statement.

23      A.      Most recently in the year 2011 the

24 first statement and I will read it verbatim.  It

25 is Experian 005 and it's quoted here.  "I'm a

1                       KEISHA JONES

2     victim of identity theft both financial and

3     medical.  Please be advised that all questions

4     should be directed to me in writing by U.S. mail

5     only at the address of record in New York (P.O.

6     Box)."  End of statement.

7          Q.     That is the statement that you

8     wanted Experian to include in January of 2011?

9          A.     Correct.

10         Q.     Now, you also directed me to

11    another consumer statement that you asked to have

12    included on Experian 13?

13         A.     Correct.

14         Q.     What is the statement that you

15    wanted Experian to include?

16         A.     When the first -- the January

17    statement wasn't added then I wrote again and

18    asked again on December 20th.  "You are on notice

19    that my credit reports contain false, inaccurate

20    and fraudulent information.  All correspondence

21    must be sent to my only address of record at P.O.

22    Box 634, Bronx, New York 10451.  Legal action will

23    commence to correct the record."

24         Q.     Those are the statements that you

25    wanted Experian to include?

1                      KEISHA JONES

2          A.      Those are two -- yes, those are the

3     two.

4          Q.      Are there others?

5          A.      There was a previous one several

6     years ago, but I can't find the letter that I

7     sent.  Only Trans Union put it on there and it

8     remains on there to this day.

9          Q.      You have asked them to include a

10    different statement then?

11         A.      I'm sorry?

12         Q.      There are different statements that

13    you asked Experian to include?

14         A.      These are the statements that I'm

15    asking for Experian to include.  The previous

16    statement before all of these was the one that

17    actually appears on my Trans Union credit report.

18    I don't have that letter.

19         Q.      I'm trying to understand.  Do you

20    want all three statements included or you're

21    saying include this one and then other times

22    you're saying include a different one?

23         A.      What I'm saying is I mailed the

24    letter as you could see here to Experian in

25    January of 2011 requesting my 100-word consumer

1                    KEISHA JONES

2    statement, which I'm entitled to.  When Experian

3    did not do that, I wrote again on December, 2011

4    and requested that my 100-word consumer statement

5    be added.

6          Q.    A different one?

7          A.    A different one from January

8    because it was 11-months later.  Here we sit

9    January 4th and I still don't have my consumer

10   statement.

11         Q.    Since the first time that you have

12   asked Experian to include a consumer statement,

13   they've indicated in your file, "ID fraud victim

14   alert.  Applications may be submitted in my name

15   or my identity may have been use without my

16   consent to fraudulently obtain goods and services.

17   Do not extend my credit without first contacting

18   me personally and verifying all applications

19   information a day or evening.  This victim alert

20   will be maintained for several years beginning...

21   All correspondence should be sent to me at P.O.

22   Box 634 Bronx, New York 10451."  Do you see that?

23         A.    I see that.

24         Q.    That statement has been included in

25   your files since you have asked for a personal

1                    KEISHA JONES

2    statement?

3         A.    That is not the statement.  Because

4    my letter specifically states that I wanted my

5    100-word consumer statement on there verbatim.

6    However, if I am not understanding that I'm not

7    entitled to a 100-word consumer statement

8    verbatim, that was not clear to me.  Experian

9    never sent me anything saying, hey, we are

10   summarizing what you said.  You can't have it

11   verbatim.  As far as I'm concerned I'm entitled to

12   a 100 word statement verbatim.  This is not

13   verbatim.

14        Q.    This is a summary?

15        A.    This is Experian's statement.  This

16   is not my statement.

17        Q.    Since first requesting that a

18   consumer personal statement be included, has that

19   Experian statement been in your file?

20        A.    This is the statement that I have

21   seen.

22        Q.    That has been in place since you

23   asked for a consumer statement?

24        A.    I don't know what was in place back

25   in '04/'05 because as I said, Trans Union is the

```
 1                      KEISHA JONES

 2   only CRA that has put the original statement that

 3   I originally sent regarding my whole fraud

 4   situation that remains today.

 5           Q.      I understand that the statement

 6   that appears in your file is not the one that you --

 7   verbatim of what you wanted.  My question is only

 8   that when you asked for a consumer statement they

 9   put this statement in or a statement in?

10           A.      But this is incorrect.

11               MR. MALLON:   He is not asking if it

12           is correct.  I think the question is do you

13           think they put this in in response to your

14           request.

15           Q.      When you requested the personal

16   statement, was this statement added indicating

17   that you're a victim of identity theft?

18           A.      This statement was there before

19   these two letters.

20           Q.      Since notifying Experian that your

21   identity was stolen, have they included a statement

22   that you're the victim of identity theft, a fraud

23   victim alert?

24           A.      I have to go back and look and see

25   how far back this goes.  I would have to see --
```

```
 1                    KEISHA JONES

 2          Q.      My question is, are you contending

 3    in this lawsuit that Experian put a different

 4    statement than the one that you have asked for

 5    verbatim or is your complaint that they didn't put

 6    a statement regarding your status as a fraud

 7    victim?

 8          A.      They did not put my 100-word

 9    consumer statement as I have it written.

10          Q.      But they put a statement, it just

11    wasn't the one that you wanted?

12          A.      They put some statement here, but

13    it is their own statement.  It is not my

14    statement.

15          Q.      And it informs the reader that

16    you're the victim of identity theft?

17                  MR. MALLON:   Objection, it speaks for

18          itself.

19          A.      This statement that Experian has on

20    here says applications may be submitted or my

21    identity may have been used.  The fact is that

22    applications were submitted and the fact is my

23    identity has been stolen.  So this statement that

24    Experian chose to put on here is not accurate.

25                  In addition to it not being the
```

1                           KEISHA JONES

2     100-word consumer statement that I submitted that

3     I was under the impression that should added

4     verbatim.

5              Q.       But it was added when you asked for

6     a consumer statement; is that right?

7              A.       It was there before.  I don't know

8     when it appeared.   I have to cull over the

9     documents again to see when this incoherent

10    statement popped up.

11             Q.       Is there anything else in this

12    report or consumer disclosure that you contend is

13    inaccurate other than what you have identified?

14             A.       So far as I'm concerned it is the

15    consumer statement on page three.  I see my

16    student loans are here.  So this section is

17    accounts in good standing, okay.

18                      So if I'm reading this correctly

19    from page eight on these are accounts in good

20    standing and they all seem to be accurate.

21                      From page 8 to 12 these are

22    accounts in good standing.  Page 13 there is a

23    fraudulent address that still remains and there is

24    a fraudulent phone number here.  And so I'm

25    dealing with pages three, four, five, six and

1                    KEISHA JONES

2    seven.  I recognize everything on here.  Sometimes

3    I'm dealing with directly, but the only fraud that

4    I see or inaccuracy I have already identified.

5              I would also like to say for the

6    record on page eight, Long Island University.  On

7    the right-hand side, your statement.  That

8    statement has been there since 2001 and that was

9    my statement verbatim.  So my expectation is

10   always that when I submit a statement it is

11   entered verbatim.

12        Q.     The statement that appears on eight

13   is to your satisfaction?

14        A.     That is my verbatim.  That is what

15   I assumed would be done when I send in a request

16   for my statement to be added.

17        Q.     Before I move on, to clarify the

18   inaccuracies that you allege are contained in the

19   January 4th, 2013 report are the telephone number,

20   the Edison Avenue, New York address and the

21   content of the consumer statement; is that right?

22        A.     Correct.

23        Q.     Is there anything else that you

24   allege is inaccurate in that report?

25        A.     Not inaccurate.  There are some

1                          KEISHA JONES

2      things that I have to find out on my own, but I

3      recognize everything here.

4          Q.      Are you alleging in this lawsuit

5      that anything else is inaccurate in this report?

6          A.      In this report dated January 4th,

7      2013, that's it.

8          Q.      We could put this aside.

9                  Let's discuss the Central Financial

10     Control Defendant.  Have you ever seen any entries

11     concerning Central Financial Control or CFC in

12     your Experian credit file?

13         A.      Yes.

14         Q.      When was the first time?

15         A.      I think it goes as far as '08.

16     '08, '09.  Somewhere in there.   '08, '09, '10.

17         Q.      What was your understanding why it

18     was there?

19                 MR. MALLON:   Objection.

20         A.      I don't know why it was there

21     because it is not an account that I had.  It

22     wasn't my account.  It was fraud.

23         Q.      Do you have any information at all

24     as to how it ended up in your file?

25         A.      I have no idea how it got to my

1                          KEISHA JONES

2      file.  I know it is fraud.

3             Q.      Do you have any reason to think

4      that it was associated with theft of your identity

5      in Philadelphia?

6             A.      Yes, I believe it does stem from

7      the identity theft.

8             Q.      What is the reason that you believe

9      that?

10            A.      It appears eight years later that

11     everything seems to be concentrated in the

12     Philadelphia, Pennsylvania area from Commerce Bank

13     to the addresses that Comcast was delivering

14     service to, to the hospital, everything seems to

15     be concentrated there in Philadelphia,

16     Pennsylvania.

17            Q.      Have you ever been treated at

18     Hahnemann University Hospital?

19            A.      No, I have never been to a hospital

20     outside of New York.

21            Q.      Have you ever received any document

22     or bills from Hahnemann University Hospital?

23            A.      No.

24            Q.      How about from CFC?

25            A.      No.

1                    KEISHA JONES

2        Q.      And other reports as well?

3        A.      If the notation is there.  I don't

4    know if it may have fallen off in between reports.

5        Q.      They put this in after you disputed

6    those items?

7        A.      I would assume so, yes.

8        Q.      Has Experian told you to contact

9    CFC directly?

10       A.      No.

11               (Jones Exhibit 15 for identification,

12          Copy of Miss Jones' credit disclosure dated

13          March 13th, 2011.)

14       Q.      Take a look at Exhibit 15.  Miss

15   Jones is this a copy of your credit disclosure

16   date March 13th, 2011?

17       A.      Yes.

18       Q.      And you were sent this at your P.O.

19   Box in the Bronx?

20       A.      Yes, P.O. Box 634.

21       Q.      So you received this document?

22       A.      Yes, I see this.

23       Q.      You see on the first page there are

24   two notations regarding Central Financial Control?

25       A.      Yes.

```
 1                     KEISHA JONES

 2        Q.     Did you receive this in response to

 3   disputing those credit items?

 4        A.     Yes.

 5        Q.     It indicates that or instructs you

 6   to contact Central Financial Control directly?

 7        A.     Yes.

 8        Q.     Did you do so?

 9        A.     Yes, but not at the direction of

10   Experian.  I did that previously when I saw it in

11   '08 or '09 or whatever year it was, I contacted --

12   no, I didn't contact CFC.  I contacted the

13   hospital.

14        Q.     Did you ever contact CFC?

15        A.     I don't recall contacting CFC.

16        Q.     Did you ever inform CFC that that

17   was not your debt?

18        A.     I don't recall speaking to them,

19   but I consistently disputed it via my credit

20   report.

21        Q.     Did you ever dispute it with CFC?

22        A.     I don't recall disputing it with

23   them directly.  I do recall going directly to the

24   hospital.

25        Q.     When did you go directly to the
```

1                   KEISHA JONES

2    hospital?

3         A.    I called '08, '09, whenever I

4    discovered it.  I don't know exactly what the year

5    is, but you know.

6         Q.    Who did you speak with?

7         A.    It is in my complaint.  The

8    gentleman's name that I believe I spoke with is

9    Keith whatever his last name is.

10        Q.    What did you tell him?

11        A.    I explained to him that this is

12   fraud and I wanted to know what was happening.  If

13   they are claiming this is my information they need

14   to send it to me and obviously they didn't.

15        Q.    Did you tell him anything else?

16        A.    I just explained that it was fraud

17   and that I have disputed it and that was pretty

18   much the extent of the conversation.  And I made a

19   phone call to medical records and that is how I

20   found out that the DOB didn't match.

21        Q.    What is medical records?

22        A.    Medical records at Hahnemann

23   University Hospital.

24        Q.    What did you do next?

25        A.    I'm sorry?

1                    KEISHA JONES

2          A.      No.

3          Q.      Do you know which social security

4    number they had on your account?

5          A.      I don't know that they did have a

6    Social Security Number, I don't know.

7          Q.      You don't know one way or the

8    other?

9          A.      I don't know.

10         Q.      Did you learn about any other

11   information that they had in your file?

12         A.      The medical records that they have

13   there at the hospital has my name and a different

14   birthday and a Philadelphia address.  I don't know

15   about the social.

16         Q.      Do you know any information about

17   the treatment the hospital gave?

18         A.      I would have no way of knowing

19   that.  That is private information.

20         Q.      They didn't give you that?

21         A.      No.

22         Q.      Did you have any other

23   correspondence or written or oral with Hahnemann

24   University Hospital other than that?

25         A.      I think that was -- I recall that

1                    KEISHA JONES

2    was the extent of it.  When I didn't get a letter

3    back, I just, as I said, I consistently disputed

4    it with -- consistently disputed it on my credit

5    report.

6            Q.      Did you ever have any written or

7    oral communication with CFC?

8            A.      I don't recall speaking to CFC

9    directly.

10           Q.      Did you ever give Experian any

11   document from the hospital or CFC indicating that

12   you weren't responsible for the debt?

13           A.      I never received anything from the

14   hospital.

15           Q.      So you never gave anything to

16   Experian from the hospital or from CFC?

17           A.      There was nothing to give.

18           Q.      Why did you bring your lawsuit

19   against CFC and Hahnemann University Hospital?

20           A.      Those were the two that were on my

21   credit report and since I am not an attorney, I

22   figured cast my net wide and see what happens.

23           Q.      What do you mean by that?

24           A.      Meaning as far as I was concerned

25   the hospital hired CFC to collect on a fraudulent

```
 1                       KEISHA JONES
 2    debt, so I need to bring them both to the table to
 3    get this straightened out, especially since I knew
 4    the DOB and address didn't match.
 5          Q.      Why do you contend they were
 6    responsible for a debt that was fraudulently or
 7    account that was fraudulently opened in your name?
 8                MR. MALLON:   Objection to form.  She
 9          is not alleging they are responsible.  She is
10          saying she wasn't responsible.
11          A.      Those are the entities that I need
12    to deal with to get it off.
13          Q.      Do you think they were responsible
14    for why it appeared in your credit file?
15                MR. MALLON:   Objection to form.
16          A.      I don't know who is responsible,
17    all I know is that it is fraud and it needs to come
18    off.
19          Q.      Who perpetrated the fraud?
20                MR. MALLON:   Objection to form.
21          A.      An identity thief.
22          Q.      The reason why there is a -- there
23    was a CFC or Hahnemann entry in your file is
24    because of an identity theft?
25                MR. MALLON:   Objection to form.
```

```
 1                      KEISHA JONES

 2          A.      Correct.  Someone used my

 3   information and went to the hospital.  Or I'm

 4   assuming.  I don't know about the social.  That I

 5   have yet to confirm.

 6          Q.      Someone used your name and

 7   information to pay for services from the hospital,

 8   is that your understanding?

 9              MR. MALLON:  Objection to form.

10          A.      My understanding someone used my

11   name.  I have not been able to confirm that the

12   hospital actually has my social security number.

13          Q.      And you settled with the hospital

14   and CFC in this lawsuit?

15          A.      Correct.

16          Q.      How much did you receive from that

17   settlement?

18              MR. MALLON:  Objection.  I instruct

19          her not to answer.  It is a confidential

20          settlement.  Don't answer the question.

21          Q.      Did you receive money from CFC and

22   Hahnemann University Hospital?

23              MR. MALLON:  Objection, same

24          objection.  It's confidential.  Don't answer

25          the question.
```

 1                        KEISHA JONES

 2          Q.      They are no longer a party to the

 3     lawsuit; is that right?

 4                  MR. MALLON:    Objection to form.

 5          Q.      Do you know if they are still a

 6     part to the lawsuit or not?

 7          A.      I don't know.  I haven't seen -- I

 8     don't know what -- it there have been documents

 9     that have been signed to officially dismiss them.

10          Q.      You're dismissing them from this

11     action?

12          A.      We have settled and I believe there

13     is some paperwork that needs to be done.

14          Q.      Let's discuss Comcast Cable.  Have

15     you ever seen any interests concerning Comcast

16     Cable in your Experian credit file?

17                  MR. MALLON:    Objection to form.

18          A.      I'm sorry?

19          Q.      Have you seen any entries

20     concerning Comcast Cable in your Experian credit

21     file?

22          A.      Yes.

23          Q.      When was the first time?

24          A.      I don't remember the first time.

25     It is probably like 2010.  Somewhere thereabouts.

```
 1                          KEISHA JONES
 2          Q.      How many times did you see an entry
 3     regarding Comcast Cable in your credit file?
 4          A.      Whenever I discovered it, it was on
 5     there up until today when I looked at this report.
 6          Q.      How many times did you see it in
 7     there?
 8          A.      Every time I have seen the report
 9     from when I discovered it up until today.
10          Q.      How many times would you estimate
11     you have seen that?
12          A.      Minimum of five.
13          Q.      What is your understanding as to
14     why that account was there?
15               MR. MALLON:   Objection to form.
16          A.      It is fraud.  It is on my credit
17     report and it was fraudulent.  It was opened
18     fraudulently by someone in the Philadelphia area.
19          Q.      How did you come to believe that?
20          A.      It was on my credit report.
21          Q.      Is there any other basis for
22     believing it was fraudulent?
23          A.      I didn't open any accounts in
24     Pennsylvania.
25          Q.      Do you have any other information?
```

1                        KEISHA JONES

2          A.      Other than my credit report?

3          Q.      Yes.

4          A.      I'm sorry, what are you asking?

5          Q.      I'm trying to understand all the

6    information and knowledge you have concerning the

7    Comcast Cable entry in your Experian credit file.

8          A.      I have no business with Comcast

9    Cable.

10         Q.      Do you have any information

11   regarding that account that is in your name?

12                 MR. MALLON:   Objection to form, asked

13         and answered.

14         A.      No more than what is on the credit

15   reports.

16         Q.      Do you know anything about that

17   account?

18         A.      I don't.

19                 MR. MALLON:   Objection.

20         Q.      Do you know a name or information

21   that it is associated with?

22                 MR. MALLON:   Same objection.

23         A.      I have received no documentation

24   from Comcast.

25         Q.      What is your -- have you ever had

```
 1                    KEISHA JONES
 2   after receiving -- after making your dispute?
 3        A.     I did receive it after making the
 4   dispute.
 5        Q.     This document states that the
 6   credit grantor requests you to contact them
 7   directly; is that right?
 8        A.     This document does request that I
 9   contact the Comcast directly and this is dated
10   December 9th, 2011 and my correspondence was
11   before then.  So I didn't need Experian to tell me
12   to contact Comcast.  I just did it.
13        Q.     Did you ever contact Comcast after
14   December 9th, 2011?
15        A.     So my letters to Comcast, one is
16   dated November 19, 2011.  And another is dated,
17   yes, December 20th which clearly states that I'm
18   fed up.  So, yes.
19        Q.     Did you have any communication
20   with Experian regarding the Comcast account after
21   receiving this report from them dated December 9th?
22        A.     I received several reports in the
23   month of December, I believe.  I have to go back
24   and look at them to see what the nature is because
25   I received random stuff in the mail from Experian
```

```
 1                          KEISHA JONES
 2    that I don't even know what it was.
 3                    So I'm not certain that I did
 4    additional disputes beyond December 9th.  I have
 5    to look at those documents again.
 6         Q.     Do you have any recollection of
 7    disputing a Comcast account after December 9th,
 8    2011?
 9         A.     I recall I did.
10         Q.     Did you receive any response from
11    Experian?
12         A.     I received a few reports in
13    December from Experian.  Excuse me, reports and
14    information.  I don't believe everything was a
15    full *arm report.
16         Q.     Did you ever provide any
17    information to Experian regarding Comcast?
18         A.     Other than my dispute?
19         Q.     Did you ever provide any documents
20    to Experian regarding the Comcast entry?
21         A.     I did not.
22         Q.     Did you ever provide them with any
23    of the correspondence that you had with Comcast?
24         A.     I did not.
25         Q.     Did you ever provide Experian with
```

```
 1                    KEISHA JONES
 2    any fraud affidavit or police report that your
 3    Comcast account was a result of identity theft?
 4         A.      I have one police report from 2005.
 5         Q.      That is the only one that you
 6    contend that you sent to Experian?
 7         A.      That's correct.
 8         Q.      This account didn't appear until
 9    sometime around 2010?
10         A.      Somewhere thereabouts, '8, '9, '10.
11         Q.      You never sent Experian a copy of
12    the police report after you discovered CFC or the
13    Comcast accounts on your credit file?
14         A.      It is my understanding once you
15    file a police report regarding identity theft it
16    is one police report.  You do not file a police
17    report for every instance of fraud.
18         Q.      You were asked over the years by
19    Experian to send them a copy of the police report?
20         A.      No.
21               (Jones Exhibit 17 for identification,
22         Credit disclosure for Miss Jones dated
23         June 18th, 2004.)
24         Q.      Look at the exhibit marked Jones
25    Exhibit 17.  Is this your name and address on this
```

```
 1                     KEISHA JONES
 2    document?
 3         A.      Yes, it is.
 4         Q.      It appears to be your credit
 5    disclosure dated June 18th, 2004?
 6         A.      Yes.
 7         Q.      Do you recognize the accounts?
 8         A.      Yes.
 9         Q.      Now, the first page indicates that
10    at your request an initial security alert be
11    placed on your file?
12         A.      Correct.
13         Q.      Why did you ask for an initial
14    security alert in June, 2004?
15         A.      Because at the time where I was
16    working there was conversation about someone in HR
17    in the mailroom doing -- allegedly accessing
18    employee information, and so since I didn't know
19    what that was about, I said well, I don't know
20    what is happening, I don't have any facts, but at
21    least I can put a fraud alert on there just to be
22    safe.
23         Q.      So you had no information that your
24    identity had been stolen?
25         A.      No, it was a situation in the place
```

1                    KEISHA JONES

2  that I was working where there was something going

3  on with HR.

4          Q.     Was this the first time that they

5  added a security alert to your file?

6          A.     I don't know.

7          Q.     You don't recall?

8          A.     I'm sorry?

9          Q.     Was that the first time in June,

10  2004 that you had added a security alert to your

11  credit file?

12         A.     I don't know.  That instance goes

13  back a couple of years, so I don't know.

14         Q.     You have added security alerts and

15  freezes to your Experian file since at least 2004?

16         A.     No.  There was no such thing as a

17  security freeze in 2004.

18         Q.     You added a security alert?

19         A.     Fraud alert.  Is that the same as a

20  security alert?

21         Q.     What do you understand what was

22  placed in June, 2004 on your account?

23         A.     I know of a fraud alert which is

24  90 days and also looking at page 17 apparently the

25  identity theft started early in 2004.  So it did

1                    KEISHA JONES

2    start sooner but I didn't know it was an identity

3    theft because there is a Philadelphia address on

4    here.   Experian Bates stamp 500.

5         Q.     Let's put that aside.

6              MR. STRAZZERI:   Mark this as 18

7              (Jones Exhibit 18 for identification,

8         Complaint.)

9         Q.     Let's talk about the lawsuit, Miss

10   Jones.   Why have you brought a lawsuit against

11   Experian?

12        A.     Because there has consistently been

13   fraud on my reports that I have not been able to

14   get off my reports.   So my reports are inaccurate.

15        Q.     So what do you contend that

16   Experian did wrong?

17        A.     It didn't investigate properly.

18        Q.     How so?

19        A.     Clearly the hospital is a clear

20   example.   The DOB didn't match, the address didn't

21   match and the name matched and I don't know about

22   the social security number.   So I have never

23   disputed my personal information with Experian.

24   My name and my social and my DOB as far as I knew

25   was accurate.

```
 1                      KEISHA JONES

 2              If those things are accurate on my

 3      Experian credit report, how is that your client

 4      comes in Keisha Jones born on some different day

 5      who lives in a different state, this is her account when

 6      my information doesn't match up.

 7          Q.     Do you understand that not all the

 8      information has to match up for an item to be

 9      included in a consumer's credit file?

10              MR. MALLON:   Objection to form.

11          A.     No, I don't understand that.  That

12      makes no sense to me.

13          Q.     If someone were to not put the

14      correct birth date on an account, that account

15      shouldn't be included in the credit file?

16              MR. MALLON:   Objection, form.

17          A.     Say that again.

18          Q.     If someone were to put a different

19      birth date on their credit account, you believe it

20      shouldn't be included in the credit file any

21      longer?

22              MR. MALLON:   Objection to form.  I

23              think we are running low on time, are you

24              going do debate with her what the FCR means

25              or are we going to allow Comcast time to ask
```

KEISHA JONES - 1/10/2013

1              KEISHA JONES

2       questions?

3       Q.     Do you have an answer?

4       A.     I don't understand the question.

5       Q.     Why did you sue Equifax?

6       A.     The same issue, fraud, inability to

7  access my credit reports.

8       Q.     Let me go back to Experian.  You

9  said action against Experian because it didn't

10 investigate properly; is that right?

11      A.     Fraud, correct.

12      Q.     What do you mean fraud?

13      A.     There is fraud on my credit reports

14 and I haven't been able to get it off via what I

15 thought was normal channels.  You dispute it and

16 they investigate and then they determine if the

17 information is correct or incorrect and it

18 consistently came back as being correct.  I don't

19 understand how that can be so when the DOB and the

20 address don't match and Experian new or should

21 have known that I'm a victim of identity theft

22 because it has been clear all along.

23      Q.     When you say they determine if the

24 information is correct or not correct, who are you

25 referring to?

1                    KEISHA JONES

2          A.      Experian and its client.

3          Q.      Its client meaning?

4          A.      Whomever your client is in this

5     case.  It could be Comcast, CFC, the hospital.

6          Q.      So your understanding is that CFC

7     and the hospital are clients of Experian?

8          A.      I believe so.

9          Q.      Let's take a look at the complaint.

10    Is your allegation -- was your allegation against

11    Trans Union any different than from Equifax and

12    Experian?

13         A.      They are similar.

14         Q.      That is they were reporting entries

15    that you contend are fraudulent?

16         A.      Correct.

17         Q.      Take a look at the complaint which

18    is marked as Exhibit 18.  Turn to paragraph 52,

19    which introduces a section regarding Experian.  It

20    is in the section describing Experian.

21                 Miss Jones describe your allegation

22    in paragraph 52 that Experian does not investigate

23    disputes or frauds?

24         A.      It is my belief they do not.  Again

25    using the hospital as a classic -- as the example.

1                    KEISHA JONES

2         Q.      What information do you have with

3    respect to whether or not Experian ever conducted

4    an investigation with CFC or the hospital?

5         A.      Consistently reporting the fraud on

6    my credit report and verifying it as being true

7    and correct.

8         Q.      But if CFC indicated to them that

9    it was accurate, would you consider that to be an

10   investigation?

11        A.      No.

12        Q.      What do you contend Experian should

13   have done to investigate that CFC and the

14   Hahnemann account other than check with the

15   hospital or CFC?

16              MR. MALLON:    Objection to form.

17        A.      I don't know what is supposed to

18   happen, but in the real world with normal people,

19   if I say that, you know, this microphone belongs

20   to me, and someone says no, the microphone belongs

21   to me, I'm going to say, well, what do you have to

22   show that the microphone belongs to you.

23        Q.      Take a look at paragraph 53, you

24   called Experian to initiate a dispute in November

25   of 2011?

```
 1                      KEISHA JONES

 2          A.      Correct.

 3          Q.      What did you dispute?  What dispute

 4    are you describing here?

 5          A.      I started out by trying to dispute

 6    fraudulent addresses.

 7          Q.      And they requested during this call

 8    on November 10, 2011 a police report?

 9          A.      They asked me did I file a police

10    report regarding that fraudulent address.

11          Q.      They also asked you to submit the

12    police report to Experian, right?

13          A.      No.  They asked me to go -- did I

14    file and send them a police report for this

15    particular incident.  The conversation was based

16    on what you're disputing, did you file a police

17    report about this.  I said I don't have -- I don't

18    have to file a police report every time something

19    happens.  The rep was insisting that every time

20    something happens, I have to file a police report.

21          Q.      During this call did they ask you

22    for a copy of the police report?

23          A.      I don't recall them asking me for

24    that.  They asked me to file a police report based

25    on what I was disputing at that point in time.
```

```
 1                    KEISHA JONES
 2        Q.     Describe your allegations in
 3   paragraph 55?
 4             MR. MALLON:   Objection to form.   The
 5        allegations speak for themselves in
 6        paragraph 55.  You can answer.
 7             (Witness reviewing document.)
 8        Q.     What are you alleging Experian did
 9   wrong here?
10        A.     I was trying to get the contact
11   information -- accurate contact information for
12   CFC.
13        Q.     And --
14        A.     And the rep told me to just Google
15   it.
16        Q.     You felt that Experian should have
17   provided you with that address?
18        A.     It was my understanding that they
19   are supposed to, correct, yes.
20        Q.     And you screamed at the Experian
21   representatives?
22        A.     I did.  I was quite upset and I did
23   raise my voice, not intentionally to be
24   adversarial, but I was upset.  The reason that I
25   did that because I'm trying to -- back to Jones
```

```
 1                      KEISHA JONES
 2             MR. STRAZZERI:   That is not what it
 3         says there.
 4         Q.     Are you basing your contention that
 5    your credit report was disseminated to a
 6    third-party solely on this section or that page of
 7    your Experian credit disclosure?
 8         A.     Correct.  Because it says record of
 9    requests for your credit history.
10         Q.     Do you have any information or
11    knowledge indicating that your credit report was
12    disclosed to any third-party other than what
13    you're saying that one page shows?
14         A.     I have to go back and look through
15    them all once again.
16         Q.     Other than what appears in your
17    credit disclosures, do you have any knowledge or
18    information that your credit report was
19    disseminated to a third-party?
20         A.     Other than my credit report you're
21    saying?
22         Q.     Other than the disclosures that you
23    received of from Experian, do you have any
24    information indicating that a third-party has
25    received a copy of your Experian credit report?
```

```
 1                    KEISHA JONES
 2         A.    I'm basing it on my credit --
 3              MR. MALLON:   He is asking you other
 4         than that.
 5         A.    Not other than my credit report,
 6   no.
 7         Q.    Have you applied for credit in the
 8   last seven years?
 9         A.    I have not applied for credit since
10   my security freeze has been in place since 2006.
11         Q.    Have you submitted any other
12   applications such as a job application or
13   insurance application that required that entity to
14   review your Experian credit report?
15         A.    Yes.
16         Q.    Who?
17         A.    December 14th I gave written
18   authorization for the FBI and the Department of
19   Homeland Security.
20         Q.    Department 14, 2012?
21         A.    Yes.
22         Q.    Anyone else?
23         A.    Sorry, December 17th.
24         Q.    Have you submitted any other
25   applications such as a job application or
```

1                        KEISHA JONES

2       insurance application or housing application that

3       enabled the entity to access your Experian credit

4       report?

5            A.      The only access or permission I

6       have given since the freeze has been on in

7       December 6th is December 17th, 2011 to the FBI.

8                 MR. KARAMOUZIS:     '12.

9            A.      Yes, December 17th, 2012 to the

10      FBI, Department of Homeland Security.

11           Q.      Other than looking at those

12      disclosures, do you have any reason to believe

13      that any third-party has reviewed or seen a copy

14      of your Experian credit disclosure?

15           A.      Other than this information here?

16           Q.      Yes.

17           A.      Not that I know of.

18           Q.      Have you authorized anyone to

19      review your file?

20           A.      Only the December 17th, 2012.

21           Q.      Let's look at paragraph 60 of your

22      complaint.  You allege here that Experian has not

23      maintained a permanent security freeze.  What is

24      your basis for that allegation?

25           A.      That is a -- 60.  If I go back to

1                    KEISHA JONES

2    the December 30th report which is Jones

3    Exhibit 19, I am not sure if this is the report or

4    another one.    I did receive correspondence from

5    Experian.   Let me just -- the basis for that, I'm

6    looking at Jones Exhibit 10.

7         Q.        Those are documents that you

8    produced to Experian?

9         A.        Correct.

10        Q.        Go ahead.

11        A.        And that would be toward the back.

12   It is page 1 of 24 and this is the first page of

13   the report dated December 4th and I have it

14   labeled paragraph 60.   I tried to be organized and

15   behind that it is page 1 of 2.   The first page,

16   December 22nd -- the last four -- three pages or

17   four pages of that package.   The last three.

18        Q.        Starting with the December 4th --

19        A.        Right, it says up top paragraph 60.

20        Q.        Do you have any reason to believe

21   that a security alert was not on your account at

22   that time?

23        A.        Based on these documents when I

24   received them in the mail unsolicited I didn't

25   know why I was receiving them.   And why would a