**Exhibit S**

SUPREME COURT OF THE STATE OF
NEW YORK
COUNTY OF BRONX

DOCKET NO. 24149-05

---

KEISHA JONES,

   Plaintiff,

- against -

COMMERCE BANCORP, INC.,
JOHN DOES 1-50
XYZ CORPORATON

   Defendant(s).

---

**COMPLAINT**

FILED

DEC 28 2005

BRONX COUNTY CLERK'S OFFICE

## PARTIES

  Plaintiff KEISHA JONES, acting *pro se*, for her complaint against defendant, COMMERCE BANCORP, INC., alleges upon knowledge as to her own acts and otherwise upon information and belief, says:

  1. That at all times hereinafter mentioned, Keisha Jones ("Plaintiff") is a self-employed individual and resident of Bronx County in the State of New York.

  2. Upon information and belief, Commerce Bancorp, Inc. aka "Commerce Bank" and "CBH" ("Defendant") is a domestic corporation with its corporate offices in the State of New Jersey and is a publicly traded company on the New York Stock Exchange under the symbol CBH.

  3. Upon information and belief, Commerce Bank is authorized to conduct business in the State of New York.

  4. Upon information and belief, as of June 30, 2005, Commerce Bank operated approximately 326 bank branches that served New York, New Jersey, Pennsylvania and Delaware.



DEPOSITION EXHIBIT
Jones 6
1/10/13
BILL VISCONTI

5. Upon information and belief, "with assets of $36 billion, CBH is the largest bank headquartered in Southern New Jersey, serving Metropolitan Philadelphia, New Jersey, New York, Delaware, Washington, DC and Virginia."

6. Upon information and belief, "CBH plans to continue its growth and reinforce its brand by increasing its branch offices to approximately 700 and its assets to $100 billion by 2009. As part of this plan, CBH commenced its expansion into the Washington-Baltimore market in June 2005, announced its plans to enter Southeast Florida in the fourth quarter of 2005 through the acquisition of Palm Beach County Bank, West Palm Beach, and remains committed to subsequently enter the Boston market at a later date."

## FACTUAL ALLEGATIONS AND SUMMARY OF CLAIMS

7. Commerce Bank caused the theft of Plaintiff's personal identity and company information, resulting in her emotional distress, demise of her business and loss of income.

8. In a May 2005 Associated Press article titled "Bank data theft could hit nearly 700,000: Customers' financial records stolen by employees", it states "The bank employees accessed records for customers of Cherry Hill, N.J.-based Commerce Bank".

9. Plaintiff called the Hackensack NJ police precinct cited, regarding the details of the Associated Press article on or about 5/30/05.

10. Upon information and belief, Zoran Levajac, a former branch manager at Commerce Bank, Kathleen Lovelace, a former assistant branch manager at Commerce Bank, James Digangi, a former employee of Commerce Bank, and Anthony Diamanti, a former employee of Commerce Bank, were arrested in connection with the data theft scheme described in the article.

11. Plaintiff was advised to dissolve the business as soon as administratively possible, as a direct result of the factual allegations and claims herein.

12. Upon information and belief, the IRS and FBI are being kept apprised of the Hackensack NJ police investigation.

## TIMELINE

13. In February 2004 Plaintiff personally opened one (1) business checking account #7917184017 for her business ILV Enterprise, Ltd. at Commerce Bank on East 85th Street and Third Avenue in New York.

14. Plaintiff provided corporate documents to establish the account.

15. Plaintiff provided sensitive personal information to establish the account, including her state issued identification, social security number and date of birth.

16. Plaintiff was required to sign documents in order to establish the account.

17. Plaintiff was the sole authorized signor on the account.

18. Plaintiff never hired employees nor did she give any individual ILV Enterprise, Ltd.'s banking information. Plaintiff transacted all legitimate banking business.

19. Plaintiff has never opened or maintained personal accounts or any other business accounts with Commerce Bank, other than account #7917184017.

20. Commerce Bank warranted to their customers generally, and to the Plaintiff in particular, that account information would be safeguarded and limited to authorized parties.

21. On May 22, 2005, Plaintiff discovered that the business checking account balance was incorrect when she was unable to execute a debit card purchase at an office supply store. Plaintiff walked to the nearest Commerce Bank branch in New York to inquire about the linked ATM / debit card.

22. Plaintiff spoke with Commerce Bank's representative Ms. Jeorlene Concillion to review the business checking account.

3

23. The audit trail revealed money was stolen, in at least three (3) separate incidents, by criminal(s) in May 2005.

24. The criminal(s) changed Plaintiff's business checking account address, phone number and other account information at one or more of Commerce Bank's 326 branches in New Jersey, Pennsylvania, Delaware and/or other states with Commerce Bank branches.

25. Plaintiff angrily stated to Ms. Concillion that she did not withdraw the funds and immediately demanded to review the fraudulent paperwork.

26. Ms. Concillion printed the forged Commerce Bank withdrawal slips used to steal funds from Plaintiff's business checking account. Again, Plaintiff angrily stated to Ms. Concillion that she did not withdraw the funds.

27. On her own, Ms. Concillion accessed Plaintiff's signature on file in the computer system, compared it to the forged documents and stated, "that's not your signature", referring to the Commerce Bank withdrawal slips.

28. Ms. Concillion called the fraud department and spoke to "Stephanie" to determine what the next steps should be. Plaintiff completed required documentation to forward to Commerce Bank's fraud department at the NY branch on May 22, 2005.

29. On May 23, 2005, Plaintiff went to Commerce Bank on East 85th Street and Third Avenue to speak to the branch manager at approximately 8:30am EST. The branch manager refused to speak to the Plaintiff, by way of the "greeter" at the front entrance, and referred the Plaintiff to Commerce Bank representative Ms. Karen Clarke.

30. Ms. Clarke called the fraud department and spoke to "Stephanie", the person that was informed of the fraud initially May 22, 2005. Plaintiff was told the paperwork was forwarded internally and that "someone" would contact the Plaintiff on Friday May 27, 2005.

4

31. On May 24, 2005, the Plaintiff provided additional information to Ms. Clarke, by phone, to forward to the fraud department.

32. The Plaintiff was not contacted May 27, 2005.

33. On June 1, 2005, the Plaintiff called Commerce Bank at East 85th Street and Third Avenue at 7:35am EST and requested to speak to the branch manager or a supervisor.

34. Commerce Bank representative Ms. Claudia Gutierrez stated that the East 85th Street and Third Avenue branch was open without a supervisor or manager onsite.

35. On June 1, 2005, traumatized by the chain of events, Plaintiff subsequently called and emailed Commerce Bank's CEO's office. Ms. Mamie Prout was the contact person.

36. After speaking with Ms. Prout, Commerce Bank's Jay Phillips in Corporate Security called the Plaintiff.

37. Plaintiff confirmed that Mr. Phillips had not received the information provided to Ms. Clarke May 24, 2005. Specifically, to check the system for any accounts opened using Plaintiff's personal and business information and investigate them all and a voicemail message from John Dimanaco allegedly calling from Commerce Bank (215-673-9155).

38. Untrusting of Commerce Bank's wherewithal to follow through, Plaintiff emailed a second memo to Ms. Prout on June 1, 2005.

39. On June 6, 2005, Mr. Phillips informed Plaintiff that Henry Byrd would handle "both" cases. It was during this conversation with Mr. Phillips that the Plaintiff learned at least one (1) fraudulent Commerce Bank account was opened using Plaintiff's personal information.

40. Plaintiff also learned that a counterfeit State Farm insurance check was deposited in and returned to the fraudulent account at Commerce Bank.

41. Commerce Bank missed at least five (5) opportunities to prevent fraud and have the criminal(s) arrested within its 326 bank branch network.

42. Plaintiff's legitimate business insurance premium was authorized and debited monthly from the business checking account by State Farm.

43. As a direct result of identity theft, Plaintiff's legitimate business insurance premium payment was returned unpaid and the policy was subsequently canceled for non-payment.

44. When the Plaintiff spoke to Mr. Byrd on June 7, 2005, he stated that she would have an opportunity to review photos and/or surveillance video at a NY Commerce Bank branch or at Commerce Bank's NJ offices, in an effort to identify the criminal(s). The conversation ended with Mr. Byrd stating that the Plaintiff would receive a call in approximately one (1) week.

45. Traumatized by the chaos in Plaintiff's business and personal life, on July 11, 2005 Plaintiff realized she had not heard from Mr. Byrd and left a message on his voicemail.

46. Mr. Byrd did not call the Plaintiff back on July 11, 2005.

47. Plaintiff called Commerce Bank's CEO's office again on July 12, 2005 for answers from Ms. Prout and was told Mr. Byrd would call.

48. On July 13, 2005 Plaintiff spoke to Mr. Byrd.

49. Plaintiff was never notified by Commerce Bank that the stolen funds were credited to Plaintiff's business checking account approximately five (5) weeks earlier, until she made phone calls in July.

50. Plaintiff immediately requested that Mr. Byrd contact the Commerce Bank branch on East 85th Street and Third Avenue to advise that she will arrive to withdraw all funds and return the linked ATM / debit card. Mr. Byrd advised her to see Commerce Bank representative Ms. Z. Mateo at the branch.

51. Ms. Mateo asked for the Plaintiff's "other license". Ms. Mateo was referring to the criminals' information in Commerce Bank's computer system.

52. Plaintiff presented her valid identification that was used to open the business checking account in February 2004 and angrily stated that she is a victim of identity theft.

53. Plaintiff withdrew all funds, handed the linked ATM / debit card to Ms. Mateo, requested a printout of account activity and stated the account should be closed.

54. Again, untrusting of Commerce Bank's ability to follow through, on July 20, 2005 Plaintiff confirmed her suspicions when she was able to access, download and print account activity, via the internet. Plaintiff's instructions to close the account July 13, 2005 were not followed.

55. Plaintiff filed a written complaint against Commerce Bank July 2005 with the Office of the Comptroller of the Currency ("OCC"), regulator of national banks in the United States.

56. It is outrageous that the Plaintiff, a lay person, had to force Commerce Bank to provide answers due her by repeatedly calling and writing Commerce Bank's CEO's office and the regulator of national banks in the United States (OCC).

57. Commerce Bank's Ms. Mamie Prout admitted, in a letter to the OCC, that the Plaintiff is a victim of identity theft.

58. Plaintiff is traumatized by the fact that she will have to represent and defend herself against a growing $36 billion corporation, with an army of the best lawyers money can buy.

59. Plaintiff is not an attorney.

60. Commerce Bank, its agents, servants, employees, licensees and / or independent contractors:

7

a. knew of criminal activities within its growing bank branch network;

b. failed to mitigate fraud given its knowledge of criminal activities, causing Plaintiff's identity theft and sensitive information to be misused;

c. intentionally misled the Plaintiff from the outset of the investigation;

d. concealed the scope and status of the investigation;

e. intentionally withheld documentation requested and totally disregarded the provisions in Section 609(e) of the Fair Credit Reporting Act (15 U.S.C. § 1681g), all of which amounts to *bad faith*.

61. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "60", inclusive with the same force and effect as through said paragraphs were more fully and completely set forth herein at length.

62. Commerce Bank, its agents, servants, employees, licensees and / or independent contractors acted in *bad faith* given its knowledge of criminal activity; wantonly and willfully misled the Plaintiff to believe the investigation was under its control at all times until it was forced to reply to an OCC complaint; withheld the police contact information regarding her case and; intentionally misled Plaintiff by stating she would be able to review photos and surveillance video.

63. Commerce Bank, its agents, servants, employees, licensees and / or independent contractors negligently failed to exercise ordinary care in handling Plaintiff's account; failed to conform with reasonable banking standards and; failed to follow its own internal procedures.

64. The occurrences were caused by wanton and willful acts, negligence, carelessness and recklessness of Commerce Bank, its agents, servants, employees, licensees and / or independent contractors, without any negligence on behalf of the Plaintiff contributing to the occurrences.

8

65. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "64", inclusive with the same force and effect as through said paragraphs were more fully and completely set forth herein at length.

66. The *Contract* provided that "If the Account is not owned by a natural person (a corporation, partnership, limited liability company, sole proprietorship, unincorporated associations, etc.), then the Account Holder must provide evidence to our satisfaction of the authority of the individuals who sign the signature card to act on behalf of the Account Holder."

67. Commerce Bank, its agents, servants, employees, licensees and / or independent contractors *materially breached the contract* by failing to identify the criminal(s) as such with the signature card on file, the "digitized signature" in the computer, corporate documents and/or the active ATM / debit card linked to Plaintiff's business checking account #7917184017.

68. Commerce Bank's *breach of contract* aided in the criminal(s)' ploy to take control of Plaintiff's account, steal her identity, steal money, obtain sensitive information verbally and otherwise, including but not limited to postal mail, computer printouts, statements, canceled checks, payees and account history, given its knowledge of criminal activities within its growing bank branch network.

69. Commerce Bank's *breach of contract* further perpetuated identity theft and other fraudulent activities, within Commerce Bank's 326 bank branch network and beyond, thus compromising Plaintiff's health, livelihood, business records, tax identification and social security numbers.

70. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "69", inclusive with the same force and effect as through said paragraphs were more fully and completely set forth herein at length.

9

71. Commerce Bank, its agents, servants, employees, licensees and / or independent contractors *breached its fiduciary duty* by failing to provide its customers and Plaintiff in particular, with the "trust, privacy and confidentiality" that are "the guiding principles upon which Commerce's relationship with you is built"; failing to "take all reasonable steps to protect the privacy" of its customers and Plaintiff specifically, given its knowledge of criminal activities; and failing to follow the most basic banking procedures.

72. Commerce Bank violated the New York Consumer Fraud Act and New York Consumer Protection statutes of the General Business Law (misrepresentations, false advertising, concealment of information).

73. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "72", inclusive with the same force and effect as through said paragraphs were more fully and completely set forth herein at length.

74. As a direct result of Commerce Bank's transgressions, Plaintiff was forced to seek employment, to mitigate her losses, in an unfavorable job market, subjecting her to potential employer's questionable business practices and further fraud using her personal information.

a. She turned to temporary agencies and the general job market, knowing that potential employers request sensitive personal information.

b. Plaintiff drafted a "confidential" version of her resume, refused to provide sensitive personal information on employment applications and stated in all instances she would provide sensitive personal information if:

   i. an offer of employment were extended and;

   ii. a background check was required as part of the offer (pre-employment process).

10

c. An individual's social security number and date of birth are unnecessary prior to receiving a written offer and entering the pre-employment phase. Sadly, there are a small number of employers that acknowledge this fact and have modified their process accordingly.

d. An appointment was scheduled with a NYC temp agency (Agency #1) and when the Plaintiff arrived, the "recruiter" stated she was too busy to interview the Plaintiff. This is the behavior that people are met with when there are more people looking for work than there are jobs.

e. An appointment was scheduled with a NYC temp agency (Agency #2) that offered temporary and permanent placement. Plaintiff signed up for both services and went on job interviews and one temp assignment. Plaintiff's work was satisfactory to Agency #2 evidenced by a subsequent phone call to return to the same site for another short term temp assignment.

f. Plaintiff was traumatized by the business practices of Agency #2. Specifically, Plaintiff angrily disagreed with their practice of leaving a list of names with social security numbers on a clip board, on an open desk for employees to peruse, when picking up paychecks. Plaintiff scribbled over her social security number so that it was unreadable and signed for her check next to her name and scribbled out social security number.

g. Agency #2 did not call the Plaintiff to work or interview again after the incident.

75. Commerce Bank's, its agents, servants, employees, licensees and / or independent contractors failure to call the police in five (5) or more incidents and arrest the criminal(s) within its 326 bank branch network, Agency #1's humiliating business practice and Agency #2's negligent office procedures, worsened Plaintiff's fragile emotional state.

76. Commerce Bank, its agents, servants, employees, licensees and / or independent contractors conduct en masse, caused Plaintiff's fear of never ending fraud, criminal identity theft,

11

uncharacteristic sleeplessness, nervous trembling, anxiety, loss of appetite, mental anguish, pain, suffering, humiliation and embarrassment.

77. Plaintiff now spends an unprecedented number of hours rebuilding a business, conducting research, writing letters, making phone calls, screening harassing calls from creditors, responding to clients, monitoring business, personal and other reports and accounts, deciphering relevant articles, FTC and FBI testimonies, court cases and legislation regarding identity theft, meeting with business advisors to mitigate fraud, conferring with colleagues and referral services in a frantic search for affordable legal counsel, in an attempt to pick up the pieces of her shattered life.

78. Commerce Bank's, its agents, servants, employees, licensees and / or independent contractors willful disregard of sound procedures, industry standards and use of adequate technology, caused Plaintiff to suffer injuries of an economic nature which have prevented her from doing business in a manner she is accustomed to; Plaintiff can no longer cater to clients in the way her position mandated; she was in good standing prior to the occurrences and has lost income, substantial lines of credit, her investment in the business and opportunities to obtain minority business certifications, precluding her from enjoying her usual and customary activities professionally and personally.

79. Commerce Bank's, its agents, servants, employees, licensees and / or independent contractors outrageous and intentional acts to conceal wrongdoings and mislead the Plaintiff specifically and the public in general, is atrocious. By reason of the facts and circumstances stated above, Plaintiff has been damaged by the defendant and seeks judgment on her claims of bad faith, negligence, breach of contract, breach of fiduciary duty, consumer fraud, intentional infliction of emotional distress and negligent infliction of emotional distress as follows:

a. bad faith damaged Plaintiff approximately ten million dollars ($10,000,000);

b. negligence damaged Plaintiff approximately ($10,000,000);

c. breach of contract damaged Plaintiff approximately ($10,000,000);

d. breach of fiduciary duty damaged Plaintiff approximately ($10,000,000);

e. deception (consumer fraud) damaged Plaintiff approximately ten million dollars ($10,000,000);

f. intentional infliction of emotional distress damaged Plaintiff approximately ten million dollars ($10,000,000);

g. negligent infliction of emotional distress damaged Plaintiff approximately million dollars ($10,000,000);

h. Plaintiff seeks compensatory damages for time spent commencing and defending this action through to resolution and;

i. also seeks punitive damages in the sum of thirty million dollars ($30,000,000).

80. Plaintiff and others similarly situated, should be allowed to:

a. receive an unlimited number of free credit reports from all consumer credit reporting agencies, business credit reporting agencies (i.e. D&B) and banking industry credit reporting agencies (i.e. ChexSystems);

b. freeze and unfreeze credit reports at no cost, to prevent injuries to innocent people and;

c. victims of identity theft, caused by the outrageous acts, negligence and recklessness detailed herein, upon request should receive new social security numbers and cards (to be picked up at a local social security office, *not* mailed), invalidating the stolen social security number in the IRS, all DMV, social security administration and other systems forever.

WHEREFORE, Plaintiff, demands judgment in its favor and against Commerce Bank for damages, together with pre-judgment interest, post-judgment interest, attorney's fees (if retained or

13

consulted during this action), other fees, costs and disbursements and all other legal and equitable relief to which she is entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable herein.

## VERIFICATION

Keisha Jones, being duly sworn, deposes and says:

I am the Plaintiff in the above entitled action. I have read the foregoing complaint and know the contents thereof, the same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

To: Commerce Bancorp, Inc.
Commerce Atrium
1701 Route 70 East
Cherry Hill, NJ 08034-5400
Tel: 888-751-9000

By: _____
Keisha Jones
Pro Se
Post Office Box 634
Bronx, NY 10451-0634
Tel: 212-495-9187

Subscribed and sworn to before me
this 28 day of November 2005
_____
Notary Public

DIANA M. COLLINS
Notary Public, State of New York
No. 04CO6050725
Qualified in Bronx County
Commission Expires July 2, 2007

14