JASON SCOTT, APRIL 4, 2013

1    those people initiate the ACDVs that are sent to the

2    data furnishers.  For the ACDVs received back by the

3    data furnishers that are not handled by automation, that

4    an agent reviews, I would refer to them as an ACDV

5    response agent.

6         Q.  Okay.  So do these dispute or response agents,

7    do they have the ability to verify information by making

8    a phone call to a furnisher or to a consumer?

9              MR. STRAZZERI:  Objection, form.

10        A.  They do have the ability to contact the data

11   furnisher by telephone.  I am not certain if they would

12   contact a consumer in response to an ACDV form.  I'm

13   simply not sure about that last portion.

14        Q.  (By Mr. Mallon)  Not likely that they would,

15   correct?

16             MR. STRAZZERI:  Objection, form.

17        A.  I've never -- in my personal experience, I've

18   never seen that.  I wouldn't say that it has not

19   happened.  I just don't know that they would.

20        Q.  (By Mr. Mallon)  Okay.  But you've never seen

21   it happen in your experience?

22        A.  In my personal experience, I have not seen

23   that.

24        Q.  Okay.  But they do have the capacity to make a

25   phone call to the furnisher, correct?

JASON SCOTT, APRIL 4, 2013

1      A.  Yes, that is correct.

2      Q.  Okay.  And does that ever happen?  Have you

3  seen that happen in your experience?

4             MR. STRAZZERI:  Objection, form.

5      A.  No, I don't believe that I have ever seen the

6  ACDV response agent actually call the data furnisher.

7  That's not to say that it does not happen.

8      Q.  (By Mr. Mallon)  But you've never seen it

9  happen?

10      A.  But in my personal experience, I have not seen

11  that happen.

12      Q.  And you've worked for Experian for

13  approximately 10 years, correct?

14      A.  I have worked for Experian for approximately 10

15  years.  I have never actually held a job function in

16  responding to the ACDVs, so I wanted to preface that.

17  Yes, I have been with Experian for 10 years.  We're just

18  talking about a different segment of the job that I

19  personally have never held.

20      Q.  I thought that was your first job, handling

21  disputes, no?

22      A.  I was a dispute agent when I first got to

23  Experian.  I initiated the ACDVs that were sent to the

24  data furnishers.  I assisted consumers over the

25  telephone and over the mail.  So I did not receive and

JASON SCOTT, APRIL 4, 2013

1  process the responses back from the data furnishers.

2      Q.  Okay.  So you have never held that -- you have

3  never done that?

4      A.  That's never been my primary function.  I'm

5  educated on the policies and procedures and how to

6  respond to them.  If you're asking me have I ever held

7  that job, that would be no.

8      Q.  Okay.  Why don't we get back to Exhibit 3 and

9  turn to the third page there, which would be probably --

10  it's Experian 18, I believe.  Do you see that?

11      A.  I have that.

12      Q.  Okay.  Can you describe this document to me?

13      A.  Certainly.  This is an ACDV generated by

14  Experian sent to Central Financial Control.  It pertains

15  to a dispute by Ms. Jones, indicating that the

16  particular Central Financial Control account number did

17  not belong to her, that it was opened fraudulently in

18  her name.

19      Q.  Okay.  Very good.  The top left-hand corner, it

20  says "Program:  Caprespa."  Do you see that?

21      A.  I do.

22      Q.  What does that mean?

23      A.  I'm not familiar with that abbreviation.  I'm

24  not sure.

25      Q.  Okay.  Below that it gives a subcode.  Is that

JASON SCOTT, APRIL 4, 2013

1    number.  That in itself won't tell me the location of

2    the office.  I would actually have to look up that

3    individual to make that determination, what office they

4    are working out of.

5        Q.  Okay.  Going back up to the top right-hand

6    corner.  It says "Date Sent:  1/20/2011."  Do you see

7    that?

8        A.  I do.

9        Q.  What does that mean?

10       A.  Well, that would indicate that the ACDV was

11   sent to Central Financial Control on January 20, 2011.

12       Q.  Okay.  And then it says a date due of

13   2/27/2011.  Do you see that?

14       A.  Yes, sir, I do.

15       Q.  How was the due date determined?

16       A.  Well, there is a -- a reinvestigation can take

17   between 30 to 45 days.  The difference between 30 or 45

18   days for the due date depends on what type of credit

19   report is being used.  For example, if Ms. Jones

20   requests her yearly free credit report and then submits

21   a dispute based off that information, that dispute would

22   allow 45 days.  If Ms. Jones were to simply contact

23   Experian and purchase a copy of her disclosure and she

24   disputed information off the disclosure she paid for,

25   that would allow 30 days.  So if a consumer requested a

JASON SCOTT, APRIL 4, 2013

1              MR. MALLON:  He's produced here to talk

2     about the investigation, so I'm asking him if that was

3     taken into consideration or if it should have been.

4              MR. STRAZZERI:  How would he know whether

5     something was considered?

6              MR. MALLON:  He can answer the question.

7        Q.   (By Mr. Mallon)  Can you answer the question,

8     Mr. Scott?

9              MR. STRAZZERI:  The question is:  What did

10    the agent consider?  Is that the question?

11             MR. MALLON:  Can you read back the

12    question, please, Reporter?

13             (Record read.)

14             MR. STRAZZERI:  So your question is whether

15    or not the agent had taken that into consideration?

16             MR. MALLON:  Joe, I would like an answer.

17    I would like you to stop with the speaking objection and

18    let him answer the question.

19        Q.   (By Mr. Mallon)  Can you answer the question,

20    Mr. Scott?

21             MR. STRAZZERI:  Objection, form.

22        A.   Well, I'll respond by saying, sir, I can't -- I

23    can't say for certain what the individual who reviewed

24    this specific ACDV in 2011, you know, what they were

25    keying in on.  More weight is given to a Social Security

JASON SCOTT, APRIL 4, 2013

1    inspector or the secret service, several different law

2    enforcement options to get an investigative report for

3    identity theft.

4              When Experian receives a valid identity

5    theft, Experian will block the information that the

6    consumer is stating is fraudulent.  So Experian had not

7    yet received an identity theft from Ms. Jones so the

8    address still was on file and it was considered to be

9    valid.

10        Q.   Okay.  So as long as -- you know, despite the

11   fact that she's claiming this is identity theft, the

12   date of birth is wrong and the address doesn't match the

13   Bronx address that the consumer reported and Experian

14   had on file for a number of years, Experian wouldn't

15   change this information because she didn't send a police

16   report, correct?

17             MR. STRAZZERI:  Objection, form.

18        A.   As a valid identity theft report had not been

19   received by Ms. Jones at the time this ACDV was

20   generated and when Experian received the response back

21   from Central Financial Control, the address was still on

22   file as being a valid address, Experian's policy would

23   have been to process the update.  So the account was

24   updated and Ms. Jones was notified.

25        Q.   (By Mr. Mallon)  And the notification was sent

JASON SCOTT, APRIL 4, 2013

1    60 seconds here?  I'll be right back.  I'll just put you

2    guys on hold.  Is that okay, Joe?

3                  MR. STRAZZERI:  Yeah.  Go off the record.

4                  (Recess taken.)

5        Q.   (By Mr. Mallon)  Mr. Scott, let me ask you a

6    question about Experian's reinvestigation of these two

7    accounts here.  You said the analyst would have looked

8    at this information provided by the furnisher, correct?

9        A.   Yes.

10       Q.   And then analyzed it to see -- based upon

11   Experian's policies and procedures, to see if this

12   account should remain on the consumer report; is that

13   right?

14       A.   Well, in reviewing the ACDV response, the ACDV

15   response agent would look to see what was on file.  For

16   example, if an account had previously been blocked due

17   to identity theft, so we would look to see what's on

18   file and we would take that into consideration.

19       Q.   Okay.  Would they look at things like

20   plaintiff's prior address history to show that she had a

21   consistent history of living in the Bronx for the past

22   10 years or something like that or would that not be

23   relevant?

24                  MR. STRAZZERI:  Objection, form.

25       A.   The agent would really focus in on what had

JASON SCOTT, APRIL 4, 2013

1    been provided by the consumer and what had been provided

2    by the subscriber.

3        Q.   (By Mr. Mallon)  Okay.  So they wouldn't really

4    look at things like that, correct?

5            MR. STRAZZERI:  Objection, form.

6        A.   You know, I can't speak for somebody else and

7    what they would look at, but the Experian policy would

8    direct them to look to see if the address that had been

9    reported by the data furnisher was blocked due to fraud.

10       Q.   (By Mr. Mallon)  Okay.  So Experian's policies

11   would not be to review things like the plaintiff's

12   entire address history to see if this account should

13   remain on her report or not, correct?

14           MR. STRAZZERI:  Objection, form.

15       A.   It's my understanding that the prior history,

16   the prior address history would not come into play if it

17   were not -- if it was not given on this ACDV response.

18       Q.   (By Mr. Mallon)  It wouldn't, in that

19   Experian's policies and procedures wouldn't look at

20   anything about how long the plaintiff had reported fraud

21   in various manners to Experian, correct?

22           MR. STRAZZERI:  Objection, form.

23       A.   In the ACDV response, again, it's really

24   looking at the information provided by the consumer and

25   the information received back from the data furnisher

JASON SCOTT, APRIL 4, 2013

1    information you brought up, allegations or security

2    freezes would be considered beyond what I stated.  It

3    looks for the information on the ACDV and whether that

4    had previously been blocked due to fraud.

5         Q.  (By Mr. Mallon)  Okay.  That's all.  Why don't

6    we look at another ACDV here.  This one would be Page 23

7    in the exhibit and it's another dispute with Central

8    Financial Control.  Let me know if you see that.

9         A.  What is the Bates number?

10        Q.  Bates No. Experian 23.

11        A.  Okay.  I see that.

12        Q.  And this ACDV is dated March 8, 2012, correct?

13        A.  Yes.

14        Q.  Okay.  Again, this is relating to one of the

15   Central Financial Control accounts, correct?

16        A.  That's correct.

17        Q.  And again the plaintiff is claiming she's a

18   victim of identity theft, correct?

19        A.  Yes.

20        Q.  There's also a note that this account was

21   involved in litigation and that she's claimed that she's

22   a victim of identity theft in the litigation; is that

23   correct?

24        A.  Yes, that is what this indicates.

25        Q.  Okay.  And do you know why that notation of

JASON SCOTT, APRIL 4, 2013

1          A.   The data furnisher requested certain data

2     elements to be updated.

3          Q.   (By Mr. Mallon)   And what happened?

4               MR. STRAZZERI:   Objection, form.

5          A.   The updates were processed.

6          Q.   (By Mr. Mallon)   Okay.   And the account

7     remained on Ms. Jones' consumer report, correct?

8               MR. STRAZZERI:   Objection, form.

9          A.   As the response was not a request to delete,

10    then, yes, the account would have remained on file as a

11    result of this contact.

12         Q.   (By Mr. Mallon)   Was Ms. Jones ever provided

13    with notice of the results of this reinvestigation?

14         A.   That I'm not sure.

15         Q.   Do you have any evidence that she was provided

16    with these results?

17         A.   Because this was initiated at the direction of

18    counsel, I'm not sure.

19         Q.   So you don't think she was, correct?

20              MR. STRAZZERI:   Objection,

21    mischaracterizing his testimony.

22         Q.   (By Mr. Mallon)   You can answer.

23         A.   It wasn't as if Ms. Jones had contacted

24    Experian to request this reinvestigation.   It was

25    requested at the direction of counsel.

1    Q.   (By Mr. Mallon)  And that's why she wasn't

2    notified of the results of the reinvestigation, correct?

3             MR. STRAZZERI:  Objection, mischaracterizes

4    his testimony.  Assumes facts.

5    A.   When the investigation results -- or when the

6    investigations or reinvestigations were completed, we

7    would have provided counsel with the results of the

8    reinvestigation that counsel requested.  To the extent

9    that I have no knowledge if Ms. Jones did or did not

10   ever see the investigation results of this contact.

11   Q.   (By Mr. Mallon)  Okay.  That's fine.  And why

12   don't we look at one more document on Exhibit 3, please.

13   Please turn to Page Experian 22, which does not appear

14   to be an ACDV, but a good old-fashioned Consumer Dispute

15   Verification.

16   A.   (Witness complies.)  Yes, sir, I have that.

17   Q.   Okay.  And this is not an ACDV, correct?

18   A.   That is correct.  It was a CDV, a paper

19   version.

20   Q.   Can you tell us what a CDV is?

21   A.   It is the paper version of the ACDV.

22   Q.   Okay.  And does it function essentially the

23   same?

24   A.   That is correct.

25   Q.   It was done manually instead of automated?

JASON SCOTT, APRIL 4, 2013

1    A.   For the -- for the consumer identification

2    given to us by the subscriber, yes.

3    Q.   Okay.  And it looks like they've got a

4    different name for her.   Instead of Keisha Jones,

5    they've got Keshia Jones, K-e-s-h-i-a.  Do you see that?

6    A.   Well, it is a different spelling than what

7    Experian had provided them.

8    Q.   So it's not the same spelling of her name,

9    correct?

10   A.   Correct.

11   Q.   Okay.  And it's got a different address?   It's

12   got an address of 332 West Berkley Street, Philadelphia,

13   Pennsylvania, correct?

14   A.   Yes.

15   Q.   But it looks like they checked the box that the

16   Social Security number and date of birth was the same,

17   correct?

18   A.   Yes.

19   Q.   Okay.  So what does that indicate to Experian?

20   A.   What does what indicate to Experian?

21   Q.   That information on the right, is that --

22   that's telling Experian what information they have on

23   file for the plaintiff?

24   A.   Yes, sir.

25   Q.   Okay.  And then below that, I guess under

JASON SCOTT, APRIL 4, 2013

1    "Verified As Reported," and it's got some actual

2    information about the account.  Do you see that with a

3    balance of $2,956?

4         A.   Correct.

5         Q.   And the dates on the account are January 24,

6    2009, June 23, 2011.  Do you see that?

7         A.   Yes, sir.

8         Q.   Okay.  Then it says, "Special handling.

9    Contact subscriber if info is needed."  Do you see that?

10        A.   I do.

11        Q.   Do you know what that means?

12        A.   Well, everything that you just read in this

13   field is a snapshot of what Experian had on its file at

14   the time.  That comment would have also been displaying

15   at the time this CDV was generated.

16        Q.   And was this -- did Experian to this account

17   then verified by Comcast?

18             MR. STRAZZERI:  Hold on a second.  What was

19   the question?

20        Q.   (By Mr. Mallon)  Did Experian consider this

21   account verified by Comcast?

22        A.   Well, on the CDV the representative for Comcast

23   checked the box "Verified As Reported."

24        Q.   And that's enough for Experian, right?

25             MR. STRAZZERI:  Objection, form.

JASON SCOTT, APRIL 4, 2013

1      A.   No.   Experian analyzes the CDV response as

2   well.

3      Q.   (By Mr. Mallon)   How would they have analyzed

4   the CDV response pursuant to their policies and

5   procedures?

6      A.   When Experian received this response from

7   Comcast, much like in our earlier discussions, it's

8   going to compare what Experian has on file against what

9   was provided.   It's going to look to see if information

10   had been previously blocked due to fraud.   If

11   information that had been provided by the data furnisher

12   was appearing on the consumer disclosure and the request

13   was verified as reported, there would not be any change

14   on this particular account.

15      Q.   And that's what happened here?

16           MR. STRAZZERI:   Objection, form.

17      A.   Can you clarify your comment "That's what

18   happened here?"

19      Q.   (By Mr. Mallon)   Well, the information remained

20   on the consumer -- the plaintiff's consumer report,

21   correct?

22      A.   One second.   Yes.   The account was -- or it

23   remained on file, and it had the consumer statement

24   "Item disputed by consumer."

25      Q.   Right.   And do you know if this account, this

JASON SCOTT, APRIL 4, 2013

1  document.

2      Q.  (By Mr. Mallon)  But sitting here today, do you

3  know if it was Experian's decision or Comcast's decision

4  to remove this account from the plaintiff's consumer

5  report?

6          MR. STRAZZERI:  Objection, form.

7      A.  No, sir, I don't know.

8      Q.  (By Mr. Mallon)  Okay.  And does the same go

9  with the Central Financial Control accounts, which have

10  been removed from the plaintiff's consumer report?

11         MR. STRAZZERI:  Objection, form.

12     A.  And again you're asking if I recall the direct

13  reason?

14     Q.  (By Mr. Mallon)  Just start with even more

15  basic.  Who directed that it be removed?  Was it

16  Experian decided to remove that on its own or did

17  Central Financial Control direct Experian to remove that

18  account?

19         MR. STRAZZERI:  Objection to form.

20     A.  Sitting right now with the documents in front

21  of me, I don't recall.

22     Q.  (By Mr. Mallon)  Is there a document you could

23  look to to obtain that information?

24         MR. STRAZZERI:  Objection, asked and

25  answered.

JASON SCOTT, APRIL 4, 2013

1    educational paragraphs, but not necessarily include a

2    copy of her disclosure.

3        Q.  Okay.  So something was generated on that date?

4        A.  Yes.

5        Q.  Can you tell based on this entry what was

6    generated?

7        A.  You haven't clarified which entry you're

8    referring to, sir.

9        Q.  The first one.

10            MR. STRAZZERI:  Are we talking about 1148?

11            MR. MALLON:  Yes.

12        A.  The first entry, which I consider to be the

13    first entry, is the oldest entry and that was dated

14    August 23rd of 2002.

15        Q.  (By Mr. Mallon)  Still on the first page?  Is

16    that on Page 1148?

17        A.  Yes, sir, it is.

18        Q.  Okay.  I see that.  And what does -- what does

19    the oldest entry say there?

20        A.  Well, on this date Experian added an initial

21    security alert and also provided Ms. Jones with a copy

22    of her consumer disclosure free of charge due to her

23    allegedly being a victim of identity theft.

24        Q.  Okay.  Does this indicate to you that Ms. Jones

25    notified Experian as early as August of 2002 that she

1    because she stated that she could be a victim of

2    identity theft.

3        Q.   Okay.  So, again, my prior question was:  Does

4    this indicate that as early as August 2002 Ms. Jones

5    notified Experian that she might be a victim of identity

6    theft?

7             MR. STRAZZERI:  Objection to form.  The

8    document states, speaks for itself.

9        A.   Sir, I see the code that you're referring to,

10   but below that I see more specific information

11   indicating that a security alert was added because it

12   was requested, and because it was requested, we sent a

13   free copy of a disclosure.

14       Q.   (By Mr. Mallon)  Okay.  And then the entry

15   above that is December 29, 2002.  Do you see that?

16       A.   I do.

17       Q.   What is that entry for?

18       A.   An initial security alert was requested.

19   Experian added the alert and again sent Ms. Jones a

20   complimentary copy of her Experian disclosure.

21       Q.   Okay.  The next entry is June 18, 2004.  I'm

22   sorry.  I'm missing one.  The next entry is June 10,

23   2003.  What is that for?

24       A.   Well, on June 9th, Experian received a request

25   from Ms. Jones requesting a free copy of her credit

JASON SCOTT, APRIL 4, 2013

1    amount of time.  They're typically broken down to cover

2    different amounts of time.

3         Q.   Right.

4         A.   So this was not generated on 2007.  It would

5    just cover the date ending August 20, 2007.

6         Q.   Okay.  Can you tell me what a DR log discloses?

7         A.   The DR log, that will give you a variety of

8    information.  It will show reinvestigations; it will

9    show paragraphs that might have been sent to the

10   consumer; it will show different remarks, internal

11   remarks, external remarks sent to Ms. Jones; how often

12   she requested a security alert; if a security freeze is

13   added.  It just covers a lot more information that the

14   disclosure log would not contain.

15        Q.   Okay.  Why don't we move on to Page 1156.

16   About halfway down the page there's a entry dated, a

17   stamped date of March 18, 2005.  Do you see that?

18        A.   Yes.  I see several contacts with that stamp

19   date.

20        Q.   Sure.  There's one regarding an HSBC/tax.  Do

21   you see that one?

22        A.   I see an address, but that was associated with

23   HSBC/tax.

24        Q.   Okay.  Does this entry indicate that that

25   address was deleted?

1      A.   Yes.   7610 Gilbert Street in Philadelphia was

2    deleted on that date.

3      Q.   Does this indicate why it was deleted?

4      A.   It was -- the allegation of the account, the

5    address did not belong to Ms. Jones.

6      Q.   Okay.   Below that it looks like we've got

7    another deleted address dated the same date.   Do you see

8    that?

9      A.   Yes, sir.

10      Q.   For the 7209 Devon Street in Philadelphia,

11    Pennsylvania?

12      A.   Yes.   That was soft deleted.

13      Q.   Why was it deleted?

14      A.   Again, the allegation that the address did not

15    belong to her.

16      Q.   Okay.   And understanding that Ms. Jones alleged

17    that.   But we know that that doesn't mean that

18    Experian's automatically going to remove the address,

19    correct?

20      A.   Well, pursuant to Experian's policies and

21    procedures, it can remove an address without an identity

22    theft report, so in this instance the addresses were

23    soft deleted.

24      Q.   Okay.   Do you know does this indicate if

25    Experian did any reinvestigation regarding those

JASON SCOTT, APRIL 4, 2013

1    2005.

2        Q.   (By Mr. Mallon)   Okay.   And as a result of

3    that, a driver's license was deleted from her consumer

4    report; is that correct?

5        A.   That is what this indicates, yes.

6        Q.   Okay.   Are driver's license numbers typically

7    reported on Experian consumer reports?

8        A.   Speaking from my personal history, I have not

9    seen many instances of a driver's license appearing on a

10   consumer disclosure.

11       Q.   Okay.   Why don't we go to Page 1159.   The entry

12   at the very top of the page dated February 18, 2005,

13   this indicates that the plaintiff here put a fraud

14   victim alert on her report?

15       A.   It would indicate that an extended security

16   alert was added to her file.   Who made the request,

17   whether it was Ms. Jones directly or another CRA, this

18   entry does not disclose that.

19       Q.   Okay.   But it was added to her file?

20       A.   Correct.

21            MR. STRAZZERI:   Whenever is a good stopping

22   point, I'd like to take a five-minute break?

23            MR. MALLON:   Yeah.   How long do you --

24            MR. STRAZZERI:   Just five minutes or so.

25            MR. MALLON:   Okay.   Let's take five minutes

JASON SCOTT, APRIL 4, 2013

1      A.  Yes, sir.

2      Q.  Do you know why it was sent to that address?

3      A.  Well, this item was investigated because of a

4   phone call.  She could have indicated that the P.O. Box

5   in the Bronx was her mailing address that she desired to

6   have her mail sent to.

7      Q.  Okay.  When a consumer calls in, I assume you

8   need certain information from them to verify that it's

9   actually the consumer calling, correct?

10     A.  Correct.  They would need to verify their name,

11  their mailing address, Social Security number, and date

12  of birth.

13     Q.  Well, how do you know that their mailing

14  address is correct?  What do you compare that to?

15     A.  For example, like the phone call that we're

16  describing, we can ask and request that verification.

17     Q.  Okay.  So you'll ask them what their mailing

18  address is, correct?

19     A.  Well, on a phone call like we're describing,

20  yes.

21     Q.  Okay.  And how would you -- what will you

22  compare it to in the file to make sure that that address

23  is correct?

24              MR. STRAZZERI:  Objection, form.

25     Q.  (By Mr. Mallon)  Does Experian have an address

1    what one might consider traditional consumer statements.

2    It's alerting her that she does have an extended fraud

3    alert on her file valid for seven years and also her

4    file has been frozen due to the security freeze she

5    requested.

6        Q.   So this indicates to you that her file was

7    frozen at this point in time, correct?

8        A.   Yes, that's correct.

9        Q.   Do you know when her file was frozen?

10       A.   One moment.  Let me go back to Exhibit 5.  It

11   appears that her file was frozen as of November 17,

12   2006.

13       Q.   November?  And where did you get that from?

14       A.   Bates 1150.

15       Q.   1150.  What part of the page is that on?

16       A.   The second entry from the top, you'll see

17   "Letter Paragraphs:  Freeze confirmation letter."

18       Q.   Just give me a second here.  Okay.  It says

19   "Freeze confirmation letter.  New York freeze notice of

20   rights process," right?

21       A.   Yes, sir.

22       Q.   Does that indicate to you that she placed a

23   security freeze pursuant to New York law, right?

24       A.   Yes, sir.

25       Q.   Okay.  Do you know what a security freeze is